## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JKN Universe, LLC,<br><br>       Plaintiff,<br><br>  v.<br><br>VVV Global Ent. LLC,<br><br>       Defendant. | Civil Action No. 1:25-CV-8234<br><br>Judge Lewis J. Liman<br><br><br>**DEFENDANT VVV GLOBAL ENT. LLC'S ANSWER TO PLAINTIFF'S COMPLAINT; COUNTERCLAIM; AND THIRD-PARTY COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| VVV Global Ent. LLC,<br><br>       Counterclaim Plaintiff/Third-Party Plaintiff,<br><br>  v.<br><br>JKN Universe, LLC, d/b/a The Miss Universe Organization<br><br>       Counterclaim Defendant,<br><br>  and<br><br>Legacy Holding Group USA, Inc,<br><br>  and<br><br>Raúl Rocha Cantú,<br><br>  and<br><br>BDE Miss USA, LLC,<br><br>  and<br><br>Thom Brodeur,<br><br>       Third-Party Defendants. | |

<u>**DEFENDANT VVV GLOBAL ENT. LLC'S ANSWER TO PLAINTIFF'S COMPLAINT;**</u>
<u>**COUNTERCLAIM; AND THIRD-PARTY COMPLAINT**</u>

Defendant VVV Global Ent. LLC ("VVV"), through counsel, for its answer to Plaintiff JKN Universe, LLC ("JKN")'s Complaint, states as follows. Defendant denies each allegation, statement, matter, and thing contained in Plaintiff's Complaint except as is hereinafter expressly admitted or alleged.

**ALLEGATIONS CAPTIONED:** <u>**"PRELIMINARY STATEMENT"**</u>

1.      This action presents the Court with a straightforward dispute. Beginning in 2023, JKN and VVV entered into a Management Agreement whereby JKN granted VVV a license to manage Miss USA and Miss Teen USA pageants throughout the United States. A material term of their agreement required that VVV manage the pageants in such a way that would not bring the brand into disrepute. VVV failed to do so and has been the subject of various news articles and complaints that cast JKN in a bad light. JKN endeavored to salvage the parties' business relationship to no avail and accordingly was constrained to seek relief in this forum for damages in excess of $75,000.00.

**ANSWER:**    The allegations set forth in paragraph 1 of the Complaint characterize the Complaint and the Management Agreement, which speak for themselves. The allegation that classifies a term of JKN and VVV's agreement as a "material term" is a legal conclusion for which no response is necessary. VVV denies the remaining allegations in Paragraph 1 of the Complaint. To the extent any allegations in this paragraph allege wrongdoing by VVV, such allegations are expressly denied.

## ALLEGATIONS CAPTIONED: "PARTIES"

2.      Plaintiff JKN is a Delaware limited liability company with one member, JKN Legacy, Inc. JKN Legacy, Inc. is a Delaware corporation with its principal place of business located at No. 251 Little Falls Drive, Wilmington, DE 19808.

**ANSWER:**    This paragraph does not assert an allegation against VVV and therefore no response is required. To the extent an answer is required, on information and belief, VVV admits the allegations in paragraph 2 of the Complaint.

3.      Defendant VVV is a Florida limited liability company with offices at 5011 Ocean Boulevard, Suite 305, Sarasota, Florida 34242. Based on information and belief, VVV has one member, Laylah Loiczly. Ms. Loiczly is a resident of Sarasota County, Florida.

**ANSWER:**    VVV admits that it is a Florida limited liability company. VVV denies that it has offices at 5011 Ocean Boulevard, Suite 305, Sarasota, Florida 34242. VVV avers that the Ocean Boulevard address is the address for its statutory agent. VVV admits the remaining allegations in paragraph 3 of the Complaint.

## ALLEGATIONS CAPTIONED: "JURISDICTION AND VENUE"

4.      This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) (diversity) because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds the sum or value of $75,000.

**ANSWER:**    The allegation in paragraph 4 of the Complaint regarding the conclusion that there is jurisdiction over this action states a legal conclusion to which no response is required. To the extent an answer is required, VVV does not dispute that this Court has subject-matter jurisdiction over this action. VVV denies that JKN is entitled to any relief.

5.      This Court has personal jurisdiction because VVV consented to jurisdiction in this forum as set forth in Section 4.06 of Management Agreement and, on information and belief, VVV transacted business in New York from which this claim arises.

**ANSWER:**    The allegation in paragraph 5 of the Complaint regarding the conclusion that there is personal jurisdiction over VVV states a legal conclusion to which no response is required. To the extent an answer is required, VVV does not dispute that it is subject to this Court's jurisdiction. VVV further avers that Section 4.06 of the Management Agreement speaks for itself, and VVV denies any allegations in paragraph 5 of the Complaint that are inconsistent with the Management Agreement.

6.      Venue is proper in this judicial district because it is where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred. See 28 U.S.C. § 1391(b).

**ANSWER:**    The allegation in paragraph 6 of the Complaint regarding the conclusion that venue is proper in this judicial district states a legal conclusion to which no response is required. To the extent an answer is required, VVV does not dispute the propriety of venue in this district.

7.      Venue is also proper in this judicial district because the Parties consented to litigation in this forum pursuant to Section 4.06 of the Management Agreement.

**ANSWER:**    The allegation in paragraph 7 of the Complaint regarding the conclusion that venue is proper in this judicial district states a legal conclusion to which no response is required. To the extent an answer is required, VVV does not dispute the propriety of venue in this district. VVV further avers that Section 4.06 of the Management Agreement speaks for itself, and VVV denies any allegations in paragraph 5 of the Complaint that are inconsistent with the Management Agreement.

**ALLEGATIONS CAPTIONED: "GENERAL ALLEGATIONS"**

8.      JKN owns a proprietary system for conducting the world-renowned annual beauty and communication skills pageants known as the Miss USA and Miss Teen USA pageants.

**ANSWER:**     This paragraph does not assert an allegation against VVV and therefore no response is required. To the extent a response is required, VVV admits the allegations in paragraph 8 of the Complaint.

9.      On July 28, 2023, JKN entered into a Management Agreement with VVV (the "Management Agreement") whereby JKN engaged VVV "to assume the operations, direction, management and supervision" of the Miss USA and Miss Teen USA pageants. Attached hereto as Exhibit 1 is a true and correct copy of the Management Agreement.

**ANSWER:**    VVV admits that it entered into a July 28, 2023 Management Agreement with JKN. VVV avers that the Management Agreement speaks for itself and VVV denies any allegations in paragraph 9 of the Complaint that are inconsistent with the Management Agreement.

10.      Pursuant to Section 1.02 of the Management Agreement, VVV had the right to "all profits" and the obligation to "pay when due all expenses" relating to the pageants.

**ANSWER:**    VVV avers that Section 1.02 of the Management Agreement speaks for itself and VVV denies any allegations in paragraph 10 of the Complaint that are inconsistent with the Management Agreement.

11.      Pursuant to the Management Agreement, VVV also "agree[d] to provide and maintain in full force and effect, at [VVV's] sole expense" certain minimum liability insurance as set forth in Section 1.05.

**ANSWER:**    VVV avers that Section 1.05 of the Management Agreement speaks for itself and VVV denies any allegations in paragraph 11 of the Complaint that are inconsistent with the Management Agreement.

12.    Among other things, VVV was required to "operate the [Miss USA and Miss Teen USA pageants] in accordance with the operating standards developed by" JKN and "maintain in full force and effect all necessary licenses and permits." Exhibit 1 at § 1.02(a) & (c).

**ANSWER:**    VVV avers that Sections 1.02(a) and (c) of the Management Agreement speak for themselves and VVV denies any allegations in paragraph 12 of the Complaint that are inconsistent with the Management Agreement.

13.    In exchange for the license to operate the Miss USA and Miss Teen USA pageants, VVV was obligated to pay an initial fee of $255,137.00 and subsequent annual fee(s) of $375,000.00. Exhibit 1 at § 2.01.

**ANSWER:**    VVV avers that Section 2.01 of the Management Agreement speaks for itself and VVV denies any allegations in paragraph 13 of the Complaint that are inconsistent with the Management Agreement.

14.    Section 3.02(iv) of the Management Agreement states that JKN may terminate the Agreement upon thirty days' prior written notice if:

> Manager's improper action(s) or inaction(s), as the case may be, results in any situation or occurrence which subjects Manager to public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency in our reasonable and good faith opinion.

**ANSWER:**    VVV avers that Section 3.02(iv) of the Management Agreement speaks for itself and VVV denies any allegations in paragraph 14 of the Complaint that are inconsistent with the Management Agreement.

**Allegations Captioned:** *"VVV's Mismanagement Under the Management Agreement"*

15.     Based on information and belief, VVV appointed Ms. Loiczly, also known as Laylah Rose, as CEO, President, and director of the Miss USA and Miss Teen USA pageants.

**ANSWER:**     VVV admits the allegations in paragraph 15 of the Complaint.

16.     Based on information and belief, VVV engaged a production company to assist in securing a major network deal to televise the pageants and hired the production company's Executive Producer as Director of Operations for Miss USA 2023, but failed to pay the production company or Executive Producer for its services.

**ANSWER:**     VVV admits that it engaged a production company. VVV denies the remaining allegations in paragraph 16 of the Complaint.

17.     VVV entered into a Production Agreement with RB Entertainment, Inc. in or about September 2023 for the production of two programs for broadcast, entitled "MISS USA" and "MISS TEEN USA," but despite services rendered, VVV failed to pay amounts owed to RB Entertainment, Inc. in excess of $2,000,000.00. Based upon information and belief, it was not until after RB Entertainment, Inc. initiated a lawsuit against VVV that VVV issued payment.

**ANSWER:**     VVV admits that it entered into an agreement with RB Entertainment, Inc., in or about September of 2023 for the production of two programs for broadcast in 2023. VVV denies the remaining allegations in paragraph 17 of the Complaint. VVV avers that RB Entertainment, Inc., was paid in full for the 2023 agreement referenced in Paragraph 17.

18.     In addition to securing broadcasting for the pageants, the Management Agreement required VVV to issue invoices and send payments to pageant winners, pageant partners, and all other parties Miss USA contracted with for purposes of presenting the pageants.

**ANSWER:**    VVV avers that the Management Agreement speaks for itself, and VVV denies any allegations in paragraph 18 of the Complaint that are inconsistent with the Management Agreement.

19.    In 2023, VVV issued letters to certain State Directors demanding that they not conduct pageants. Based on information and belief, these demand letters were issued by VVV as a result of its failure to obtain or maintain the required licenses.

**ANSWER:**    VVV admits that it issued a letter to certain state directors in 2023. VVV denies the remaining allegations in paragraph 19 of the Complaint. VVV avers that the letters referred to in paragraph 19 of the Complaint were approved by JKN prior to being sent to the state directors. VVV further avers that the sole entity legally capable of and responsible for obtaining and maintaining the state director licenses in 2023 was JKN, and that JKN failed to fulfill those obligations in breach of the Management Agreement.

20.    VVV additionally failed to file franchise disclosure documents for franchises operating in the U.S. which resulted in undue delays in operating various pageant events, monetary losses, miscommunications with pageant partners, and harm to the Miss USA and Miss Teen USA brands.

**ANSWER:**    VVV denies the allegations in paragraph 20 of the Complaint. VVV avers that JKN was the sole entity legally capable of and responsible for obtaining, maintaining, distributing, and/or "filing" the franchise disclosure documents for franchises of the Miss Universe Organization in 2023.

**Allegations Captioned:** ***"JKN's Effort to Correct VVV's Mismanagement"***

21.    In 2024, JKN made clear that all management issues regarding the Miss USA and Miss Teen USA pageants would be handled by VVV. Indeed, upon learning of the multiple failures

in VVV's management and operation of the Miss USA and Miss Teen USA pageants, JKN entered into a Settlement Agreement with VVV, dated March 1, 2024 (the "Settlement Agreement"), that amended certain terms of the Management Agreement. JKN entered into the Settlement Agreement in hopes that the additional terms would correct and alleviate the management issues it was aware of at the time of executing the Settlement Agreement. Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the Settlement Agreement.

**ANSWER:**   VVV admits that it entered a March 1, 2024 Settlement Agreement with JKN. VVV avers that the Settlement Agreement speaks for itself and VVV denies all allegations in paragraph 21 of the Complaint that are inconsistent with the Settlement Agreement. VVV denies the remaining allegations in paragraph 21 of the Complaint. VVV further avers that the Settlement Agreement was entered into in large part to resolve disputes arising from JKN's breaches of the Management Agreement.

22.   The Settlement Agreement implemented "Rules of Engagement," reiterated VVV's obligation to collect and issue payments, and confirmed "[f]or the avoidance of doubt . . . the Management Agreement as amended remains in full force and effect." Exhibit 2 at § 13.

**ANSWER:**   VVV avers that the Settlement Agreement speaks for itself, and VVV denies all allegations in paragraph 22 of the Complaint that are inconsistent with the Settlement Agreement.

23.   Not long after executing the Settlement Agreement, JKN learned of distinct management concerns relating to VVV's treatment of pageant winners.

**ANSWER:**   VVV denies that its treatment of pageant winners was anything other than professional and denies that its interactions with pageant winners presented cause for "concern."

VVV is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 23 of the Complaint, and therefore, VVV denies the same.

**Allegations Captioned:** ***"VVV's Mistreatment of Pageant Titleholders"***

24.     In May 2024, Miss USA 2023 Noelia Voigt resigned from her position alleging the mismanagement and harassment she experienced from Ms. Loiczly.

**ANSWER:**    VVV admits that in May 2024, Miss USA 2023 Noelia Voigt resigned from her position. VVV denies the remaining allegations in paragraph 24 of the Complaint. VVV specifically denies any alleged wrongdoing by VVV and/or Ms. Loiczly.

25.     Specifically, in her resignation letter, Ms. Voigt maintains: "[t]here is a toxic work environment . . . that, at best, is poor management and, at worst, is bullying and harassment." According to Ms. Voigt, "[Ms. Loiczly] was generally inaccessible for communication" and Ms. Voigt "would have to follow up multiple times to get a response from [Ms. Loiczly] (sometimes as late as a month later)." Ms. Voigt stated that Ms. Loiczly's communications to Ms. Voigt were "often cold and unnecessarily aggressive" and "accusatory." According to Ms. Voigt, Ms. Loiczly even "threatened . . . disciplinary action, including taking away [Ms. Voigt's] salary."

**ANSWER:**    Paragraph 25 of the Complaint purports to set forth allegations in a document that is not attached to the Complaint. VVV avers that any such document speaks for itself. VVV denies the allegations purportedly set forth in the document referenced to in paragraph 25 of the Complaint.

26.     Based on Ms. Voigt's resignation letter, VVV selected ineffective chaperones and traveling companions, and at times, neglected to provide a chaperone or companion at all, despite VVV's contractual obligations to do so.

**ANSWER:**    Paragraph 26 of the Complaint purports to set forth allegations in a document that is not attached to the Complaint. VVV avers that any such document speaks for itself. VVV denies the allegations in paragraph 26 of the Complaint.  The final sentence of paragraph 26 of the Complaint sets forth a legal conclusion to which no response is required.  To the extent a response is required, VVV states that the Settlement Agreement speaks for itself, and denies all allegations set forth in paragraph 26 of the Complaint that are inconsistent with the Settlement Agreement.

27.    Based on information and belief, VVV did not prepare Ms. Voigt for the Miss Universe pageant or provide her with the required national costume.

**ANSWER:**    VVV denies the allegations in paragraph 27 of the Complaint. VVV avers that Ms. Voigt declined to wear the national costume VVV provided. Ms. Voigt declined to use VVV's partners and sponsors for preparation for the Miss Universe pageant.

28.    Based on information and belief, VVV did not provide pageant winners with the necessary tax documents in a timely manner or at all.

**ANSWER:**    VVV denies the allegations in paragraph 28 of the Complaint.

29.    Despite Ms. Voigt's resignation and move out of the apartment designated for her by Miss USA as part of the terms of her tenure, VVV failed to continue making rental payments or otherwise terminate the lease such that the residential property issued a Three Days Notice letter, that if the outstanding rent owed was not paid, it would result in the initiation of eviction proceedings. Ms. Loiczly did not respond to JKN's query for an explanation.

**ANSWER:**    VVV admits that Ms. Voigt resigned and moved out of the apartment designated for her. VVV avers that the apartment was then used by the runner-up who became Miss USA upon Ms. Voigt's resignation. VVV admits that the property in question issued a three-

day notice letter. VVV avers that the letter was sent to Ms. Voigt, long after she had moved out, and that it was sent in error, as VVV had paid over $11,000 to buy out the remainder of the lease two weeks prior the issuance of the letter. VVV denies the remaining allegations in paragraph 29 of the Complaint.

30.     Also in May 2024, Miss Teen USA 2023 Uma Sofia Srivastava resigned from her position as a result of VVV's mismanagement. According to Ms. Srivastava, her interactions with Ms. Loiczly were "degrading, aggressive, and made [Ms. Srivastava] feel silenced."

**ANSWER:**     VVV is without knowledge or information sufficient to form a belief as to the source or accuracy of the alleged statement made by Ms. Srivastava set forth in paragraph 30 of the Complaint, and therefore, VVV denies the allegation. Further answering, VVV denies the allegations in paragraph 30 of the Complaint, and VVV denies that VVV or Ms. Loiczly's interactions with Ms. Srivastava were anything other than professional and appropriate.

31.     Based on information and belief, despite multiple requests, VVV did not pay, or unduly delayed in paying, scholarship money owed to Ms. Srivastava.

**ANSWER:**     VVV denies the allegations in paragraph 31 of the Complaint.

32.     Despite these public resignations, which led to several news articles and inquiries about VVV's mismanagement, VVV did not change the way it managed the pageants.

**ANSWER:**     VVV denies the allegation of mismanagement set forth in paragraph 32 of the Complaint and therefore denies the remaining allegations in paragraph 32 of the Complaint.

33.     On or about October 2024, JKN began learning of VVV's continued poor treatment of contestants and pageant winners that was not in line with JKN's expectations.

**ANSWER:**    VVV denies the allegation of poor treatment of contestants and pageant winners set forth in paragraph 33 of the Complaint and therefore denies the remaining allegations in paragraph 33 of the Complaint.

34.    In 2024, Ms. Alma Cooper was announced the winner of the Miss USA pageant, becoming the first active member of the armed forces to wear the crown. Ms. Cooper would earn an annual guaranteed compensation of $100,000.00 for serving as Miss USA.

**ANSWER:**    VVV admits that in 2024, Ms. Alma Cooper was announced as the winner of the Miss USA pageant. Upon information and belief, VVV admits that Ms. Alma Cooper was the first active member of the armed forces to wear the Miss USA crown. VVV denies the remaining allegations in paragraph 34 of the Complaint. VVV avers that it met with Army officials about this issue and the Army would not permit Ms. Cooper, as an active service member, to accept an outside salary.

35.    Just five days before Ms. Cooper was to board a plane to Mexico City for purposes of participating in the Miss Universe pageant as Miss USA, Ms. Cooper reported to JKN that her country costume was still not complete as a result of VVV's negligence. Ms. Cooper also inquired as to how to pay for overweight luggage fees and whether she was limited to a certain number of suitcases when travelling to the Miss Universe pageant—questions that had previously gone unanswered by Ms. Loiczly. JKN promptly responded to Ms. Cooper and separately communicated to Ms. Loiczly that VVV needed to confirm in writing that it would pay for Ms. Cooper's luggage fees. JKN also instructed that a delegate manager should handle further communications with Ms. Cooper as it seemed that Ms. Loiczly was refusing to do so effectively.

**ANSWER:**    VVV is without knowledge or information sufficient to form a belief as to the allegations in paragraph 35 of the Complaint that relate to alleged communications between

Ms. Cooper and JKN, and therefore, VVV denies the same. VVV denies any allegations of negligence in paragraph 35 of the Complaint.

36.    As Manager, VVV was responsible for issuing payment to pageant winners. As of June 2025, VVV has not paid Alma Cooper for rendering services as Miss USA nor has VVV reimbursed Ms. Cooper for expenses associated with rendering such services.

**ANSWER:**    To the extent that paragraph 36 of the Complaint refers to contractual obligations set forth in the Management Agreement, VVV states that the Management Agreement speaks for itself, and VVV denies any allegations in paragraph 36 of the Complaint that are inconsistent with the Management Agreement. VVV further avers that the Army would not permit Ms. Cooper, an active service member, to receive an outside salary. Accordingly, VVV admits Ms. Cooper received no salary but denies that was wrongful or a violation of the Management Agreement. VVV further avers that Ms. Cooper was reimbursed for all expenses for which she submitted receipts to VVV.

37.    Rather than honor the esteemed Miss USA winner, VVV exacerbated its failure to pay by ignoring collection attempts from Ms. Cooper's agent or otherwise claiming harassment in response to receiving a single invoice of non-payment.

**ANSWER:**    VVV denies the allegations in paragraph 37 of the Complaint

**Allegations Captioned:** *"VVV's Mismanagement Spreads and JKN Terminates Agreement"*

38.    In March 2025, a long-standing partner to the Miss USA pageants expressed to JKN "the reputation and integrity of the Miss USA and Miss Teen USA Brand [is] at serious risk" as a result of "ongoing communication challenges with Laylah Rose."

**ANSWER:**    VVV is without knowledge or information sufficient to form a belief as to the allegations in paragraph 38 of the Complaint, and therefore, VVV denies the same. VVV denies

that its management or Ms. Loiczly's communication negatively affected the reputation of the Miss USA and Miss Teen USA brands or that there were ongoing communications challenges. VVV avers that JKN's interference with VVV's management and JKN's own mismanagement damaged the Miss USA and Miss Teen USA brands, as well as VVV's and Ms. Loiczly's reputations.

39.    Based on information and belief, VVV unduly delayed in paying or failed to pay amounts owed to various vendors and partners to the Miss USA and Miss Teen USA pageants.

**ANSWER:**    VVV denies the allegations in paragraph 39 of the Complaint.

40.    Additionally, despite VVV's obligation to maintain liability insurance, VVV did not provide proof of insurance to JKN.

**ANSWER:**    VVV denies the allegations in paragraph 40 of the Complaint.

41.    On July 17, 2025, JKN issued to VVV a termination letter, entitled Termination of Management Relationship, that identified eight separate bases for termination of the Management Agreement.

**ANSWER:**    VVV admits that it received a letter from JKN dated July 17, 2025. VVV avers that the July 17 letter speaks for itself. VVV denies the remaining allegations in paragraph 41 of the Complaint. VVV denies the existence of any valid grounds for JKN to terminate the Management Agreement.

42.    Despite receiving the termination letter, VVV's mismanagement and breach of the Management Agreement continued. On or about August 9, 2025, JKN became aware of VVV's failure to issue a $10,000 Teen USA Scholarship to Miss Teen USA 2024 Addie Carver. Despite attempts by Ms. Carver's agent to resolve this issue with VVV's Ms. Loiczly since February 2025, Ms. Loiczly failed to meaningfully respond.

**ANSWER:**    VVV denies the allegations in paragraph 42 of the Complaint.

43.    Based on information and belief from State Directors, the Miss USA and Miss Teen USA brands have been substantially tarnished by the apparent actions and/or inactions of Ms. Loiczly and VVV. In light of public accusations made against VVV and Ms. Loiczly, various State-Level Pageants experienced a drop in the number of contestants, resulting in a significant monetary losses.

**ANSWER:**    VVV denies that the Miss USA and Miss Teen USA brands have been tarnished by the actions or inactions of Ms. Loiczly or VVV. VVV is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 43 of the Complaint, and therefore, VVV denies the same. VVV avers that if the state pageants experienced a drop in the number of contestants, it may be due to JKN's delay in issuing franchise disclosure documents and subsequent state license agreements, giving state directors a much shorter time to operate under a license and recruit contestants.

44.    In addition to the decreased number of contestants, JKN has been unable to secure a U.S. broadcaster to air or stream the Miss USA and Miss Teen USA pageants in English in light of the public scandals and various publications pointing to or referencing VVV's and Ms. Loizcly's mismanagement.

**ANSWER:**    VVV denies mismanagement on the part of VVV or Ms. Loizcly. VVV is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 44 of the Complaint, and therefore, VVV denies the same. VVV avers that it secured a four-year deal with a U.S. broadcaster to air the Miss USA and Miss Teen USA pageants in English (Miss Teen USA had never before been broadcast). VVV is without knowledge as to the reason that JKN, BDE, or Brodeur was unable to accomplish what VVV was able to do.

45.    VVV's failure to satisfy its obligations under the Management Agreement and the Settlement Agreement has accordingly caused JKN actual damage and damage to its brand and reputation, in an amount exceeding $75,000.00, which will be determined at trial.

**ANSWER:**    VVV denies the allegations in paragraph 45 of the Complaint.

### ALLEGATIONS CAPTIONED: "FIRST CAUSE OF ACTION
### (Breach of Management Agreement)"

46.    JKN realleges and incorporates by reference the allegations set forth in the preceding paragraphs 1 – 45 as if fully rewritten herein.

**ANSWER:**    VVV incorporates by reference as if fully set forth herein, its responses to the allegations contained in paragraphs 1 through 45 of the Complaint.

47.    On July 28, 2023, JKN and VVV entered into the Management Agreement (Exhibit 1).

**ANSWER:**    VVV admits that it entered into a July 29, 2023 Management Agreement. VVV avers that the Management Agreement speaks for itself and VVV denies any allegations in paragraph 47 of the Complaint that are inconsistent with the Management Agreement.

48.    The Management Agreement provides, in pertinent part, that:

    a.    VVV shall "operate the Business in accordance with the operating standards developed by" JKN and "maintain in full force and effect all necessary licenses and permits" (Section 1.02(a));

    b.    VVV shall "maintain in full force and effect all necessary licenses and permits" (Section 1.02(c));

    c.    VVV "agrees to provide and maintain in full force and effect, at [VVV's] sole expense, the following minimum insurance coverages" as prescribed in Section 1.05; and

    d.   JKN may terminate if VVV's "improper action(s) or inaction(s), as the case may be, results in any situation or occurrence which subjects Manager to public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency in our reasonable and good faith opinion" (Section 3.02(iv)).

**ANSWER:**    VVV avers that the Management Agreement speaks for itself and VVV denies any allegations in paragraph 48 of the Complaint that are inconsistent with the Management Agreement.

49.    JKN performed all of its obligations under the Management Agreement except those conditions, covenants and obligations excused by VVV's breach.

**ANSWER:**    VVV denies the allegations in paragraph 49 of the Complaint.

50.    Defendant VVV materially breached its obligations under the Management Agreement by:

    a.   Creating a toxic work environment for pageant winners, staff, and volunteers;

    b.   Failing to maintain or provide proof of maintaining liability insurance;

    c.   Failing to maintain necessary licenses during all relevant times;

    d.   Failing to pay vendors and partners who provided services in support of the Miss USA and Miss Teen USA pageants or otherwise pay fees in accordance with the Management Agreement;

    e.   Failing to pay scholarship monies to Ms. Srivastava and Ms. Carver;

    f.   Failing to pay Ms. Cooper's salary; and

    g.   Failing to reimburse expenses.

**ANSWER:**    VVV denies the allegations in paragraph 50 of the Complaint.

51.    As a direct and proximate result of Defendant VVV's breach, JKN has been damaged in an amount not yet ascertained and that is continuing, but that is substantially in excess of the jurisdictional minimum of this Court.

**ANSWER:**    VVV denies the allegations in paragraph 51 of the Complaint.

**ALLEGATIONS CAPTIONED: "SECOND CAUSE OF ACTION**
**(Breach of Settlement Agreement)"**

52.    JKN realleges and incorporates by reference the allegations set forth in the preceding paragraphs 1 – 51 as if fully rewritten herein.

**ANSWER:**    VVV incorporates by reference as if fully set forth herein, its responses to the allegations contained in paragraphs 1 through 51 of the Complaint.

53.    On March 1, 2024, JKN and VVV entered into the Settlement Agreement (Exhibit 2).

**ANSWER:**    VVV admits that it entered into a March 1, 2024 Settlement Agreement with JKN.  VVV avers that the Settlement Agreement speaks for itself and VVV denies any allegations in paragraph 53 of the Complaint that are inconsistent with the Settlement Agreement.

54.    The Settlement Agreement provides, in pertinent part, that:

    a.  VVV "will remit the license fee due under the Management Agreement" (Section 2(c));

    b.  "The Parties agree to comply with the communication standards set forth on Exhibit A to this Agreement" (Section 3);

    c.  "Each party . . . must respond substantively to each request from the other party within 48 hours of receipt of an email or other written request for information or within 48 hours of receipt of the request" (Exhibit A-1); and

d.  VVV "is responsible for the expenses of a titleholder and also receives full revenue from endorsements or appearances the titleholder might execute. That requires housing, salary, and reimbursement of travel and other expenses for all appearances." (Exhibit A-2).

**ANSWER:**    VVV avers that the Settlement Agreement speaks for itself and VVV denies any allegations in paragraph 54 of the Complaint that are inconsistent with the Settlement Agreement.

55.    JKN performed all of its obligations under the Settlement Agreement except those conditions, covenants and obligations excused by VVV's breach.

**ANSWER:**    VVV denies the allegations in paragraph 55 of the Complaint.

56.    Defendant VVV materially breached its obligations under the Settlement Agreement by:

a.  Failing to respond to JKN's written requests, or to respond in a timely manner; and

b.  Failing to pay titleholders and/or reimburse titleholder expenses, or otherwise pay fees in accordance with the Settlement Agreement.

**ANSWER:**    VVV denies the allegations in paragraph 56 of the Complaint.

57.    As a direct and proximate result of Defendant VVV's breach, JKN has been damaged in an amount not yet ascertained and that is continuing, but that is substantially in excess of the jurisdictional minimum of this Court.

**ANSWER:**    VVV denies the allegations in paragraph 57 of the Complaint.

**ALLEGATIONS CAPTIONED: "THIRD CAUSE OF ACTION**
**(Breach of Implied Covenant)"**

58.    JKN realleges and incorporates by reference the allegations set forth in the preceding paragraphs 1 – 57 as if fully rewritten herein.

**ANSWER:** VVV incorporates by reference as if fully set forth herein, its responses to the allegations contained in paragraphs 1 through 57 of the Complaint.

59. Implied in the Management Agreement was a covenant that VVV would act in good faith and deal fairly with JKN, that VVV would do nothing to interfere with JKN's interests and commitments under the Management Agreement (and as amended by the Settlement Agreement), and that VVV would give at least the same level of consideration to the interests of JKN as VVV would give its own interests. Instead of complying with this duty, VVV acted in bad faith by:

    a. Enticing vendors, partners, and/or affiliates to provide services in support of the Miss USA and Miss Teen USA pageants without intent or plan to remit payment for said services, thereby exposing JKN to liability and bringing the brand in disrepute;

    b. Mistreating pageant contestants, winners, staff and volunteers, whether privately or publicly, and causing them to endure hardships and incur expenses, while knowing that such discontent would damage JKN's interests and reputation; and

    c. Creating a toxic work environment for many involved in the Miss USA and Miss Teen USA pageants.

**ANSWER:** The allegation in the first sentence of paragraph 59 of the Complaint states a legal conclusion to which no response is required. To the extent a response is required, VVV denies those allegations. VVV denies the remaining allegations in paragraph 59 of the Complaint.

60. In breach of the implied covenant of good faith and fair dealing, VVV committed the acts alleged above for the purpose of consciously depriving JKN from the rights and benefits to which JKN was entitled under the Management Agreement as amended, and without considering the interests of JKN at least to the same extent as VVV does its own.

**ANSWER:** VVV denies the allegations in paragraph 60 of the Complaint.

61.     As a direct and proximate result of VVV's actions, JKN has been damaged in an amount not yet ascertained and that is continuing, but that is substantially in excess of the jurisdictional minimum of this Court.

**ANSWER:**    VVV denies the allegations in paragraph 61 of the Complaint.

### ALLEGATIONS CAPTIONED: "FOURTH CAUSE OF ACTION
(Declaratory Judgment (28 U.S.C. § 2201))"

62.     JKN realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 61 as if fully set forth herein.

**ANSWER:**    VVV incorporates by reference as if fully set forth herein, its responses to the allegations contained in paragraphs 1 through 61 of the Complaint.

63.     An actual and justiciable controversy now exists between JKN, on the one hand, and VVV, on the other, with respect to whether (a) the Management Agreement has been terminated and (b) whether VVV's conduct is deemed by the general public to embarrass, offend, insult, shock, or otherwise denigrate public morals, individuals, groups, or the community.

**ANSWER:**    The allegation in paragraph 63 of the Complaint states a legal conclusion to which no response is required but, responding further, VVV denies the allegations in clauses (a) and (b) of paragraph 63 of the Complaint.

64.     A judicial determination is necessary and appropriate at this time under the circumstances in order to resolve the parties' rights, duties and obligations arising out of the current dispute.

**ANSWER:**    The allegation in paragraph 64 of the Complaint states a legal conclusion to which no response is required but, responding further, VVV avers that any judicial determination of the parties rights should be in favor of VVV.

**ALLEGATIONS CAPTIONED: "PRAYER FOR RELIEF"**

WHEREFORE, JKN prays for relief as follows:

    a.   For compensatory monetary damages, in an amount to be proven at trial;

    b.   For restitution and disgorgement of all benefits and ill-gotten gains unjustly obtained by VVV through the acts complained of herein;

    c.   That the Court issue an Order awarding all other relief the Court finds equitable and just, including but not limited to, costs, attorney fees, and pre- and post-judgement interest and costs; and

    d.   For such other and further relief as the Court may deem just and proper.

**ANSWER:**    VVV denies the allegations in this unnumbered paragraph of the Complaint that bears the first term "WHEREFORE," and specifically denies that JKN is entitled to relief of recovery of any kind from VVV.

**AFFIRMATIVE DEFENSES**

Defendant VVV states the following separate defenses to JKN's Complaint and reserves the right to amend or supplement the affirmative defenses asserted herein and to assert other and additional defenses as may be necessary upon further discovery and investigation. In asserting these defenses, VVV does not assume any burden of proof with respect to any issue where the applicable law places the burden upon JKN.

1.    JKN's Complaint fails, in whole or in part, to state a claim upon which relief may be granted.

2.    JKN is in breach of the Management Agreement and the Settlement Agreement.

3.    Some or all the causes of action may not be maintained because of release. Specifically, but without limitation, in the Settlement Agreement, JKN waived and released all

claims against VVV arising prior to March 1, 2024. Many of the allegations in JKN's complaint relate to alleged acts or failures to act that allegedly occurred prior to March 1, 2024. Any such alleged actions or failures to act cannot form the basis of actionable claims against VVV due to the Settlement Agreement's release.

4.    The alleged damages claimed by JKN, if any, were caused in whole or in part by the acts or omissions of persons over whom VVV has no control or right of control, including but not limited to JKN itself and, thus, any recovery should be reduced or barred by such parties' proportionate fault.

5.    JKN's claims are barred, in whole or in part, by the doctrines of laches, waiver, unclean hands, estoppel and/or ratification.

6.    JKN's claims are barred, in whole or in part, by JKN's failure to mitigate any damages allegedly sustained.

7.    Plaintiffs' claims are barred and/or reduced by JKN's contributory or comparative negligence and JKN's contributory or comparative fault.

8.    Should VVV be held liable to JKN, which liability is specifically denied, VVV would be entitled to a set-off for all sums of money or damages that JKN owes to VVV.

9.    JKN's alleged damages, if any, were caused by the acts or omissions of JKN, and/or by the fault of JKN, and thus any recovery might be reduced accordingly or eliminated altogether in accord with applicable statutes and common law, including the law of New York and/or the law of any other state whose law may apply.

10.    To the extent that a contract exists between JKN and VVV, JKN cannot state a claim for breach of contract because it cannot demonstrate that it has satisfied the required elements of breach, performance, and damages.

11.     To the extent that JKN is alleging fraud, conspiracy, deceit, or other similar conduct, JKN has failed to plead these claims with sufficient particularity.

12.     JKN's Complaint fails to state a claim on which relief can be granted as to costs and disbursements, attorney's fees, expert fees, expenses, pre-judgment interest, post-judgment interest, refund, unjust enrichment, disgorgement, restitution, punitive or treble damages.

13.     VVV had no duty to JKN or has performed each duty, if any, owing to JKN.

14.     Some or all the causes of action may not be maintained because of payment.

15.     Some or all the causes of action may not be maintained because of res judicata.

16.     With respect to each purported cause of action, the acts of VVV were, at all times, done in good faith and without malice.

17.     VVV hereby gives notice that it intends to rely upon any other defenses that may become available or apparent during the discovery proceedings in this matter, and hereby reserves its right to amend its Answers and to assert any such defenses.

## <u>JURY TRIAL DEMAND</u>

VVV requests a jury trial on all claims so triable.

**[Counterclaim and Third-Party Complaint begin on next page.]**

## VVV'S COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff, VVV Global Ent., LLC ("VVV"), for its counterclaim and third-party complaint against Plaintiff and Counterclaim Defendant, JKN Universe, LLC, d/b/a The Miss Universe Organization ("JKN"), and Third-Party Defendants Legacy Holding Group USA, Inc. ("Legacy"); Raúl Rocha Cantú ("Cantú"); BDE Miss USA, LLC ("BDE"); and Thom Brodeur ("Brodeur"), seeking declaratory relief, preliminary and permanent injunctive relief, specific performance, money damages, and attorney fees and costs, states as follows:

## INTRODUCTION

1.      The Miss USA and Miss Teen USA pageants (the "Pageants") are among the United States' most beloved institutions. Dating back to 1952, Miss USA is the crown jewel of the Miss Universe Organization ("Miss Universe"). Unfortunately, as described below in vivid detail—and backed up with contracts, text messages, and emails, all attached as exhibits hereto—Miss Universe's current owners, JKN and Legacy, have tarnished the Miss USA brand by depriving Miss USA of operating funds, interfering with VVV's ability to manage Miss USA as it was contracted to do, and disparaging the results of JKN's own actions. In the process, JKN, Legacy, Legacy's owner Cantú, and Brodeur—a "pageant coach" who has long held designs on taking over Miss USA and who has proven willing to wage a campaign of baseless public disparagement against anyone who stands in his way—have caused great financial and reputational injury to VVV, which VVV now seeks to remedy.

2.      VVV's involvement with the Pageants spans from late 2022 to the present. Throughout this time, the Counterclaim Defendant's and Third-Party Defendants' misconduct has been extensive.

3.      In 2022, JKN, then the sole-owner of Miss Universe,[1] promised it would grant VVV an exclusive, twelve-year master license agreement ("License Agreement") to operate the Pageants in the United States, by April 1, 2023. That promise was set forth in a letter of intent dated December 20, 2022 ("LOI"). In accordance with the LOI, VVV paid JKN a $1.5 million deposit toward the purchase price of the 12-year license.

4.      But JKN immediately broke its promise. Due to delays caused by JKN and through no fault of VVV, JKN did not grant VVV the twelve-year License Agreement by April 1, 2023.

5.      Instead, by representing that it would grant the 12-year License as soon as it had attended to certain regulatory requirements, JKN induced VVV to enter into a short-term "Management Agreement," and then a "Settlement Agreement," both of which, again, expressly promised VVV a twelve-year License Agreement.

6.      The Management Agreement provided VVV with less control over the operation of the business than the License Agreement would have, and lower funding with which to operate. It also allowed JKN to remain involved in the operation of Miss USA. Without a license, VVV could not prepare and issue franchise disclosure documents ("FDDs"), which were necessary for Miss USA to collect fees from the operators of its state pageants ("State Directors," who operate the "State-Level Pageants"), and who were, legally, franchisees. This left the funding of the Miss USA operation entirely under JKN's control. It also meant that JKN retained the practical ability to select state directors, with whom VVV was required to conduct business.

7.      In reliance on JKN's promise of an imminent twelve-year License Agreement, and due to JKN's failure to fulfill its funding promises as set forth in the Management and Settlement

---

[1] Miss Universe as used herein refers to the d/b/a entity of its owner JKN, and after January of 2024, of both JKN and Legacy, as co-owners of Miss Universe.

Agreements, and JKN's representations to VVV regarding the existence of other sources of funding, VVV invested *millions of dollars* of its own money into Miss USA.

8.    In reliance on its investment, VVV expected to operate the Pageants, beginning with the 2023 national competitions and ending in 2035, as an exclusive licensee. Operating as an exclusive licensee for twelve years would have allowed VVV control the timing of FDD/franchise process and therefore the flow of operating revenue, to select the best State Directors to align with VVV's goals for Miss USA, and to implement a business plan, beginning in 2023, that would make the Pageants much more profitable than they had been, in addition to implementing improvements to the Pageants to make a better experience for contestants. The extended term would also allow VVV to recoup its initial deposit and the additional funds it invested into the Miss USA organization.

9.    Yet, to this date, JKN has not granted VVV any license. In the course of their dealings with VVV, Miss Universe and its owners began using the promise of a twelve-year License Agreement as a pretext to squeeze additional operating funds out of VVV to cover the costs of the Pageants. Each time the twelve-year License Agreement seemed within reach, JKN manufactured delay after delay, consistently failing to deliver the License Agreement after securing VVV's commitment to invest additional funds into Miss USA and to expend additional labor that built up the Miss USA and Miss Universe brands, to the benefit of Miss Universe and its owners and the detriment of VVV.

10.    Additionally, Miss Universe and its owners wrongfully retained revenue they had received from the operation of the Pageants that should have been paid to VVV under the Management Agreement—hindering VVV's ability to perform its duties and requiring it to take on additional debt.

11. Making matters worse, JKN and Legacy failed to fulfill their contractual obligations to timely prepare and issue FDDs, which were necessary for Miss USA to collect fees from the State Directors. Under the Management Agreement, which JKN itself had prepared, the State Director fees were supposed to cover the costs of operating Miss USA. And, under the Settlement Agreement, JKN was explicitly obligated to, at its cost, enter into the state license agreements ("State License Agreements") directly with State Directors and to comply with all applicable franchise laws.

12. The brand and reputation damage that JKN's Complaint alleges VVV caused can primarily be traced back to JKN's misconduct. JKN neither took the necessary steps to adequately fund the Pageants nor relinquished control over funding to VVV by granting VVV the twelve-year License Agreement that JKN had promised to VVV. State Directors were not granted timely State License Agreements to conduct their 2023, 2024, or 2025 State-Level Pageants; subsequently, those State Directors did not timely pay the license fees that JKN intended to largely fund the Pageants.

13. Incredibly, JKN recently attempted to pull another bait-and-switch by suing VVV for failures to timely file franchise disclosure documents and maintain the annual State License Agreements when those are—and have always been—JKN's obligations under the express terms of the parties' agreements.

14. Equally baseless are JKN's allegations that VVV poorly managed the Pageants or has caused the Miss USA brand harm. The 2023 and 2024 nationally televised Pageants were massive successes, *despite* JKN's interference with VVV's management.

15. VVV's director, Laylah Loiczly, who is professionally known as Laylah Rose ("Rose"), and her husband have personally invested more than $4 million into Miss USA since

December of 2022, in an attempt to maintain the Miss USA and Miss USA Teen brands for which VVV was expecting to receive the twelve-year License Agreement.

16.     In addition, operating the Pageants is a highly public endeavor, and VVV's undertaking of the 2023 Pageants caused its owner's reputation and good name within the pageant world to become intertwined with the Miss USA and Miss Teen USA brand. VVV was subsequently put in a position where its owner's good reputation was negatively affected by Miss Universe's actions and inactions with respect to the Pageants, as well as by a concerted online smear campaign by Brodeur and his associates, many of whom, Brodeur included, had been rejected for positions in VVV's Miss USA organization.

17.     After more than two years of JKN's—and, after January of 2024, Legacy's—delays and excuses for their failure to adequately fund Miss USA and to officially grant VVV the twelve-year License Agreement so that VVV could take funding into its own hands, VVV is now forced to defend itself both in this Court and the court of public opinion.

18.     After VVV shared with Legacy and Cantú its business plan for making the Pageants much more profitable while improving the contestant experience, Miss Universe held up the 2025 FDDs, refusing to issue them until and unless VVV acquiesced to its demands to invest additional *millions of dollars* of its own money to put on the 2025 Pageants—funds that were not required by any contractual obligation VVV had ever undertaken.

19.     Only if VVV agreed to this additional cash infusion would Miss Universe supposedly issue the 2025 FDDs to unlock the State Director revenue.

20.     Likewise, only if VVV agreed would Miss Universe supposedly sign a License Agreement, despite its contractual obligation to do so, as set forth in both the Management Agreement and the Settlement Agreement.

21.    VVV pointed out that it would be foolish to continue to pump money into the brand without an executed License Agreement under which VVV could finally start recouping its investment. In other words, why would VVV invest additional millions of dollars without any guarantee that it would be operating the Pageants past 2025?

22.    Two days later, Miss Universe purported to terminate its Management Agreement with VVV.

23.    Miss Universe's cited reasons for terminating the Management Agreement are both false and pretextual.

24.    After obtaining all the money and effort it could from VVV, without ever delivering VVV the twelve-year License Agreement, Miss Universe appears to believe it can now proceed with VVV's business plan for Miss USA—minus VVV.

25.    These actions violate VVV's contractual rights, giving rise to expectation damages of over $100 million for the loss of revenue over the course of the promised twelve-year License Agreement. These actions also give rise to damages for VVV's detrimental reliance on Miss Universe's false and fraudulent promises and to damages for Brodeur and BDE's concerted interference, along with JKN, Legacy, and Cantú, with VVV's business relations and its expectation of obtaining a twelve-year License Agreement.

26.    Miss Universe has obtained the benefit of VVV's money and its labor but has not given VVV the benefit of its bargain. VVV would not have invested millions of dollars, had its owner and her spouse sign a personal guarantee, and taken on additional debt if not for the long-promised twelve-year License Agreement and the future revenue it represents.

27.    VVV is left having spent millions of dollars with nothing to show for it except the diminution of its and its owner's good name, thanks to the Counterclaim Defendant's and Third-

Party Defendants' interference in VVV's operation of the Pageants and Third-Party Defendant Brodeur's and his allies' campaign of disparagement.

28.     VVV seeks to be made whole monetarily, including payment of its attorney fees; an injunction barring any further transfer or renewal of the license to operate Miss USA; and an order compelling specific performance of the promises Defendant JKN made to VVV—including, at long last, the execution of a twelve-year License Agreement with VVV to operate the Pageants.

## THE PARTIES

29.     Defendant, Counterclaim-Plaintiff, and Third-Party Plaintiff, VVV Global Ent., LLC, is a Florida limited liability company with its principal place of business in Florida. VVV's sole member resides in Florida.

30.     Plaintiff and Counterclaim-Defendant, JKN Universe, LLC, is a Delaware limited liability company with its principal place of business in New York. On information and belief, JKN is owned by a Thai company.

31.     According to widely circulated news reports, JKN acquired the Miss Universe pageant in 2022 for $20 million. Since then, JKN has operated a business known as Miss Universe.

32.     From its 2022 purchase through October 2023, JKN owned 100% of the Miss Universe brand. According to a press release on the Miss Universe website dated January 24, 2024, JKN sold 50% of the Miss Universe brand to Legacy for $16 million. On information and belief, that transaction closed in or about January, 2024. Since then, JKN and Legacy have been co-owners of the Miss Universe brand.[2]

---

[2]     On information and belief based on news reports (*see* https://www.kaohooninternational.com/markets/554825#:~:text=The%20company%20stated%20that%2C%20as,paid%20to%20JKN%20Global%20Content), due to partial payment, Legacy's actual ownership percentage may be less than the full 50% contemplated in the original deal between JKN and Legacy (the news report, dated March 2025, pegs it at 41.81%).

33.     Third-Party Defendant Legacy Holding Group USA, Inc., is a Delaware Corporation. On information and belief, Legacy's principal place of business is Mexico City, Mexico. According to the January 24, 2024 Miss Universe press release, Legacy is owned by Cantú.

34.     Third-Party Defendant Raúl Rocha Cantú is an individual who owns Legacy. On information and belief, Cantú is a citizen of Mexico.

35.     Third-Party Defendant BDE Miss USA, LLC, is a Delaware limited liability company. On information and belief, its principal place of business is in the state of Washington. On information and belief, Brodeur is a member of BDE.

36.     Third-Party Defendant Thom Brodeur is an individual. On information and belief, Brodeur is a citizen of the United States. He resides in Kennewick, Washington.

37.     In September 2025, Brodeur made representations on social media, and it was widely reported in news media, that Brodeur claimed to have acquired a ten-year license to run the Miss USA and Miss Teen USA pageants.

## JURISDICTION AND VENUE

38.     VVV is a citizen of a different state from JKN and all Third-Party Defendants, who are either citizens of states of which VVV is not a citizen or are subjects of a foreign state.

39.     The amount in controversy exceeds $75,000 as to each Counterclaim Defendant and Third-Party Defendant.

40.     The Court therefore has subject-matter jurisdiction over VVV's counterclaims and third-party claims under 28 U.S.C. § 1332.

41.    This Court has personal jurisdiction over JKN because its principal place of business is in New York and because it consented to this Court's jurisdiction in an agreement with VVV.

42.    This Court has personal jurisdiction over Legacy, as it is an owner of Miss Universe, and over Cantú, who serves as Miss Universe's president, because, as Miss Universe acknowledges in a May 19, 2025 press release available at https://www.missuniverse.com/press-releases/miss-universe-press-release-5/, Miss Universe maintains a corporate office in New York City. In addition, on information and belief, Cantú, though a Mexican citizen, maintains a residence in New York.

43.    This Court has personal jurisdiction over BDE and Brodeur because, on information and belief based on BDE's and Brodeur's own public statements, BDE, through its member, officer, and/or director Brodeur, has entered into an agreement with New-York-based Miss Universe to operate Miss USA.

44.    In addition, Brodeur is subject to general jurisdiction in New York due to his business dealings, including serving as VP and CMO of the Queen Beauty Network ("QBN"), which is headquartered in New York. Brodeur's contact information, listed on QBN's website, includes a phone number with a 332 area code, one of the area codes for Manhattan.

45.    Venue is proper in this district under 28 U.S.C § 1391(b) because a substantial part of the events giving rise to the claims in this complaint occurred here, where JKN and Miss Universe have offices.

**FACTS**

**The Pageant System**

46.     JKN and Legacy[3] co-own a proprietary system for conducting the annual Pageants and the rights to use certain trademarks, including Miss USA and Miss Teen USA.

47.     JKN—and, beginning January of 2024, Legacy—operate the Pageant System under the d/b/a Miss Universe.

48.     The Pageants are part of the Miss Universe competition. The winner of the Miss USA Pageant goes on to compete against winners from other countries around the world for the title of Miss Universe.

49.     Similarly, before the national-level Pageants can be conducted, the State-Level Pageants are held in each state and the District of Columbia. The winners of the State-Level Pageants (both for Miss USA and Miss Teen USA) go on to compete in their respective national-level Pageants.

50.     The State-Level Pageants are run by the State Directors, with whom JKN annually executes the year-long State License Agreements. [*See* Exhibit 3, 2023 Miss USA FDD at Exhibit A, 2023 State License Agreement, at Section 4.1 (stating that the term of the 2023 State License Agreement between JKN and the State Directors began on the date the parties signed the License Agreement and expired "on the day following the 2023 Miss USA Pageant"); *see also id.* at 4.2 (stating the 2023 State License Agreement was for a limited term, and that the State Directors had "no right to renew" the State License Agreement).]

---

[3] When VVV began negotiating for the twelve-year License Agreement, JKN was the sole owner of Miss Universe. On Information and belief, in January of 2024, JKN's parent company, JKN Global Content Pte. Ltd., sold 50% of its shares in JKN Legacy Inc, an entity that fully owns Counterclaim Defendant JKN Universe, which operates Miss Universe, to Third Party Defendant Legacy Holding Group USA Inc.

51.     Under this licensing arrangement that JKN created, in exchange for the State License Agreements, the State Directors are required to pay  the State License Fees to JKN. [*See id.* at Sections 3.2 and 5.]

**Franchise Law Requires JKN to Provide FDDs Before Entering the State Licenses with the State Directors or Collecting the Licensing Fees**

52.     As JKN[4] has acknowledged, before JKN[5] could execute the State License Agreements that allowed State Directors to operate the State-Level Pageants, JKN was required to issue FDDs to the State Directors. In some states, JKN was required to meet additional disclosure requirements. [*See, e.g.*, Ex. 26 (July 18, 2023 FDD Cover Letter, advising then Miss Universe president Paula Shugart and Mireya Martinez that they could use the FDDs that had been issued on June 28, 2023 to sell the 2023 State Licensing Agreements in certain states, that the FDDs would expire at various times depending on the respective state's regulations, and that material events such as a change in JKN's management would trigger the need for JKN to update the FDDs).]

53.     JKN and VVV had an understanding that given the risks of noncompliance with franchise laws, direct communications to State Directors regarding the 2024 State License Agreements needed to come from JKN, but that as soon as the State Directors signed their respective State License Agreement, all communication with State Directors would be from VVV. [*See* Ex. 2, Settlement Agreement at Section 4(d).] As documented in the Rules of Engagement that JKN and VVV negotiated as part of the March 1, 2024 Settlement Agreement, "following execution of the 2024 License Agreements between Miss Universe and each State Director, Miss Universe will direct any State Director's communications received by Miss Universe to VVV

---

[4] And, after January of 2024, as has been acknowledged by Legacy representatives.

[5] And, after January of 2024, Legacy.

within 24 hours of receipt of the State Director's communication." [*See* Ex. 2, at Rules of Engagement.]

54.    In emails that Miss Universe sent to the 2024 State Director applicants dated January 11, 2024, January 29, 2024, and February 27, 2024, Miss Universe also acknowledged that the 2024 FDDs, the amended FDDs that were required after Miss Universe's material changes, and the 2024 State Licenses would all be coming from Miss Universe. [*See* Ex. 22, January 11, 2024 Email (stating Miss Universe understood "we are a bit behind schedule" and that FDDs for the Pageants "will be forthcoming" and "[d]ue to federal regulations, we can[]not send you a State Pageant License Agreement to sign until a minimum of 14 days pass from the date you sign the [FDD] receipt"); *see also id.* January 29, 2024 Email (stating Miss Universe would be "transitioning to co-ownership between JKN Global Group and the Mexico-based Legacy Holdings" and that Miss Universe's "legal counsel needs some additional information about the transaction from our parent company and then will most likely need to amend the FDD that we provided to you, and re-submit it to certain states. Unfortunately, this means there will be a slight delay in sending out your license agreements"); *see also id.* February 27, 2024 Email (stating that "[i]n light of the recent agreement between JKN Legacy, Inc., the parent company of the Miss Universe Organization, and Legacy Holding Group USA Incorporated, [Miss Universe] will be sending out a FRANCHISE DISCLOSURE DOCUMENT SUPPLEMENT via PandaDocs").]

55.    Further, Miss Universe has acknowledged that it needed "Jose at JKN to countersign the license agreements before [VVV] can invoice" for the 2024 State License Fees. [*See* Ex. 23 February 29, 2024 Email.]

56.    Remarkably, despite all the above, through its Complaint, JKN attempts to blame VVV for the failure "to file franchise disclosure documents" so that State Directors could operate

their State-Level Pageants under a State License Agreement and pay the State License Fees. [*See* Complaint at ¶ 20.]

57.    The Complaint also accuses VVV of failing "to obtain or maintain the required licenses" and ties this failure to the fact that VVV had to send a letter informing certain State Directors that they were planning for their 2024 State-Level Pageants without a 2024 State License Agreement and that this was inappropriate. [*See* Complaint at ¶ 19; *see also* Ex. 46 (August 4, 2023 VVV letter to State Directors stating that "while preparations for the 2024 state pageants have begun, no 2024 state directorship will be awarded a license until after the conclusion of the 2023 Miss USA/Miss Teen USA Pageants," and that "until these matters are finalized, no state pageants for 2024 shall be held, as such unauthorized activities can lead to confusion and uncertainty").]

58.    The truth is that the reason State Directors could not begin planning their 2024 State-Level Pageants in August of 2023 was that JKN had failed to provide State Directors with the FDDs required before JKN could offer State Directors the State License Agreements. As a result, any activity related to 2024 State-Legel Pageants was being conducted without a license.

59.    Contrary to the Complaint's allegation that VVV was required to "file franchise disclosure documents for franchises operating in the U.S.," [Complaint at ¶ 20], the Management Agreement expressly prohibited VVV from engaging in the State-Director License process. [*See* Ex. 1 at Section 1.03 (prohibiting VVV from "enter[ing] into any contract, lease, license or obligation on behalf of [JKN]," and from "sell[ing], transfer[ing], sublicens[ing], or otherwise dispos[ing] of all or any portion of the Business").] Additionally, the Settlement Agreement required that *JKN* "enter into (or, as applicable, amend, extend or renew)" license agreements

"directly with the [State Directors] and comply with federal and all applicable state franchise and business opportunity laws." [*See* Ex. 2 at Section 4(d).]

60.     Any allegation or implication in the Complaint that VVV was responsible for completing the FDDs or otherwise securing the State License Agreements is false.

61.     The Federal Trade Commission's franchise rule, found at 16 C.F.R. Part 436 ("FTC Franchise Rule") requires that *franchisors* disclose certain information, in a document known as an FDD, to their prospective franchisees at least 14 days before the franchisees sign any agreement or make any payment to the franchisor. [*See* 16 CFR § 436.2.]

62.     Under the FTC Franchise Rule, the FDD must contain 23 specific items, including:

> (1) information about the franchisor and its parents, predecessors and affiliates,
> (2) the business experiences of franchisor's key players,
> (3) the franchisor's and its related entities' litigation history,
> (4) the franchisor's and its related entities' bankruptcy history,
> (5) initial fees,
> (6) other fees,
> (7) the estimated initial investment,
> (8) restrictions on sources of products and services,
> (9) the franchisee's obligations,
> (10) the financing terms,
> (11) the franchisor's assistance, advertising, computer systems, and training,
> (12) the franchise territory,
> (13) the trademarks to be licensed,
> (14) the patents, copyrights, and proprietary information material to the franchise,
> (15) the franchisee's obligation to participate in the actual operation,
> (16) restrictions on what the franchisee may sell,
> (17) the renewal, termination, transfer, and dispute resolution,
> (18) the public figures involved,
> (19) the financial performance representations,
> (20) outlets and franchisee information,
> (21) financial statements,
> (22) contracts to be signed (attached as exhibits), and
> (23) receipts (acknowledgement of FDD delivery)

(collectively, the "23 FDD Information Requirements"). [*See* 16 CFR § 436.5.] Under the FTC Franchise Rule, if the franchisor experiences any material changes (such as changes in corporate structure, management, or key personnel) during the year, the franchisor must amend the FDD "as soon as reasonably practicable." [*See* 16 CFR § 436.7.]

**VVV Was Formed to Become the Long-Term Miss USA and Miss Teen USA Licensee**

63.     VVV was formed by its sole owner, Rose, to become the long-term licensee of the Miss USA and Miss Teen USA Pageants.

64.     Rose has served as the CEO of VIP Pageantry television network and is the owner of the Laylah Rose Couture clothing brand. Rose is a member of the Council of Fashion Designers of America. VIP Pageantry hosted several seasons of New York Fashion Week—a part of the CFDA. Five generations of Rose's family have been involved in the pageant and fashion world.

65.     VVV's involvement in the Pageants was and always has been driven by Rose's genuine commitment to implementing a thoughtful business plan designed to strengthen and modernize the Pageants.  From the outset, VVV's goals centered on improving the experience of the contestants and enhancing the overall quality of the Pageants.

**SUMMER AND FALL 2022 – Brodeur Seeks the Miss USA License; Brodeur and Others Falsely Accuse the Prior Miss USA License Holder of Rigging a Pageant**

66.     In the summer of 2022, Brodeur engaged in discussions with Miss Universe about obtaining the license to operate the Pageants.

67.     At that time, the Miss USA and Miss Teen USA licensee was Miss Brand Corporation, which was owned by Crystle Stewart ("Stewart").

68.     After the 2022 Pageants, Stewart and her operation became the subject of rumors and criticism in the pageant world. This included allegations of rigging the 2022 Miss USA pageant.

69.    Defendant Brodeur was a vocal critic of Stewart and her operation of the Miss USA pageant. Others believed to be associated with and working in concert with Brodeur also were critical of Stewart.

70.    The law firm of Holland & Knight investigated the 2022 Miss USA pageant and later determined the pageant had not been rigged.

71.    But the criticism had already taken its toll, and Miss Universe suspended Stewart in October 2022.

72.    With Miss Universe's separation from Stewart, the opportunity Brodeur had cultivated had finally arrived.

73.    However, at that time, Miss Universe named a different licensee.

74.    In the fall 2022, Rose had also met with JKN's owner, Thai businesswoman, Jakkaphong "Anne" Jakrajutatip ("Jakrajutatip"),about obtaining the license to operate the Miss USA and Miss Teen USA Pageants.

75.    Playing all angles, after Rose met with Jakrajutatip, Brodeur spoke with Rose in November of 2022 about her plans to seek the license. Brodeur expressed a desire to be the president of Miss USA if Rose were to purchase the license.

76.    Rose declined to offer Brodeur such a position. Brodeur would not forget this perceived slight.

**DECEMBER 2022 – JKN Promises VVV a Twelve-Year Master License Agreement**

77.    On December 20, 2022, JKN and VVV entered into the LOI for the twelve-year License Agreement for VVV to operate the Pageants.

78.     In the LOI, JKN stated that it desired to license to VVV "a proprietary system for conducting beauty pageants for young women . . . in the United States of America to compete for the title of MISS TEEN USA, and MISS USA" on the "terms and conditions" set forth in the LOI.

79.     In the LOI, JKN expressly promised to enter into a twelve-year License Agreement with VVV containing the terms set forth in the LOI by April 1, 2023.

80.     Referring to JKN as "Licensor" and VVV as "Licensee," the LOI stated,

> Closing: The full terms and conditions of this Transaction shall be memorialized in a License Agreement and other applicable ancillary agreements (the "Agreements") drawn by the Licensor's attorney and approved by the Licensee and Licensee's attorney. Said Agreement to be fully executed by the Licensor and the Licensee on or before April 1, 2023 ("Contract Date"). Closing of this Transaction will occur simultaneously with the Contract Date.

81.     Thus, JKN promised to, and was obligated to, enter into a twelve-year License Agreement with VVV.

82.     The LOI included the following terms:

a.  The license grants the right to conduct the Pageants and the right to use and display certain "Proprietary Marks";

b.  The term of the license is 12 years;

c.  The commencement date of the license is April 1, 2023;

d.  The license fee is $6 million, with a $1.5 million "Deposit" paid by December 23, 2022, and twelve payments of $375,000 paid annually on April 1 over the twelve-year term;

e.  The $1.5 million Deposit is fully refundable if the License Agreement is not entered into by April 1, 2023;

f.  VVV provides an irrevocable letter of credit of $4.5 million to secure the annual payments, by January 31, 2023;

g.  JKN provides evidence that it has terminated the license with the previous license-holder by April 1, 2023;

h.  VVV is entitled to revenue from the 2023 Pageants and thereafter from all (1) license fees from sub-licensees of the Pageants from each U.S. state (i.e., the State Directors), (2) global broadcast fees for conducting the Pageants, (3) sponsorship fees from conducting the Pageants, (4) merchandising for the Proprietary Marks, (5) talent management fees from titleholders of the Pageants;

i.  VVV assumes expenses for the titleholders of the Pageants starting on April 1, 2023;

j.  JKN indemnifies VVV for any costs and expenses from the 2022 Pageants, including litigation concerning the prior licensee, regardless of when those costs are paid;

**EARLY 2023 – VVV Pays JKN $1.5 Million in Reliance on Future Revenue from the Promised Twelve-Year License Agreement**

83.  VVV paid the $1.5 million Deposit to JKN in December 2022.

84.  Before VVV executed the LOI and paid the $1.5 million Deposit, JKN informed VVV that the Pageants had a bank account with $1.5 million in it to pay Pageant expenses.

85.  By paying the $1.5 million Deposit to JKN, and by its sole member entering into the Personal Guarantee (defined below), VVV relied to its detriment on JKN's promises set forth in the LOI, including but not limited to JKN's promises that it would grant VVV a twelve-year License Agreement to operate the Pageants, that VVV would receive revenue from the enumerated

sources during that twelve-year period, and that JKN would cover all costs and expenses from the 2022 Pageants.

86.     VVV also relied to its detriment on JKN's representation that the Pageants had $1.5 million in the bank to cover expenses.

**SPRING 2023 – JKN Fails to Sign the Promised Twelve-Year License Agreement by April 1, 2023**

87.     On multiple occasions in early 2023, VVV reached out to JKN to ask about the status of the License Agreement, which per the LOI was to be drafted by JKN's attorneys.

88.     Despite JKN's promises in the LOI, JKN did not produce, let alone sign, the promised License Agreement by April 1, 2023.

89.     JKN's initial excuse for this delay was that JKN was still working on terminating the existing licensee of the Pageants. [*See* Ex. 5 (showing that VVV requested updates on January 26 and 30 of 2023, and that JKN responded on January 30 and February 3, respectively, that it was still in the process of terminating the existing licensee).]

90.     VVV continued diligently checking JKN's progress on finalizing the twelve-year License Agreement. [*See*, Ex. 6 (showing messages from VVV asking JKN for updates—on February 8, 2023 (stating VVV would still be available to talk at 11:04 p.m.); February 9, 2023 (asking JKN for a call); February 24, 2023 (stating VVV would be available on JKN's timeline); February 26, 2023 (stating "I am available whenever"); February 27, 2023 (stating "I am available all day today").]

91.     And JKN continued to give excuses for its delay in substantively providing an update. [*See*, Ex. 6 (showing messages from JKN with excuses for delay—on February 8, 2023 (showing JKN representative stated she was still on Zoom and could not talk with VVV); February

9, 2023 (showing JKN never responded to VVV's attempt to set up a call); February 26, 2023 (responding to VVV's request for an update by stating that JKN's representative just got back from traveling and was tired); and February 27, 2023 (stating JKN had too many other calls interrupting it to call VVV on time).]

92.     As the April 1, 2023 deadline for JKN and VVV to enter the twelve-year License Agreement was approaching, Rose messaged then the owner of JKN, Jakrajutatip, on March 14, 2023, stating that Rose had not "received the franchise agreement/contract yet." [Ex. 7.]

93.     Jakrajutatip responded to Rose that the then-President of Miss Universe was going to call VVV on March 14, 2023 to finalize the twelve-year License Agreement details. [Ex. 8.]

94.     On March 29, 2023, only 3 days before the deadline for JKN to grant VVV the twelve-year License Agreement, JKN's attorney notified VVV's attorney that JKN had "begun to prepare" the twelve-year License Agreement and that it did "not yet have a specific timeframe for" it. [Ex. 9.] Even though JKN should have begun drafting the License Agreement as early as December 20, 2022, when the LOI to enter the twelve-year License Agreement was signed, JKN's attorney stated that as of March 29, 2023, "the drafting process will take some time and then JKN will need time to review and comment on the agreement . . . will be sure to update you as we get closer to having something to share." [*Id.*]

95.     On April 6, 2023, Rose asked Jakrajutatip about the current business plan that Miss Universe was using for the Pageants. [Ex. 10.]

96.     On or about April 13, 2023, Jakrajutatip messaged Rose that JKN was going to send VVV the draft twelve-year License Agreement "soon without having others in New York involved." [Ex. 11.] In the same message, Jakrajutatip warned Rose that then-president of Miss Universe, Paula Shugart had "already set up the trap" to "do the cancel culture over" Rose and to

get someone "who claimed to be a billionaire" to replace Rose. [*Id.*] Jakrajutatip stated that this unnamed billionaire "can pay immediately if you can[]not and both of us don't want that incident to happen." [*Id.*] Jakrajutatip also urged Rose to collaborate with her "quietly and quickly in order to overcome [Paula]." [*Id.*]

97.    As late as July 19, 2023, Miss Universe was still signaling to VVV that the twelve-year License Agreement would be granted in time for the 2023 Pageants. [Ex. 12 (then-CEO of Miss Universe explaining that as soon as JKN complied with franchise laws that required JKN to issue franchise disclosure documents ("FDDs"), it can transfer the license that the parties had "just finished negotiating" to VVV).]

98.    In addition, VVV learned that the Pageants did not, in fact, have $1.5 million in the bank.

**SUMMER 2023 – To Protect its Investment, VVV Agrees to Proceed Under the Management Agreement; JKN Promises that the Twelve-Year License Agreement is Still in the Works**

99.    In July of 2023, JKN refused to sign a virtually finalized twelve-year License Agreement, claiming that it had not completed necessary regulatory requirements to sell the rights to the Pageants.

100.    Completing the regulatory requirements was completely within JKN's control. There was nothing VVV could have done to expedite the process.

101.    The 2023 Pageants had to be held in time for the Miss USA titleholder to travel to and compete in the Miss Universe competition.

102.    On July 20, 2023, well after VVV had signed the LOI and paid to JKN a $1.5 million Deposit, JKN shifted gears—Miss Universe's then-president Paula Shugart informed VVV that instead of entering the twelve-year License Agreement in time for the 2023 Pageants, JKN

and VVV must instead enter a management contract for "legal compliance right now" while they "estimate on the timeline for transition." [Ex. 14.]

103.    Miss Universe representatives assured VVV the Management Agreement was solely for purposes of legal compliance while they worked toward finalizing the twelve-year License Agreement. On July 20, 2023, MOU's then-CEO again assured VVV that the twelve-year License Agreement would begin as soon as JKN was compliant with certain franchise disclosure laws. [*See* Ex. 13 (also stating "[c]ommunication and [r]eality wise – you are the licensee holder the minute you sign [the Management Agreement] . . . [i]t's a legality to protect us all, the licensing contract is what we are all moving by.").] (Despite JKN's statement, the Management Agreement was not an express license, as the twelve-year License Agreement would have been.)

104.    Despite its previous representations about how long it would take to prepare the License Agreement, JKN quickly presented VVV with a fully drafted Management Agreement.

105.    JKN urged VVV to sign the Management Agreement, which JKN presented to VVV fully drafted, plying VVV with examples of revenue it would receive if it agreed, including broadcast rights, sponsorships, State Director fees, and ticket sales.

106.    JKN also represented that VVV would not be responsible for paying vendors from the 2022 Pageants and would be able to cover the 2023 Miss USA operating costs from the incoming franchise fees.

107.    JKN additionally represented that it would sign the License Agreement soon as JKN was compliant with franchise law in each state with respect to the FDDs, which it estimated might take two months.

108.    The representations described in the preceding two paragraphs would later prove to be false. But VVV did not know that at the time.

109.    Because the Pageants were approximately two months away,[6] and because VVV wanted to begin running the Pageants and protect its initial $1.5 million investment, VVV agreed to conduct the 2023 Pageants as a manager under the Management Agreement, dated July 28, 2023, while JKN and VVV explicitly continued to work toward the twelve-year License Agreement. [Ex. 1 at Section 3.01 (stating the term of the Management Agreement would "continue until the earlier of the day after the 2025 State Pageants or all required regulatory approvals have been obtained . . . at which time the parties shall execute a definitive License Agreement in the form attached hereto as Exhibit A, subject to customary terms and conditions that are mutually satisfactory to the parties" and attaching a draft of the twelve-year License Agreement as Exhibit A).] A true and correct copy of the Management Agreement, executed by JKN and VVV, is attached hereto as Exhibit 1.

110.    The Management Agreement gave VVV the right and responsibility to "assume the operations, direction, management and supervision of the Business." [Ex. 1, § 1.01.] The Management Agreement's definition of "Business" included "the business of conducting the 2023 Miss USA and Miss Teen USA Pageants." [*Id.*, Fourth Whereas Clause.]

111.    The Management Agreement also gave VVV the right to all profits from the operation of the Business, commencing on the "Effective Date," July 28, 2023. [*Id.* § 1.02.]

112.    The Management Agreement required VVV's owner, Rose, and her spouse, to personally guarantee the payment and performance of VVV's obligations under the Management Agreement (the "Personal Guarantee"). [*Id.* § 1.07.]

_____

[6] The 2023 Miss USA Pageant and Miss USA Teen Pageant were scheduled to take place on September 29, 2023, and September 28, 2023, respectively.

113. To protect their financial investment, Rose and her spouse executed the Personal Guarantee. [*Id*. Ex. B.]

114. The Management Agreement provided that JKN would collect the State License Fees from the holders of the licenses to conduct each State-Level Pageant and would pay those fees to VVV, less an "initial fee" of $255,137 for 2023, as compensation for VVV's operation of the Business. [*Id*. § 2.01].

115. The Management Agreement further provided that if its term was extended beyond the 2023 State-Level Pageants, the same process would be followed, except the "annual fee" deducted from the State License Fees paid by JKN to VVV would be $375,000. [*Id*.]

116. Additionally, the Management Agreement stated that "the [State] License Fees are intended to cover all of Manager's general and administrative overhead, and all salary and other compensation of Manager's employees and all expenses of operating the Business . . . ." [*Id*. § 2.02.]

117. The State License Fees were therefore the lifeblood that allowed VVV to operate the business, and JKN understood and acknowledged this.

118. The Management Agreement's original term ran from the Effective Date of July 28, 2023 through "the earlier of the day after the 2025 State-Level Pageants or all required regulatory approvals have been obtained (the 'Term'), at which time the parties shall execute a definitive License Agreement in the form attached hereto as Exhibit A, subject to customary terms and conditions that are mutually satisfactory to the parties." [*Id*. § 3.01.]

119. Accordingly, JKN again promised that it would sign the twelve-year License Agreement—and the Management Agreement obligated JKN to do so—no later than the day after the 2025 State-Level Pageants or the date regulator approvals had been obtained.

120.    JKN's renewed promise of a twelve-year License Agreement was the inducement VVV relied on to enter into the Management Agreement.

121.    JKN's promise of a twelve-year License Agreement was the inducement VVV's owner, Rose, and her spouse, relied on to enter into the Personal Guarantee.

122.    Due to the financial risk to VVV and its owner—including the $1.5 million VVV had already sunk into the Pageants and the personal guarantee taken on by VVV's owner and her spouse—it was important that JKN not be able to walk away from the Management Agreement and the twelve-year License Agreement on a whim.

123.    Indeed, the Management Agreement expressly provided that it could be unilaterally terminated by JKN only under certain narrow, expressly enumerated circumstances:

a. JKN could terminate the Management Agreement early if VVV was "in default of any of the covenants or obligations" in the Management Agreement or "in violation of any applicable law," but only if VVV did not cure the default or violation within 30 days after receiving notice of the default or violation from JKN (and longer if VVV initiated curative measures). [*Id*. § 3.02(a).]

b. JKN could terminate the Management Agreement early if JKN terminated the State Directors' licenses or decided to stop holding the Pageants, if it gave VVV 30-days' prior written notice. [*Id*. § 3.02(b).]

c. And JKN could terminate the Management Agreement early if VVV (1) failed to maintain the insurance required by the Management Agreement or (2) engaged in "improper action(s) or inaction(s)" that resulted in "any situation or occurrence which subjects [VVV] to public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to

embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency in our reasonable and good faith opinion." [*Id.*] Again, any such termination required 30 days' prior written notice. [*Id.*]

124.    The Management Agreement contemplated no other bases for its early, unilateral termination by JKN. To be valid, any termination would have to fit into one of the above categories *and* JKN would have had to provide 30 days' prior written notice and, in some cases, an opportunity to cure.

125.    The Management Agreement contained an indemnification clause in Section 4.02 stating:

> Licensor shall indemnify, defend and hold harmless Manager against and in respect of any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies, included interest, penalties and reasonably attorneys' fees that Manager shall incur or suffer, which arise out of, result from, or relate to (i) any breach of, or failure by Licensor to perform in accordance with the terms hereof, including any breach of the representations, warranties, covenants or agreements of Licensor set forth in this Agreement, and (ii) the operation of the Business (or the failure to operate the Business) prior to the Effective Date by Licensor or Licensor's prior Licensee(s).

126.    The Management Agreement stated that it would be governed by the law of Delaware and that any claims arising from the Management Agreement would be adjudicated by a court in the city and county of New York, New York.

127.    The Management Agreement provided for attorney fees and court costs to the "prevailing party" in any "claim, suit, action or proceeding" arising out of the Management Agreement. [*Id.* § 4.07.]

128.    In communications with JKN's representatives leading up to the 2023 Pageants, JKN promised VVV that it would "compromise and work alongside [VVV] on the production this year" to "make it practical, productive and profitable for" VVV. [Ex. 15.] JKN also promised VVV that it would "inject" $500,000 into VVV from the State License Fees, "plus other new and ongoing sponsors, so real cash will be just $1 million . . . Plus, ticket sales would add more into your revenue." [Ex. 16.]

129.    Before VVV signed the Management Agreement, VVV was told that under JKN's business plan, it could expect to receive 20% of the sponsorship fees to help produce the Pageants. [*See* Ex. 17 (email from JKN attorney to VVV attorney stating that 20% sponsorship is a precedent and is standard with all the national directors"); *see also* Ex. 15 (JKN representative stating that part of VVV's funding would come from "sponsorship").]

130.    In contrast, if JKN had granted VVV the promised twelve-year License Agreement, VVV would have been entitled to significant revenue from State License Fees paid by the State Directors and/or from contestant registration fees, as well as all the revenue from sponsorship fees and from licensing Miss-USA- and Miss-Teen-USA-branded products and services. The twelve years of expected revenue would have enabled VVV to turn a profit on its initial investment.

**FALL 2023 – VVV Successfully Puts on the 2023 Pageants in Only Six Weeks and Secures a TV Deal, Despite Not Receiving the State-Director Fees JKN had Just Promised to VVV; JKN Interferes with VVV's Management of the Business**

131.    When VVV began managing the Pageants, under the Management Agreement dated July 28, 2023, VVV's first task was to organize and execute the 2023 Pageants. It did so in only two months.

132.    In reliance on JKN's representations that JKN would work with VVV to adequately fund the 2023 Pageants, VVV incurred expenses associated with producing the Pageants.

133.    VVV's management of the 2023 Pageants required VVV to invest time and energy, as well as additional money, in putting on successful Pageants that were broadcast nationwide on the CW network, thanks to an exclusive, multi-year broadcast-paartnership agreement VVV reached with the CW network based on its connections in the industry.

134.    The Pageants were in Reno because VVV inherited a contract for that venue that JKN had entered into in June 2023, in breach of the LOI.

135.    VVV also effectively paid (through JKN's setoff) JKN the first $375,000.00 of 12 annual license fees that was required under the LOI.

136.    Despite the Management Agreement's provisions stating that VVV would manage the business of operating the Pageants, JKN soon began interfering with VVV's management duties.

137.    For example, JKN engaged in direct communications with certain State Directors, at times making promises and representations inconsistent with VVV's communications.

138.    This led to certain State Directors and state titleholders mistrusting VVV and a movement by and among them to thwart VVV's ability to obtain the twelve-year License Agreement.

139.    For example, in October 2023, some State Directors requested that their titleholders report concerns and frustrations about VVV to Miss Universe. However, the titleholders had had positive experiences, and they reported those experiences to Miss Universe.

140.    Through the Management Agreement, JKN and VVV agreed that VVV would absorb operating costs that the Pageants had incurred in 2022 and 2023, before the Management Agreement's effective date, despite VVV's lack of involvement in incurring those expenses. VVV

absorbed these costs through the Management Agreement's provision that reduced the 2023 State Licensees fees that JKN would pay to VVV.

141.    Specifically, $516,000.00 of 2022 and 2023 operating costs were deducted from the 2023 State Licensees fees that JKN was required to pay to VVV.

142.    When discussing the consideration for VVV's absorption of these costs, JKN's attorney stated that the benefit to VVV was that "[VVV] is receiving the longest license for the Miss USA/Miss Teen USA in the pageant's history." [*See* Exhibit 49, July 27, 2023 Email.]

143.    VVV agreed to incur debt on the front-end of its arrangement with JKN, with the expectation that once the License Agreement was executed, throughout the twelve-year period, VVV would implement its business plan and recoup its investment.

144.    The Management Agreement required JKN to pay VVV the 2023 State Director fees, minus an initial fee of $255,137. [Exhibit 1, § 2.01; Exhibit 49, July 27, 2023 Emails.]

145.    As necessary steps to collecting these State License Fees, JKN was required to prepare and file FDDs and enter into State License Agreements with the State Directors that require and allow the State Directors to pay the State License Fees and to operate their State-Level Pageants. State Directors are not allowed to recruit contestants or receive registration fees without the State License Agreements in place.

146.    The 2023 State License Fees were intended to compensate VVV for its management services and to pay VVV's expenses and overhead in operating the Pageants. [*See* Exhibit 1, § 2.01.]

147.    JKN collected the State License Fees in approximately September 2023—roughly contemporaneously with VVV's hosting the Pageants.

148.    Yet, in contravention of the terms of the Management Agreement, JKN failed to pay the 2023 State Licensee Fees to VVV.

149.    VVV also did not receive the promised sponsor revenue, ticket revenue, or any funds in a Miss USA bank account.

150.    Meanwhile, Brodeur was still angling for a way into the Miss USA organization. Brodeur advertised his own "Miss USA Welcome Party" at the pageant hotel the day before the 2023 Miss USA pageant:



151.    Brodeur did not have permission to host a party at the pageant venue and did not have permission to use the Miss USA mark. At a minimum, Brodeur was appropriating the Miss USA tradename without a license. Rose had to ask Brodeur and his accomplices to stand down.

152.    Nevertheless, during and immediately after the 2023 Pageants, Brodeur sent positive messages to Rose.

153.    By all accounts, in 2023, VVV put on some of the best Pageants in Miss USA history. Brodeur sent Rose messages saying: "PROUD OF YOU!!!"; "These kids haven't seen a stage like this in a decade, Laylah! I'm in tears for them. And clapping like a mofo for you!" [Ex. 18; *see also,* Ex. 19 (messages from Raven Ramsey stating she has "gotten so many messages from girlies saying how much fun they are having!!!! So much positive feedback and praise on your staff from them too!; "You're slaying"; "[J]ust talked to a few of the usa girls. Please tell me

why they are all calling you 'momma laylah' I LOVE THAT!!", "A lot of them have said if I don't win it's fine because this has been one of the best experiences of my life. That is so freaking refreshing and you should be SO PROUD! Enjoy prelims and we will talk soon :)"; "OMFG YOURE GOING TO LOVE UTAH[7] WELL FREAKING DONE. I helped train her and she's one of my best friends! Couldn't be happier!!!"; *see also*, Ex. 20 (email from Brodeur congratulating and complimenting Miss USA on the 2023 pageant).]

154.    On September 28, Brodeur sent a lengthier text message that said,

> Good morning, boss lady. So you were heavy on my heart and in my prayers last night and this morning. It's go time! Your first Miss Teen USA production and the first to hit a streamer I think EVER, right?

> And prelims for your first dozens of Miss USA telecasts.

> God left this on my heart. Not sure if it will mean anything to you but when He says go, I "go."

> You were made for such a time as this. Your life path has brought you to this place to minister to, heal and unify a broken sisterhood. Move in quiet confidence. Let your critics and your supporters tell the story. Ultimately they will say the same thing.

> Sending you good vibes and a beautiful day where your peace and patience outpace any challenges that may come!"

155.    Later that day, Brodeur texted Rose, "BRAVO. Prelims were a slam!!!!"

156.    On October 2, 2023, a few days after the 2023 Pageants, Brodeur texted Rose, "Imagine you have been running on fumes. Wanted to give you a shout out. Fantastic first productions. Phenomenal winners. I think you have a Miss Universe on your hands. And, well…generally…bravo. Can we do USA in Miami next year, mom? PLEASEEEEE!!! Lol."

---

[7] Referring to the 2023 Miss USA winner, former Miss Utah, Noelia Voigt ("Voigt").

157.    On October 3, 2023, after complimenting Rose's work on the Pageants, Brodeur then took the opportunity to ask for a role in VVV's Miss USA organization. Rose, again, did not offer him a role. On October 11, 2023, Brodeur applied for a state directorship. Brodeur was not one of the applicants VVV selected to be interviewed. Brodeur's approach to Rose and VVV would soon take a 180-degree turn.

158.    Despite the praise from many competitors (and Brodeur), due to JKN's failures to fulfil its obligations under the LOI and the Management Agreement, managing the 2023 Pageants was challenging.

159.    Despite VVV's success with the 2023 Pageants, upon information and belief, soon afterward, representatives of Miss Universe were searching for a "loophole" to block VVV from obtaining the twelve-year License Agreement that JKN had promised in the LOI and reiterated in the Management Agreement. [*See* Ex. 21 (December 5, 2023 Message from Raven Ramsey to Rose stating that then-president of Miss Universe, Paula Shugart, was after Laylah and was working with Miss Universe and some State Directors to "get Laylah out" and stating "[t]hey are looking for every loophole they can find to get you. DO NOT TRUST THEM").]

160.    Upon information and belief, the holdover executives at Miss Universe, certain of the State Directors, and Brodeur persuaded JKN to search for "loopholes," and the allegations in the JKN Complaint are the best "loopholes" that JKN could manufacture.

161.    The challenges VVV faced due to JKN's failure to fulfil its obligations led to discussions between VVV and JKN, which included discussions about JKN's non-payment of contractually promised funds and JKN's communications with State Directors.

**LATE FALL 2023 – JKN's Parent Company Files for Bankruptcy in Thailand**

162.    In November, 2023, JKN's parent company, JKN Global Group Public Company Limited, filed for bankruptcy in Thailand, seeking "business rehabilitation" in a Thai bankruptcy court.

**WINTER 2023-2024 – JKN and VVV Reach a Memorandum of Understanding in which JKN Again Promises VVV a Twelve-Year License Agreement; JKN's parent company sells half of its shares in the entity that owns Miss Universe to Legacy**

163.    In December of 2023, it became apparent that the twelve-year License Agreement was not going to be completed in time for VVV to take over the responsibilities associated with licensing the State Directors for the 2024 pageant season.

164.    Again, a full year after JKN promised VVV the twelve-year License Agreement, JKN's stated reason for the delay was that JKN was still sorting through the franchise regulatory issues that the twelve-year License Agreement implicated.

165.    At this time, JKN had still not paid VVV any of the promised amounts for VVV's managing the 2023 Pageants.

166.    Therefore, VVV agreed that it would continue to manage the 2024 Pageants under the Management Agreement, but under the express condition that JKN and VVV entered a supplemental agreement that specifically required: (1) JKN to pay to VVV what VVV was owed for putting on the 2023 Pageants and (2) the 2024 State Directors to pay their 2024 State License Fees directly to VVV.

167.    On January 9, 2024, JKN and VVV entered into a Memorandum of Understanding as to the supplemental agreement (the "MOU"). A true and correct copy of the MOU, executed by JKN and VVV, is attached hereto as Exhibit 45.

168. The MOU states that it "is intended to be legally binding and the parties also agree to memorialize the full terms and conditions of their agreement in a full Settlement Agreement. [Ex. 45, Preamble.] They committed to "use best efforts" to finalize the Settlement Agreement by January 10, 2024. [*Id.* ¶ 1.]

169. On information and belief, on January 23, 2024, JKN's parent company, JKN Global Content Pte. Ltd., sold 50% of its shares in JKN Legacy Inc, an entity that fully owns Plaintiff and Counterclaim Defendant JKN Universe, which operates Miss Universe, to Third-Party Defendant Legacy Holding Group USA Inc ("Legacy"), making JKN and Legacy 50/50 owners in Miss Universe.

170. On information and belief, this transaction triggered a material change that required JKN and Legacy to amend any existing FDDs. [*See* Ex. 24 (January 23, 2024 email from JKN's counsel noting that he had seen a press release detailing the sale to Legacy and flagging that the transaction could constitute a material change that needed to be addressed by amended FDDs).]

171. JKN's counsel confirmed to the then-CEO of Miss Universe that despite this change, "the license agreements should still be sent out under JKN Universe with [the CEO] (or whoever plans to sign on behalf of JKN Universe) as signatory." [*Id.*]

**SPRING 2024 – JKN and VVV Enter into a Settlement Agreement and Amendment to the Management Agreement in which JKN Yet Again Promises VVV a Twelve-Year License Agreement**

172. While the parties did not meet their January 10 target date, JKN and VVV entered into the Settlement and Release Agreement (the "Settlement Agreement") on March 1, 2024, as otherwise contemplated in the MOU. The Settlement Agreement also amended—but did not terminate—the Management Agreement. A true and correct copy of the Settlement Agreement, executed by JKN and VVV, is attached hereto as Exhibit 2.

173.    Contrary to JKN's Complaint's narrative, the Settlement Agreement was not negotiated out of JKN's need to correct any misconduct by VVV; rather, it was negotiated because JKN was failing to pay VVV amounts to which VVV was entitled for producing the 2023 Pageants, and VVV required quicker access to funding, which VVV believed could be remedied by State Directors paying their 2024 State License Fees directly to VVV, at least until VVV obtained the twelve-year License Agreement.

174.    The Settlement Agreement incorporated several recitals as part of the parties' agreement. [Exhibit 2, Section 1.] Those recitals included the following:

    a.    "The Parties entered into a Letter of Intent ('LOI') on December 20, 2022 pursuant to which VVV paid $1,500,000 and agreed to pay additional 12 payments of $375,000 to JKN for the right to enter into a 12 year master license agreement . . . for the operation of the Miss USA and Miss Teen USA pageants";

    b.    The parties did not sign the License Agreement by April 1, 2023 as they had agreed;

    c.    VVV put on the 2023 Pageants under the Management Agreement;

    d.    As of the date of the Settlement Agreement, JKN had not "paid to VVV the State Director License Fees and sponsor fees due and owing for the 2023 pageants";

    e.    As of the date of the Settlement Agreement, the parties had not signed the License Agreement.

175.     In the Settlement Agreement, JKN promised to "work cooperatively and expeditiously to finalize and sign a twelve-year master license agreement . . . with VVV, with an effective date of April 30, 2023." [*Id*. Section 3(a).] (I.e., the effective date would be backdated.)

176.    In the Settlement Agreement, the parties also agreed that VVV would manage the 2024 Pageants, under the Management Agreement, as amended in Exhibit A to the Settlement Agreement. [*Id*. Section 4(a).]

177.    The parties agreed to certain communication standards, called "Rules of Engagement," set forth in Exhibit B to the Settlement Agreement. [*Id*. Section 4(b).]

178.    The Rules of Engagement provided that JKN would not engage directly with State Directors but would instead direct any inquiries to VVV.

179.    In the Settlement Agreement, JKN agreed to account for and pay to VVV all amounts owed under the Management Agreement for the 2023 Pageants. [*Id*. Section 5(a).] This expressly included license fees paid to JKN by the State Directors. It was subject to certain setoffs described in the Settlement Agreement. [*Id*.]

180.    Under Section 5(a) of the Settlement Agreement, JKN was required to give VVV credit in the amount of $140,876, applied toward the second of the 12 annual $375,000 payments that VVV was required to make to JKN under the LOI. [*Id*. Section 5(a).]

181.    Because JKN never executed the twelve-year License Agreement, VVV never realized the benefit of that credit.

182.    JKN further agreed to have the State Directors pay license fees for the 2024 State-Level Pageants directly to VVV. [*Id*. Section 5(b).]

183.    The Settlement Agreement contained mutual releases, by both JKN and VVV, of claims against the other arising prior to the effective date of the Settlement Agreement, March 1, 2024. [*Id*. Section 7.]

184.    The mutual releases expressly excluded claims arising from a breach of the Settlement Agreement and claims arising from a breach of the Management Agreement arising after the effective date of the Settlement Agreement. [*Id.*]

185.    In other words, VVV did not release JKN from claims based on conduct occurring after March 1, 2024, including breaches of the Settlement Agreement and/or the Management Agreement.

186.    The Settlement Agreement stated that it would be governed by New York law. It did not contain a provision designating any particular venue for the resolution of disputes. [*See id*. Section 10.]

187.    The Settlement Agreement also stated, "in the event of any litigation between the Parties based upon an alleged breach or default of their respective obligations to be fulfilled pursuant to this Settlement Agreement, the prevailing Party therein shall be entitled to recover attorneys' fees and legal costs against the non-prevailing Party."

**SPRING AND SUMMER 2024 – VVV Strikes a Multi-Year TV Deal for Miss USA; JKN's Interference  Nevertheless Continues; Brodeur and His Associates Publicly Attack VVV**

188.    Brodeur maintains an Instagram profile with the handle "officialthombrodeur".

189.    On March 18, 2024, Brodeur shared a post on his Instagram profile. The post included a photo of Brodeur standing with his arms around Cantú and Olivia Quido of Miss Universe.

190.    The post's caption stated,

Remarkable meeting with key members of the leadership team for the Miss Universe Organization discussing the bigger vision for the brand.

Conceiving, launching, and building successful brands has been my passion and expertise for 35 years.

Looking forward to what comes next with this group!

#missuniverse #legacybuilding #godisgood
#brandbuilder #brand #timetoclimb #leadbyexample
#futurist #godsays #riseabove

191.    In April 2024, VVV was assured by Miss Universe VP Mario Adolfo Bucaro Flores ("Bucaro") Miss Universe's Vice President , via text, that JKN would not be working with Brodeur.

192.    Also in April 2024, thanks to Rose's connections in the industry, VVV struck an exclusive multi-year broadcast partnership with the CW network to broadcast the Pageants in English nationwide. An April 25, 2024 CW press release noted that VVV's 2023 Pageants had been "the network's #1 new special of the year and delivered the pageant's strongest performance of the last three years on television," with a peak viewership of over 1.1 million total viewers. (*See* Press Release available at [https://www.cwtvpr.com/the-cw/releases/?view=102053-the-cw-network-enters-exclusive-multi-year-agreement-to-air-miss-usa-and-miss-teen-usa-pageants](https://www.cwtvpr.com/the-cw/releases/?view=102053-the-cw-network-enters-exclusive-multi-year-agreement-to-air-miss-usa-and-miss-teen-usa-pageants).)

193.    Despite this success, and despite the Settlement Agreement and its Rules of Engagement, VVV's management of the business continued to be met with obstacles from JKN at every step.

194.    With significantly less operational control and revenue than was expected for the 2023 pageant season, and now the 2024 pageant season, VVV focused on ensuring that it obtained the funding necessary to pay for the expenses of managing the Pageants.

195.    To that end, VVV attempted to keep JKN on track to complete its regulatory requirements that were necessary before JKN could execute State License Agreements with State Directors and collect State License Fees. VVV also attempted to get JKN to agree to a 10% increase in the 2024 State License Fees for some states, since the 2023 State Licensing Fees that

JKN ended up paying to VVV were entirely insufficient to cover the expenses of VVV's producing the 2023 Pageants, let alone to allow for VVV to earn a profit from its work.

196.    Since VVV still did not have the twelve-year License Agreement to conduct the Pageants, like the 2023 State Licenses, the 2024 State Licenses had to be executed between each of the State Directors and JKN (*not* VVV).

197.    Additionally, since VVV still did not have the twelve-year License Agreement, it was up to JKN (*not* VVV) to fulfill franchise law requirements before it was permitted to offer the 2024 State Licenses to State Directors.

198.    Representatives of JKN and Legacy d/b/a Miss Universe consistently acknowledged that they were working on the FDDs that they were required to send to the State Directors.

199.    Below are examples of communications between VVV and JKN that show JKN acknowledging its responsibility to issue the FDDs and the subsequent State License Agreements, and its consistent delays in doing so:

      a.  On January 23, 2024, JKN's counsel emailed, among others, VVV, noting that he had seen a press release detailing the JKN sale to Legacy and flagging that the transaction constitutes material changes that needed to be addressed by amended FDDs. [Ex. 24.]

      b.  On February 6 and 7, 2024, JKN's counsel emailed VVV's counsel that he was trying to contact JKN for approval to proceed with issuing the amended FDDs, but he had not been able to get JKN's approval. [Ex. 25.]

      c.  On February 21, 2024, VVV's counsel emailed JKN's counsel, stating JKN's unexplained delays to issue the supplements to the 2024 FDDs were causing "very

serious harm to the reputation of Miss USA and Miss Universe brands" and demanding that JKN issue the amended 2024 FDDs and ensure that the State Directors sign the License Agreements and pay the State License Fees immediately [Ex. 28.] Through the February 21, 2024 email from VVV's counsel, VVV notified JKN that "JKN must have a license relationship with the [S]tate [D]irectors in order for there to be any business for VVV to manage, and VVV must receive the [State] [L]icense [F]ee revenue to cover the substantial costs to manage the [S]tate [D]irectors and prepare the national pageant." [*Id*.]

200.    After the 2024 FDDs had finally been sent to State Directors and most of the State Directors had signed State License Agreements, VVV immediately began communicating with JKN about ensuring it issued the FDDs that would be required before State Directors could enter their 2025 State License Agreements.

    a.    Like the 2024 FDD and State License Agreements process, below are examples of communications between VVV and representatives of JKN/Miss Universe that show JKN/Miss Universe acknowledging its responsibility to issue the 2025 FDDs and, subsequently, the 2025 State License Agreements, and JKN's/Miss Universe's consistent delays and ultimate failure to do so. During this time, JKN/Miss Universe also continually failed to execute the License Agreement, citing a variety of shifting reasons—none of which excused JKN's/Miss Universe's failure to honor its promise: On July 11, 2024, VVV's counsel sent JKN's counsel an email stating they needed to hear back from him "on the License Agreement, State [D]irector [L]icense [A]greements , information for the FDDs and pending emails." [Ex. 31.]

b.  Also on July 13, 2024, Rose updated Maria Canche, Bucaro's assistant, that VVV had not heard from JKN's attorney since July 1, and that JKN was supposed to have the "new 2025 FDDs out by August of 2024." [Ex. 32.]

c.  On July 15, 2024, VVV's counsel emailed JKN's counsel that they "really need to hear back from [him] and JKN on the various issues [they] have been raising and to work together to get the License Agreement and state FDDs and license agreements done. The delays are prejudicing or will prejudice VVV." [Ex. 33.]

d.  On July 25, 2024, Rose messaged Ms. Canche that her "counsel has a lot of open items that have not been addressed" and that "[t]hey are in need of help from JKN and David" Oppenheim (JKN's then-attorney), to which Ms. Canche replied "David has been AWOL." [Ex. 34.]

e.  On July 25, 2024, Rose similarly messaged Bucaro that her "legal team is in need of a lot of assistance. There are open items. Can anyone from JKN and David's team help?" [Ex. 35.]

f.  On August 1, 2024, a representative of Miss Universe emailed VVV's attorneys draft language for Miss Universe to send State Directors, extending the State License Agreements because the FDDs had not been finalized. [Ex. 36.]

g.  On August 2, 2024, VVV's attorneys responded to Miss Universe that they needed responses on the License Agreement and State License Agreements that had "been pending with you and your counsel for 4 and 6 weeks respectively." [Ex. 37.]

h.  On October 30, 2024, Bucaro sent Ms. Rose draft language that Miss Universe was going to send to State Directors, stating, in part, that "we [Miss Universe] are working hard to get the FDD's finalized" and issuing another extension to the State

License Agreements so the State Directors could continue preparing for their 2025 State-Level Pageants. [Ex. 38.]

i.  On March 4, 2025, VVV's attorney emailed the Miss Universe representatives with a summary of an agreement the parties reached, which included that "JKN will immediately, [at] its sole cost, undertake the work necessary to update its FDDs for the" Pageants and "JKN will endeavor to sign up the [S]tate [D]irectors within 60 days from the last week and will cause the [State License] [F]ees to be paid to VVV immediately upon signing." [Ex. 39.]

j.  On March 16 and 17, 2025, Rose messaged Ms. Canche, asking for an update of the FDDs and license. [Ex. 40.]

k.  After no substantive response to its March 4 email, on March 19, 2025, VVV's attorney sent Miss Universe an email stating, "it is beyond critical that JKN (or current franchisor party) immediately: . . . prepare the 2025 state director FDD and license agreements; . . . deliver the FDD and executable license agreement to the state directors VVV chooses to be state directors in non-registration states, with instructions to sign and pay the license fee to VVV in 14 days; and . . . submit the FDD for approval and registration in registration states in which VVV chooses to have state directors, with the plan to provide the FDD and the same instructions to pay the required license fees to VVV within 14 days after JKN provides the registered FDD to the state director." [Ex. 41.]  VVV's attorney continued by warning Miss Universe that, "[t]he current situation is untenable. At present, because JKN still has not done what it was required to do with the FDD and license agreements, no state director has a current license agreement for 2025. . . this has

improperly delayed VVV receiving the 2025 license fees to which it is entitled under the management agreement." [*Id.*]

l.  On April 30, 2025, Rose emailed and messaged Bucaro asking for an update with the State License Agreements and the FDDs. [Ex. 42; see also Ex. 43.]

m.  On June 12, 2025, Rose messaged Bucaro that they needed "to get the FDD's out asap to the [S]tate [D]irectors and finalize USA." [Ex. 44.]

201.    JKN and Legacy d/b/a Miss Universe constantly delayed completing the FDDs and additional state-specific franchise requirements, securing the State License Agreements, and ensuring that VVV received the State License Fees. This misconduct is the leading cause for all the damages and public scrutiny that JKN outlines in the Complaint.

202.    Yet, as the above communications demonstrate, JKN repeatedly delayed fulfilling its obligations with respect to FDDs and State License Agreements.

203.    JKN also subverted VVV as manager by interacting directly with the Miss USA and Miss Teen title holders, their parents, and some of the State Directors—in violation of the Rules of Engagement.

204.    The 2023 title holders did not follow the rules and requirements contained in the contestant contracts that JKN required. For example, the 2023 Miss USA titleholder refused to utilize the sponsored coaching team for the Miss Universe competition; failed to make required social-media posts; deleted social-media comments by VVV; failed to tag sponsors in social-media posts; failed to use sponsored designers for events and appearances; tagged sponsors who had sent her goods unilaterally, without coordinating with the Miss USA team; entered into contracts with sponsors without the Miss USA team's knowledge; turned down or canceled a multitude of appearances and public events (including four in December 2023 and seven in February 2023);

arrived at New York Fashion Week three days late, disappointing sponsors who had planned events with her; sent a video to Miss Universe of a substandard apartment that was not the apartment VVV had rented for her, i.e., a false complaint to Miss Universe about VVV; and failed to communicate with and respond to messages from VVV—all in violation of the agreement she signed upon entering the pageant and the titleholder handbook.

205.    When VVV required compliance with the titleholders' agreements—with JKN's own standards for titleholders—the titleholders resigned in May 2024.

206.    VVV was not responsible for the series of events that led to the titleholder resignations, yet JKN has attempted to blame VVV.

207.    During this time, opportunists were circling.

208.    On May 7, 2024, a Brodeur associate named Denise White accused Rose of engaging in "trafficking" and "forced labor."

209.    In a May 10, 2024 article, Brodeur was quoted in a New York Post smear-piece about Rose. The Post cited Brodeur as complaining about not receiving a position with VVV's Miss Universe organization and criticizing Rose's acquisition of the Miss USA organization, saying, "She bought the house and couldn't furnish it."

210.    On May 11, 2024, a Brodeur Associate named Dani Walker criticized VVV's management in an interview on News Nation.

211.    On May 14, 2024, Brodeur posted on Facebook, criticizing Rose's handling of the 2023 Miss USA titleholder's resignation and calling Rose "not very bright."

212.    On information and belief, Brodeur also texted an individual known to both Brodeur and Rose to say that Brodeur had engaged in discussions with Bucaro about taking over Miss Universe. He texted that Bucaro's official position was that Miss Universe wanted Brodeur

to have a full year to conduct castings and country pageants, and this year would have been too rushed. Brodeur also theorized that Miss Universe was planning to remove VVV. On information and belief, this text exchange occurred on or before May 15, 2024.

213.    On June 11, 2024, Brodeur posted in a since-deleted Instagram post, "when an insecure person runs a company and cannot answer honest questions, treat people who have different ideas with dignity, respect and understanding, or be disagreed with; she deletes and blocks. Welcome to Miss USA 2.0, where toddlers are handing out the tiaras."

214.    On his Instagram story, Brodeur stated, "Ask questions. Get deleted. Seek clarity. Get blocked. Challenge the leader. Get fired or forced to resign. Welcome to the new Miss USA. Way to go Layla Loiczly. You're killing it. No, really, quite literally, killing it."

215.    As of October 10, 2025, Brodeur's Instagram page had over 29,800 followers. Accordingly, his Instagram posts reach tens of thousands of people, and potentially many more given the possibility for reposts by others.

**FALL 2024 – VVV Puts on the 2024 Pageants; Miss Universe Denies it is Working with Brodeur**

216.    VVV put on the 2024 Pageants, which were again broadcast nationally on the CW under the agreement VVV struck with the network.

217.    Despite Miss Universe's prior assurances, in October 2024, Rose heard a rumor that Brodeur would be serving as the new Managing Director of Miss USA. When she conveyed this rumor to Miss Universe, Maria Jose Canche Unda ("Canche"), VP of International Relations for Miss Universe, reassured her again, responding via text, "No dear. Don't worry."

**LATE FALL 2024 – VVV Shared Its Business Plan with One of Miss Universe's Owners, and JKN Pulled the Rug Out from under VVV**

218.    In January 2024, JKN had sold approximately 50% of the ownership in Miss Universe to Legacy, which is owned by Cantú.

219.    In late 2024, VVV shared with Cantú VVV's business plan for operating the Pageants with significantly higher revenue.

220.    Subsequent to VVV sharing its business plan with Legacy's owner, JKN admitted that it had made the decision to breach its obligation to grant VVV a twelve-year License Agreement and instead proposed forming a 50/50 joint venture with VVV. This proposal soon deteriorated into a 30/70 split under which VVV would merely play an advisory role.

221.    In November 2024, JKN told VVV to cease performing under the Management Agreement.

222.    And, in violation of the Settlement Agreement and Management Agreement, JKN communicated directly to State Directors that Bucaro would be their point-of-contact and that Cantú, owner of Legacy, would be 100% owner and director of the Pageants.

223.    JKN took actions that were inconsistent with VVV's management of the Miss USA organization and of the Pageants in the United States.

224.    This included Cantú meeting with production and other companies about the Pageants.

225.    JKN set up a WhatsApp chat and invited then-current State Directors to be in the group chat. JKN also met with and then invited into the WhatsApp group chat former State Directors who VVV had determined were not to be renewed and/or who had retired.

226.    JKN told State Directors that Cantú was taking over the administration of the Pageants and had been appointed as the new President of Miss USA and that Rose would have a solely advisory role.

227.    Such management, ownership, and director changes were invalid, as they were contrary to the Settlement Agreement and Management Agreement.

**WINTER AND SPRING 2025 – JKN Briefly Entertains Returning to a License Agreement with VVV**

228.    JKN briefly entertained returning to a License Agreement with VVV in early 2025.

229.    For example, Miss Universe VP Bucaro texted Rose about signing the License Agreement on January 22, 2025.

230.    On May 8, 2025, Maria Canche, Miss Universe's VP, texted Rose to email the State Directors and remind them to communicate directly with Rose, with CC's to Canche and Bucaro.

231.    In the same text string, in response to Rose stating that some State Director had been saying that Miss Universe, and not VVV, was overseeing the Miss USA operation, Canche also stated that signing the License Agreement was "the only way these people will stop," and "the faster we finish up the faster they will stop bothering and making false claims."

232.    On May 21, 2025, Jakrajutatip texted Rose on behalf of JKN stating the following, again promising a twelve-year License Agreement, to which Rose responded, "Hi, yes, confirmed!"



233.    JKN later retreated on the long-promised terms, making it clear to VVV that the twelve-year term was off the table, suggesting a maximum of a five-year term, instead.

234.    This suggested alteration to JKN's obligation came with no suggested method of adequately compensating VVV for its loss of seven years as a licensee.

**SPRING 2025 – JKN and Legacy Exhibit Additional Signs of Financial Trouble**

235.    During their actions that underlie this lawsuit, JKN and Legacy were experiencing difficulties that, in hindsight, reveal potential liquidity problems. JKN's parent company had filed for bankruptcy in late 2023. And in March 2025, it emerged that Legacy had paid only $13.38 million of the $16 million purchase price for its share of Miss Universe and may therefore be entitled to only 41.81% of Miss Universe instead of 50%.

236.    On June 5, 2025, Thailand's Securities and Exchange Commission filed a criminal complaint against JKN's parent company, Jakrajutatip (its CEO), and one other executive, alleging they had falsified financial statements. This led to Jakrajutatip's resignation as CEO.

237.    As Miss Universe's regulatory and financial state grew increasingly fraught, on information and belief, Miss Universe became even more dedicated to inducing VVV and its owner to provide as much financial support as it could obtain from them, while still holding out from delivering VVV the benefit of its bargain.

**SPRING AND SUMMER 2025 – JKN Purports to Terminate the Management Agreement, for Pretextual Reasons**

238.    As 2025 wore on, the pageant season was fast approaching, no twelve-year License Agreement had been forthcoming, there was no agreement on a way forward, and VVV had been told to cease working under the Management Agreement.

239.    In addition, JKN had not issued FDDs (which had been promised back in August 2024), which was a prerequisite for issuing licenses to the State Directors and for collecting their State License Fees. The State Directors could not operate their business and State-Level Pageants without State License Agreements.

240.    Without the State License Fees from the State Directors, VVV lacked the funds to move forward with the 2025 Pageants.

241.    On June 12, 2025, Rose texted Bucaro noting that it was important to get the FDDs out to the State Directors for the 2025 Pageants "asap" and seeking an update about the License Agreement. Bucaro responded that he had a meeting with Jakrajutatip the following day and would get back to her.

242.    At this point Miss Universe (JKN and Legacy) was still acting as if VVV was going to be receiving a license and moving forward.

243.    On July 15, 2025, Rose participated in a telephone call with Bucaro and Jakrajutatip.

244.    In that call, Bucaro stated that Miss Universe was losing money. He cited two lawsuits that JKN wanted VVV to indemnify it for defending, and he cited the $2 million it would take to put on the 2025 Pageants.

245.    Rose responded that in order to put on the Pageants, VVV needed the money from the State License Fees, which it could not receive until JKN issued FDDs to the State Directors.

246.    Bucaro responded that JKN's obligation to issue FDDs for 2025 would come from the License Agreement and that JKN had not expedited the FDDs because the License Agreement had not been signed. He then said that JKN would not sign the License Agreement without a commitment from VVV regarding indemnification.

247.    That had never before been—and was not—a condition precedent to JKN's obligation to enter into the License Agreement. Bucaro's position was in violation of the Management Agreement and the Settlement Agreement.

248.    Bucaro estimated that between the lawsuits and the production of the 2025 Pageants, $3.7 million was needed. He attempted to get Rose to commit that she and VVV would put up some or all of that money from their own pockets before JKN would enter into the License Agreement.

249.    Bucaro was breaching prior agreements, breaking prior promises, holding up the License Agreement (and the revenue it promised), and imploring Rose for an additional infusion of cash into the organization.

250.    Rose pointed out that it would make no sense for VVV to inject even more money into Pageants for 2025 without a guarantee that VVV would be able to recoup that investment after 2025.

251.    Rose then pointed out that the source of that guarantee was the License Agreement.

252.    Two days later, on July 17, 2025, José Castillo ("Castillo"), Vice President of Operations for Miss Universe, sent a letter from Mexico City to Rose (the "Termination Letter"). The Termination Letter stated its subject as "Termination of Management Relationship," and purported to terminate the Management Agreement.

253.    In the Termination Letter, Castillo cited eight reasons supporting the decision to terminate the Management Agreement. The cited reasons were: (1) LOI Revisions, (2) Master License Agreement, (3) Communication Failures, (4) Titleholder Resignations & Brand Damage, (5) Employee Instability, (6) Alma Cooper (Miss Universe USA 2024), (7) State Director Vacancies & Management Gaps, and (8) Washington State Litigation.

254.    The Termination Letter concluded by stating that the decision to terminate the Management Agreement was final and proposing that the parties sign mutual releases and "finaliz[e] the termination of the Management Agreement on equitable terms acceptable to both parties."

255.    The reasons set forth in the Termination Letter do not justify termination of the Management Agreement under its own terms and under applicable law.

256.    Moreover, each of the eight reasons cited in the Termination Letter was based in falsehood, was merely a pretext for terminating VVV's involvement in the Pageants, or both.

257.    JKN did not give VVV 30 days to "cure" any of the cited "reasons" for terminating the Management Agreement.

258.    VVV expressly denies the allegations in JKN's Complaint that VVV caused a "toxic work environment." [*See* Complaint at ¶ 25.] As its "proof" for such a claim, JKN's Complaint cites Voigt's resignation letter. [*Id.*] As JKN knows, VVV had responded, point by point, to Voigt's resignation letter, with JKN's assistance and approval ("Resignation Response Letter"). [*See* Ex. 47 Resignation Response Letter.]

259.    In fact, many of the communications JKN now complains of were authorized and vetted in advance by JKN itself.

260.    VVV kept JKN apprised of Voigt's consistent breaches of her titleholder agreement with JKN, so JKN is aware of how diligently VVV attempted to inform Voigt about her titleholder duties, under her agreement with JKN, and assist her with fulfilling the same.

261.    As JKN knows, and as the Resignation Response points out, Voigt's (and now apparently JKN's) claim that VVV was "generally inaccessible for communication" is false, and VVV specifically responded that, instead, it was Voigt who had "failed to respond to texts, telephone, and other written communications from VVV more than 48 times during the October 2023 – May 2024 time period in complete disregard for the rules and requirements to which you agreed to adhere and thwarting our substantial efforts to communicate, coordinate and support you." [*Id.*] VVV has a record of each time Voigt failed to respond to it.

262.    Unlike Voigt's resignation letter, which provides no proof to substantiate its allegations, the Response Letter goes into detail about why each of the allegations against VVV was false. In fact, JKN knows the allegations in Voigt's resignation letter were false. Just two days before Voigt announced her resignation, Jakrajutatip sent the following message below a picture of Voigt, Paula Shugart, and others—members of Third-Party Defendant Thom Brodeur's team:

> This is from a very recent event. Laylah has been an incredible
> leader and . . . whoever is put in[ ]to this position, these people will

continue to bully that leader and I believe Laylah has what it takes
to change all of these issues caused by these people.

[*See* Ex. 48 May 9, 2024 Jakrajutatip Message.]

263.    JKN is now attempting to use the allegations in Voigt's resignation letter as a pretext
to terminate its Management Agreement with VVV, when JKN's representative had a completely
different opinion documented contemporaneously with Voigt's resignation.

264.    By letter of September 5, 2025, VVV, through counsel, responded to the
Termination Letter, asserting that the reasons for VVV's alleged termination were pretextual.
Neither JKN nor anyone from Miss Universe responded to the September 5 letter.

**SUMMER AND FALL 2025 – JKN and Legacy Purport to Grant VVV's Promised Long-Term License Agreement to BDE and Brodeur**

265.    Defendant Brodeur's long campaign to insinuate himself with Miss Universe's
owners and to undermine the public image of both VVV and its predecessor has finally paid off.
Acting in concert with Brodeur and his company, BDE, Miss Universe has announced that it is
granting BDE a ten-year license to operate the Pageants.

266.    On September 4, 2025, Brodeur shared a post on his Instagram profile that made
his March 28, 2024 post—regarding building a brand and his excitement about "what comes next"
with Miss Universe's leadership—seem prescient.

267.    Brodeur's September 4 post included as its first photo a headshot of Brodeur with
text reading, "Chairman, President & CEO," "Thom Brodeur," "MISS USA," and "MISS TEEN
USA." The post's caption stated,

> BREAKING. I'm thrilled to share that I have officially acquired
> Miss USA ® and Miss Teen USA ®.
>
> With a 10-year exclusive license, a powerhouse team, and a clear
> vision, I'm ready to modernize revitalize, and reignite two of the
> most iconic brands in American pageantry.

History is being made – and I'm inviting you to be a part of shaping it.

#MissUSA #MissTeenUSA #AmericasItGirl

268.    On September 15, 2025, Brodeur made a series of posts on his Instagram profile announcing the appointment of staff for Miss USA and Miss Teen USA, including Elise Banks-Lovely and Laura Clark as Co-National Directors; Mara Martin as Head of Communications and Public Relations; Gretchen Polhemus Jensen as Head of Partnerships; Holly Lynch as Head of Production & Creative Director; Mackenzie Kern as Head of Social Media; Richie Walls as Talent Management; Brando Easton as Talent Management; and Ali Lee as Director of Glam.

269.    Also on September 15, 2025, Brodeur made a post on his Instagram profile announcing the "Location Reveal" for the 2025 Pageants. The post stated the 2025 Pageants would be held at the Grand Sierra Resort in Reno, Nevada, on October 18 through October 24, 2025.

270.    Each of Brodeur's September 4 and 15 Instagram posts utilized the Miss USA and Miss Teen USA name and logos throughout, including on photographs of Brodeur and his newly announced staff, as well as on statements in the nature of official press releases.

271.    Brodeur's September 4 and September 15 posts used the word "official" in multiple ways, including on the Co-National Directors' "Official Statements" and in the caption of the "Location Reveal" post, which began, "It's official!"

272.    Through Brodeur's Instagram posts and in other ways, Brodeur and BDE asserted to the public that Brodeur and BDE (and not VVV) were operating the 2025 Pageants and the Miss USA and Miss Teen USA organizations.

273.    Brodeur's and BDE's actions and assertions were contrary to, and served to undermine, contractual rights of VVV of which Brodeur and BDE were aware at the time of those actions and assertions.

274.    On September 15, 2025, Miss Universe issued a press release on its website, www.missuniverse.com. The press release stated as follows:

**MISS USA & MISS TEEN USA ANNOUNCE NEW LEADERSHIP UNDER BDE MISS USA, LLC BRODEUR BEAUTY FOUNDER & CEO THOM BRODEUR TO SERVE AS PRESIDENT & CEO**

September 15, 2025 – Miami, FL — The Miss USA® and Miss Teen USA® Organizations are proud to announce a new chapter in their storied history. BDE MISS USA, LLC, led by Brodeur Beauty founder and CEO Thom Brodeur, has acquired the exclusive license rights to both pageants from the Miss Universe® Organization.

With legacies spanning 74 years for Miss USA and 42 years for Miss Teen USA, these pageants have long stood as cultural icons—launching women into successful careers in fashion, media, entertainment, entrepreneurship, and public service. Today, under Brodeur's visionary leadership, the brands are entering an exciting new era.

"Miss USA is one of the most recognizable brands in the global pageant industry," said Thom Brodeur. "We are bringing a transformational vision rooted in technology, media, and fan engagement to modernize and revitalize these titles for the next generation of powerhouse women and their worldwide fan base."

Brodeur will serve as President and CEO of Miss USA and Miss Teen USA, supported by a distinguished leadership team of industry experts:

- Laura Clark and Elise Banks-Lovely – Co-National Directors
- Gretchen Polhemus-Jensen (former Miss USA) – Strategic Partnerships
- Holly Lynch (CEO, Queen Beauty Network) – Production Lead
- Mara Martin (VYRAL PR) – PR and Communications

- Richie Walls & Brando Eaton (SEEN Entertainment) – Talent Development and Management
- Mackenzie Kern (Miss ICON Media) – Social Media Strategy and Content

Additional senior team members will be announced in the coming weeks.

The 2025 editions of Miss USA and Miss Teen USA will introduce groundbreaking fan engagement and digital integration features through PageantFans™, the premier creator economy platform serving the $32 billion global pageant industry. Initially, both competitions will operate virtually, with plans to establish headquarters in Miami, Florida, a hub for fashion, entertainment, and global culture.

This milestone was made possible through a Brodeur-led investment group including prominent entertainment and tech media figures, underscoring the renewed cultural and commercial relevance of Miss USA and Miss Teen USA.

Media Contact

Media Relations – Mara Martin
📧 Email: mara@vyralmediapr.com
📞 Phone: (734) 693-6523

275.    As JKN and Legacy co-own and control Miss Universe, the September 15 Miss Universe press release, published on Miss Universe's website, may be attributed to them.

276.    Additionally, the September 15 Miss Universe press release lists Mara Martin ("Martin") as the "Media Contact." On information and belief, Martin drafted or participated in the drafting of the September 15 Miss Universe press release.

277.    Martin is part of the Miss USA team announced by Brodeur and BDE on September 15.

278.    The September 15 Miss Universe press release represents concerted activity by JKN, Legacy, Cantú, Brodeur, and BDE, to contravene and undermine VVV's contractual rights.

279.    On September 16, 2025, VVV, through counsel, sent Brodeur and BDE a cease-and-desist letter, reiterating VVV's contractual entitlement to a twelve-year License Agreement to operate the Pageants and demanding that Brodeur and BDE cease and desist from all activity, including public announcements, that is inconsistent with VVV's contractual rights.

280.    On information and belief, Brodeur and BDE have not desisted from their actions and have continued moving forward with the 2025 Pageants.

281.    Despite JKN's allegations and JKN's and Brodeur's public statements criticizing VVV's management, Brodeur has failed to secure a national television broadcaster for the 2025 Pageants, as VVV had. Already, Brodeur has diminished the Pageants' prestige and visibility and impacted the contestants' ability to gain national exposure.

**FALL 2025 – JKN Sues VVV**

282.    In addition, letters have passed back and forth between VVV's attorneys and attorneys for JKN, seeking resolutions to the issues arising from the facts set out above. Despite these attempts, on October 3, 2025, JKN ambushed VVV with the instant lawsuit.

283.    VVV now has no choice but to bring the following counterclaims and third-party claims to protect its rights, recover its financial investment through either the long-promised twelve-year License Agreement or VVV's expectation damages, and to seek additional redress for JKN's and the Third-Party Defendants' wrongs against VVV.

<u>**COUNT I**</u>
**Breach of Contract – Management Agreement**
**(Against JKN)**

284.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

285.    The Management Agreement is a valid, binding, and enforceable contract between VVV and JKN.

286.    VVV performed its obligations under the Management Agreement.

287.    JKN breached its obligations under the Management Agreement.

288.    JKN has breached the Management Agreement by, among other things, the following acts and omissions:

    a.  failing to complete its regulatory approvals required for it to execute the promised twelve-year License Agreement;

    b.  failing to execute the promised twelve-year License Agreement;

    c.  rendering VVV's operation, direction, management, and supervision of the Business (as defined in the Management Agreement) and its additional services impossible;

    d.  failing to pay to VVV all profits from the operation of the Business (as defined in the Management Agreement);

    e.  failing to timely collect, or allow VVV to collect, all license fees owed by the Licensees (as defined in the Management Agreement) under the License Agreement (as defined in the Management Agreement);

    f.  failing to indemnify, defend, and hold harmless VVV against and in respect of any and all claims, demands, losses, costs, obligations, liabilities, damages, recoveries and deficiencies, included interest, penalties and reasonably attorneys' fees that VVV has incurred that arise out of, result from, or relate to JKN's breach and failure to perform in accordance with the Management Agreement's terms.

289. JKN's breaches have damaged VVV in an amount to be proven at trial, but in excess of 75,000.

290. More specifically, VVV calculates its expectation damages/lost profits to be not less than $116,357,876.00.

291. VVV has also incurred crisis public-relations costs as a result of JKN's breaches, in the amount of $28,745.00, and additional public relations costs in an amount to be proven at trial.

292. The Management Agreement provides for attorney fees to a party who successfully asserts its rights under that agreement.

293. VVV is entitled to its attorney fees under those provisions.

294. VVV has incurred attorneys' fees from the Law Offices of Eric C. Fleming in the amount of $107,806.64.

295. VVV has incurred attorney fees from Polsinelli in an amount in excess of $172,242.05.

296. VVV has incurred attorney fees from Barnes & Thornburg in an amount that increases as this dispute progresses.

297. VVV is entitled to a preliminary and permanent injunction barring any further transfer or renewal of the license to operate the Pageants.

298. VVV is entitled to specific performance of JKN's promise to grant VVV a twelve-year License Agreement to operate the Pageants.

## COUNT II
### Breach of Contract – Settlement Agreement
### (Against JKN)

299.  VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

300.  The Settlement Agreement is a valid, binding, and enforceable contract between VVV and JKN.

301.  VVV performed its obligations under the Settlement Agreement.

302.  JKN breached its obligations under the Settlement Agreement.

303.  JKN has breached the Settlement Agreement by, among other things, the following acts and omissions:

a.  failing to work cooperatively and expeditiously with VVV to finalize and sign the twelve-year License Agreement;

b.  communicating to VVV that it was abandoning the concept of granting it the twelve-year License Agreement;

c.  attempting, instead, to grant VVV a one-year master license agreement;

d.  failing to return the $1.5 million payment that VVV paid to JKN for the promised twelve-year License Agreement;

e.  failing to timely respond to VVV regarding the Parties' obligation to agree on who will be the 2024 State Directors for each state;

f.  communicating with potential 2024 State Directors without VVV's knowledge or approval;

g.  representing to potential 2024 State Directors that they would be granted a 2024 State License Agreement without VVV's knowledge or approval;

h.  failing to timely enter into State License Agreements;

i.  failing to comply with federal and all applicable state franchise and business opportunity laws;

j.  misrepresenting the sponsorship allocations and amounts and any other revenue received by JKN for Miss USA and Miss Teen USA in 2023;

k.  breaching its warranty that "there was no other sponsorship revenue received by JKN for the 2023 Miss USA and Miss Teen USA pageants" than what JKN represented in the Settlement Agreement;

l.  failing to timely cause the State Directors to pay the State License Fees for the 2024 Miss USA and Miss Teen USA pageants directly to VVV and impeding their ability to do so by delaying the FDDs and State License Agreements;

m.  failing to forward to VVV all sponsorship and other revenues within five days of receipt;

n.  failing to defend, indemnify, and hold harmless VVV and its owners for any claims, actions, or inquiries brought or initiated by any State Director arising out of any action or inaction by JKN between August 1, 2023 and the date the relevant State Director signs the new State License Agreement for the 2024 pageants related to or arising out the lack of compliance with applicable law or regulations;

o.  for disparaging, impugning, or otherwise speaking or writing negatively about VVV;

p.  for taking action that would subject VVV to ridicule, scandal, reproach, scorn, or indignity, or which negatively impacted the goodwill of VVV; and

q.  for communicating with titleholders and their parents without VVV's knowledge;

r.   as required in the Rules of Engagement, JKN failed to:

     i.   work collaboratively with VVV;

     ii.   attend and be prepared for meetings;

     iii.   be 100% transparent, clear, and honest;

     iv.   directing all State Director communications to VVV;

     v.   respond substantively to each request from VVV within 48 hours of receipt of an email or other written request for information or within 48 hours of receipt of the request;

     vi.   engaging with State Directors without alerting VVV first; and

     vii.   handle State Director issues directly with VVV.

304.   JKN's breaches have damaged VVV in an amount to be proven at trial, but in excess of 75,000.

305.   More specifically, VVV calculates its expectation damages/lost profits to be not less than $116,357,876.00.

306.   VVV has also incurred crisis public-relations costs as a result of JKN's breaches, in the amount of $28,745.00, and additional public relations costs in an amount to be proven at trial.

307.   The Management Agreement and Settlement provide for attorney fees to a party who successfully asserts its rights under those agreements.

308.   VVV is entitled to its attorney fees under those provisions.

309.   VVV has incurred attorneys' fees from the Law Offices of Eric C. Fleming in the amount of $107,806.64.

310.    VVV has incurred attorney fees from Polsinelli in an amount in excess of $172,242.05.

311.    VVV has incurred attorney fees from Barnes & Thornburg in an amount that increases as this dispute progresses.

312.    VVV is entitled to a preliminary and permanent injunction barring any further transfer or renewal of the license to operate the Pageants.

313.    VVV is entitled to specific performance of JKN's promise to grant VVV a twelve-year License Agreement to operate the Pageants.

## COUNT III
### Breach of the Implied Duty of Good Faith and Fair Dealing
### (Against JKN)

314.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

315.    Every contract contains an implied duty of good faith and fair dealing.

316.    Under Delaware Law, a party violates the duty of good faith and fair dealing when it has "1) acted with bad motives or intentions or engaged in deception or evasion in the performance of contract; and 2) by such conduct, denied the party of the bargain initially intended by the parties." MRPC Christiana LLC v. Crown Bank, 2017 WL 6606587, *4 (Del. Super. Ct. Dec. 26, 2017).

317.    Under New York law, "[The covenant of good faith and fair dealing] is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Refreshment Mgmt. Servs., Corp. v. Complete Office Supply Warehouse Corp.*, 89

A.D.3d 913, 915 (2d Dept. 2011) (citing *Aventine Inv. Mgmt. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514 (2d Dept. 1999).

318.    The Management Agreement, which states it is governed by Delaware law, and the Settlement Agreement, which states it is governed by New York law, are valid and binding contracts between JKN and VVV.

319.    JKN has acted with bad motives or intentions in its conduct under the Management Agreement.

320.    JKN has engaged in deception and evasion in its performance of the Management Agreement.

321.    JKN has acted in a manner that has deprived VVV of the right to receive the benefits it bargained for under both the Management Agreement and Settlement Agreement.

322.    JKN's actions set forth in Counts I and II above are hereby incorporated herein by reference.

323.    JKN has violated the implied duty of good faith and fair dealing.

324.    JKN's violation of the implied duty of fair dealing has caused damages to VVV, in the amounts set forth above.

## COUNT IV
### Promissory Estoppel
### (Against JKN)

325.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

326.    JKN made clear and unambiguous promises to VVV, including a promise to grant VVV a twelve-year License Agreement to operate the Pageants.

327.    These promises caused reasonable and foreseeable detrimental reliance on the part of VVV. That reliance specifically included (but is not limited to):

    a.    VVV's payment to JKN of a $1.5 million deposit toward the $6 million purchase price for the twelve-year License Agreement;

    b.    VVV's payment of an additional annual $375,000 installment (as adjusted and set off in the Management and Settlement Agreements) toward the $6 million purchase price for the twelve-year License Agreement;

    c.    VVV's undertaking of additional debt to keep the Business running;

    d.    VVV's payment of costs and expenses of the business;

    e.    VVV's owner's and her spouse's agreement to the personal guaranty.

328.    VVV's detrimental reliance on JKN's promises has resulted in injury and damages to VVV, in an amount to be determined at trial but in excess of $75,000.

### COUNT V
### Unjust Enrichment
### (Against JKN and Legacy)

329.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

330.    As the owners of Miss Universe, JKN and Legacy have been enriched at VVV's expense.

331.    This enrichment includes VVV's $1.5 million down payment toward the twelve-year License Agreement, VVV's payment of a $375,000 installment payment (as adjusted and set off in the Management and Settlement Agreements) toward the $6 million cost of the twelve-year License Agreement, additional funds VVV has injected into the Pageants and the Miss USA organization in the amount of at least $4.16 million, plus debts or expenses of the Pageants that

VVV has covered in an amount to be proven at trial, and the increased brand value Miss Universe has enjoyed thanks to VVV's efforts, in an amount to be quantified.

332.    It would be against equity and good conscience for Miss Universe's owners, JKN and Legacy, to retain these amounts, which VVV seeks to recover.

333.    VVV is therefore entitled to damages for JKN and Legacy's unjust enrichment, in an amount to be determined at trial but in excess of $75,000.

### COUNT VI
### Tortious Interference with Business Relationship and Expectancy
### (Against Legacy, Cantú, BDE, and Brodeur)

334.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

335.    A valid and binding contract existed between VVV and JKN under which JKN was bound to grant VVV a twelve-year License Agreement to operate the Pageants.

336.    Legacy, Cantú, BDE, and Brodeur were each aware of this contract and the business relationship and expectancy it entailed.

337.    Legacy, Cantú, BDE, and Brodeur each intentionally and without justification induced JKN to breach that contract and/or to render performance impossible by granting and/or accepting a ten-year license to BDE.

338.    Legacy, Cantú, BDE, and Brodeur each intentionally and without justification interfered with VVV's business relationship and expectancy.

339.    Legacy, Cantú, BDE, and Brodeur's interference caused injury to VVV, by among other things, depriving it of its expected revenue from the license over the remainder of the twelve-year term.

340.    VVV is therefore entitled to damages for Legacy, Cantú, BDE, and Brodeur's interference in an amount to be determined at trial but in excess of $75,000.

**COUNT VII**
**Civil Conspiracy**
**(Against JKN, Legacy, Cantú, BDE, and Brodeur)**

341.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

342.    JKN, Legacy, Cantú, BDE, and Brodeur made an agreement to do an unlawful act and/or a lawful act by unlawful means.

343.    JKN, Legacy, Cantú, BDE, and Brodeur engaged in a civil conspiracy to tortiously interfere with VVV's business relationships, contracts, and expectation.

344.    After Legacy and Cantú became involved in Miss Universe, they decided, along with JKN, to extract what resources they could from VVV and then cut VVV loose from the organization.

345.    BDE and Brodeur actively joined this conspiracy in order to obtain for themselves the long-term license that had been promised to VVV and that was VVV's contractual right, but which Brodeur had long desired.

346.    JKN, Legacy, Cantú, BDE, and Brodeur agreed to retain VVV's financial contributions to the Pageants and the value of VVV's labor on behalf of the Miss USA brand, to appropriate parts of VVV's business plan for the Pageants, and to deprive VVV of the twelve-year License Agreement and resulting revenue it had been promised.

347.    JKN, Legacy, Cantú, BDE, and Brodeur each engaged in at least one overt act in pursuance of the conspiracy.

348.    Each defendant was a participant to a campaign to jaundice contestants, State Directors, and the public against VVV, creating a false narrative of a toxic environment and poor management. Each made, or caused subordinates to make, or induced associates to make, such statements.

349.    These actions had the purpose and effect of depriving VVV of money, effort, and goodwill, as well as its business expectancy, using the false pretense of a twelve-year license.

350.    JKN, Legacy, Cantú, BDE, and Brodeur's actions, and the conspiracy, have caused injury to VVV.

351.    VVV is therefore entitled to damages for Legacy, Cantú, BDE, and Brodeur's conspiracy in an amount to be determined at trial but in excess of $75,000.

**COUNT VIII**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**(Against JKN, Legacy, and Cantú)**

352.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

353.    VVV is a Florida citizen and resident and has been injured in Florida by JKN's, Legacy's, and Cantú's violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

354.    "Section 501.204(1) of FDUTPA states that '[u]nfair methods of competition, unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.' " *Vintage Motors or Sarasota, Inc. v. MAC Ent. of N.C., LLC*, 36 So.3d 372, 376 (Fla. 2d DCA 2022) (citing Fla. Stat. § 501.204(1)).

355.    Under Fla. Stat. 501.203, the definition of consumer includes a business, partnership, or corporation.

356.    The FDUTPA prohibits deceptive and unfair acts in "trade or commerce." Trade or commerce includes "soliciting, providing, offering . . . any good or service or thing of value."

357.    For purposes of the FDUTPA, a thing of value includes licenses, franchises, and interests.

358.    JKN, Legacy, and Cantú engaged in deceptive and unfair practices in inducing VVV to enter into the Management Agreement and Settlement Agreement.

359.    VVV would not have entered into the Management and Settlement Agreements without JKN, Legacy, and Cantú's false and hollow promise of a twelve-year License Agreement.

360.    After promising VVV a twelve-year License Agreement and inducing it to invest millions of dollars into the Miss USA organization, which VVV would not have done without the promise that it was purchasing a twelve-year license, JKN, Legacy, and Cantú participated in a campaign to jaundice contestants, State Directors, and the public against VVV, creating a false narrative of a toxic environment and poor management.

361.    These actions had the purpose and effect of depriving VVV of money, effort, and goodwill using the false pretense of a twelve-year license.

362.    VVV is aggrieved by a deceptive or unfair trade practice.

363.    By entering into the Agreements, VVV suffered injury, including the expenditure of time, energy, funds, and goodwill.

364.    VVV is therefore entitled to actual damages for JKN, Legacy, and Cantú's violation of the FDUPTA in an amount to be determined at trial but in excess of $75,000.

365.    VVV is entitled to a declaratory judgment that JKN, Legacy, and Cantú engaged in a deceptive or unfair trade practice.

366.    VVV is entitled to injunctive relief to remedy JKN, Legacy, and Cantú's unfair or deceptive trade practices.

367.    VVV is entitled to its reasonable attorney fees and costs.

**COUNT IX**
**Fraudulent Inducement**
**(Against JKN)**

368.    JKN made material misrepresentations or omission of fact to induce VVV to enter into the Settlement Agreement.

369.    JKN represented that it intended to grant VVV a twelve-year License Agreement to operate the Pageants.

370.    JKN represented that it intended to abide by the Rules of Engagement that were in an exhibit to the Settlement Agreement.

371.    The representations described in the preceding three paragraphs were false.

372.    JKN's contemporaneous discussions about future licensing and brand-building opportunities with Brodeur, coupled with JKN's November 2023 bankruptcy filing and its subsequent unreasonable, bad faith, and extra-contractual demand to VVV for additional funds or else JKN would not sign the License Agreement, followed by JKN's pretextual termination of the Management Agreement and its announcement of a long-term licensing agreement with BDE and Brodeur immediately thereafter, all serve to evidence JKN's long-term plan of fraudulent inducement with respect to VVV.

373.    The totality of the circumstances and facts set forth in this Counterclaim and Third-Party Complaint demonstrate JKN's fraudulent inducement of VVV.

374.    JKN had knowledge of the falsity of its misrepresentations.

375.    JKN made its misrepresentation with the intent to defraud VVV.

376.     VVV reasonably relied on JKN's misrepresentation, to VVV's detriment.

377.     By agreeing to the Settlement Agreement, VVV agreed to cover Pageant expenses in an amount enumerated therein; to potentially costly indemnification obligations as described therein (and which JKN has attempted to enforce with respect to litigation pending in Washington State); and to release valuable legal claims that had accrued against JKN.

378.     JKN fraudulently induced VVV to enter into the Settlement Agreement.

379.     JKN's fraudulent inducement has resulted in damages to VVV.

380.     VVV is therefore entitled to damages for JKN's fraudulent inducement in an amount to be determined at trial but in excess of $75,000.

## COUNT X
### Declaratory Judgment

381.     VVV incorporates by reference the allegations in all preceding paragraphs of this Counter-Complaint and Third-Party Complaint as if fully set forth herein.

382.     As demonstrated by JKN's Fourth Cause of Action, an actual and justiciable controversy exists between JKN and VVV as to whether JKN had grounds to terminate the Management Agreement under Section 3.02(b)(iv) of that agreement by engaging in conduct "widely deemed by members of the general public[] to embarrass, offend, insult, shock, or otherwise denigrate public morals, individuals or groups, or that will tend to shock, insult, or offend the community or public morals or decency," and whether the Management Agreement has, in fact, been terminated.

383.     A judicial determination of this controversy is necessary.

384.     VVV has not engaged in conduct "widely deemed by members of the general public[] to embarrass, offend, insult, shock, or otherwise denigrate public morals, individuals or groups, or that will tend to shock, insult, or offend the community or public morals or decency."

385.    JKN did not have grounds to terminate the Management Agreement.

386.    The Management Agreement has not been terminated.

387.    In the alternative, even if VVV's present obligation to manage the Business and its right to be paid for doing so has terminated, JKN's obligation to execute a twelve-year License Agreement with VVV survives any such termination and remains an enforceable obligation.

388.    VVV is therefore entitled to a declaratory judgment that JKN had no contractual grounds to terminate the Management Agreement and that JKN must comply with its obligation to grant VVV the promised twelve-year License Agreement.

## COUNT XI
### Injunctive Relief

389.    VVV has demonstrated a likelihood of success on the merits of its claims, including its claim against JKN for breach of contract for failing to grant VVV a twelve-year License Agreement, as JKN promised in the Management Agreement and the Settlement Agreement, and its FDUTPA claim.

390.    Without injunctive relief barring any further transfers or renewal of the license, VVV will be irreparably harmed.

391.    VVV will also suffer irreparable harm without an injunction barring the appointment of new or different state directors, baring BDE from issuing FDDs and requiring them to be issued only by JKN, and barring any permanent change to Miss USA's operations or structure, pending the outcome of this litigation.

392.    JKN's financial condition is in jeopardy, as evidenced by its parent company's bankruptcy and the Thai investigation for financial fraud. On information and belief, a real danger exists that a future damages award against JKN may become uncollectible.

393.    In addition, VVV was formed for the purpose of operating the Pageants. VVV is in debt and has no other revenue stream. Without the opportunity to earn revenue via the promised License Agreement, VVV's very existence is threatened.

394.    Given the goodwill and reputational interests involved, the license to operate the Miss USA and Miss Teen Pageants is a unique asset, the deprivation of which is not compensable in money damages alone.

395.    For the above reasons, money damages are an insufficient remedy for VVV's injuries.

396.    VVV lacks an adequate remedy at law.

397.    An injunction to prevent future transfers or renewals of the license to operate the Pageants and otherwise preserving the status quo would serve the public interest, as holding parties to their contracts is in the public interest, as is returning integrity to the Miss USA organization.

398.    An injunction would not harm third parties, as the only party with a competing interest is BDE, which as described in this Counterclaim and Third-Party Complaint is a tortfeasor with respect to VVV's contractual rights, which were known to BDE and Brodeur when they accepted an agreement with JKN to operate Miss USA.

399.    VVV is entitled to preliminary and permanent injunctive relief to prevent the further transfer or renewal of the license to operate the Pageants.

**WHEREFORE,** VVV prays for the following relief:

a.    Compensatory and expectation damages for breach of contract, in an amount to be proven at trial;

b.    Compensatory damages for the torts pleaded herein, in an amount to be proven at trial;

c.  Restitution and disgorgement of funds due to which JKN has been unjustly enriched;

d.  Preliminary and permanent injunctions preventing any further transfer or renewal of the license to operate the Pageants;

e.  A preliminary injunction additionally barring the appointment of new or different state directors, baring BDE from issuing FDDs and requiring them to be issued only by JKN, and barring any permanent change to Miss USA's operations or structure, pending the outcome of this litigation;

f.  An order of specific performance compelling JKN to enter into the promised twelve-year License Agreement with VVV;

g.  An award of VVV's reasonable attorney fees and costs, and pre-and post-judgment interest;

h.  All other remedies, legal and equitable, as the Court determines are just.

## JURY TRIAL DEMAND

VVV requests a jury trial on all claims so triable.

Dated: October 20, 2025

Respectfully submitted,

**BARNES & THORNBURG LLP**

*/s/ Kristopher J. Armstrong*

Russell T. Gorkin
BARNES & THORNBURG, LLP
390 Madison Ave., 12th Floor
New York, NY 10017
Tel: (646) 746-2403
Email: RGorkin@btlaw.com

Molly N. Sigler
Tenn. Bar No. BPR# 040151
(*Pro hac vice motion forthcoming*)
BARNES & THORNBURG, LLP
1600 West End Ave.
Nashville, TN 37023
Tel: (612) 367-8728
Email: Molly.Sigler@btlaw.com

Robert C. Folland
Florida Bar No. 1007951
(*Pro hac vice motion forthcoming*)
BARNES & THORNBURG, LLP
3300 PGA Blvd., Suite 510
Palm Beach Gardens, FL 33410
Tel: (561) 473-7565
Email: Rob.Folland@btlaw.com

Kristopher J. Armstrong
Ohio Bar No. 0077799
(*Pro hac vice*)
BARNES & THORNBURG, LLP
41 S. High St., Suite 3300
Columbus, OH 43215
Tel: (614) 628-1475
Email: Kristopher.Armstrong@btlaw.com

*Attorneys for Defendant/Counterclaim*
*Plaintiff/Third-Party Plaintiff VVV Global Ent. Inc.*

## **CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that on this 20th day of October, 2025, the foregoing pleading was served upon all counsel of record via the Court's CM/ECF system.


*/s/ Kristopher J. Armstrong*
Kristopher J. Armstrong