**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JKN UNIVERSE, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>VVV GLOBAL ENT. LLC,<br><br>        Defendant. | 1:25-CV-8234-LJL<br><br>Judge Lewis J. Liman<br><br>**JURY TRIAL DEMANDED** |
| VVV GLOBAL ENT. LLC,<br><br>        Counterclaimant,<br><br>    v.<br><br>JKN UNIVERSE, LLC, d/b/a THE MISS UNIVERSE ORGANIZATION<br><br>        Counterclaim Defendant. | |

**DEFENDANT/COUNTERCLAIMANT**
**VVV GLOBAL ENT. LLC'S FIRST AMENDED COUNTERCLAIM**

Defendant and Counterclaimant VVV Global Ent., LLC ("*VVV*"), for its first amended counterclaim against Plaintiff and Counterclaim Defendant, JKN Universe, LLC, d/b/a The Miss Universe Organization ("*JKN*"), states as follows.[1]

---

[1] VVV reasserts, without amendment, its original Answer and Affirmative Defenses filed in response to JKN's Complaint. (Dkt. No. 21.) VVV amends its Counterclaim as set forth herein. For the avoidance of doubt: VVV does not reassert the Third-Party Complaint that was filed contemporaneously with its original Answer.

**INTRODUCTION**

1. VVV asserts counterclaims for breach of contract, breach of the implied duty of good faith and fair dealing, promissory estoppel, unjust enrichment, violation of the Florida Unfair and Deceptive Trade Practices Act ("*FDUTPA*"), fraudulent inducement, indemnification and defense, and violations of Florida and New York franchise law by JKN, which owns the Miss USA Pageant and the Miss Teen USA Pageant (together, the "*Pageants*").

2. JKN entered into several agreements with VVV in which JKN agreed to negotiate in good faith to finalize a twelve-year master license agreement to operate the Pageants (the "*MLA*") in exchange for $6 million.

3. Despite having long agreed on term length (*i.e.*, 12 years) and price ($6 million), JKN repeatedly delayed and ultimately breached its obligation to negotiate in good faith to finalize all of the ancillary terms and actually convey the license agreement to VVV. That is reflected by the license agreement that JKN subsequently agreed to enter into with a third-party, BDE Miss USA, LLC ("*BDE*"), which is substantially similar in all material respects (aside from the duration and price terms) to the final version of the agreement that VVV's counsel prepared and sent to JKN in June 2025. Had JKN complied with its contractual commitment to VVV, it would have executed that version, or at the very least, countered with the terms JKN ultimately agreed to with BDE.

4. JKN did neither. That is because JKN never intended to convey a MLA to VVV. Instead, using the MLA as bait, JKN convinced VVV to enter into a short-term management agreement to operate the Pageants (the "*Management Agreement*"), which provided VVV with less control over the operation of the Pageants than the MLA would have, and lower funding with which to operate. Meanwhile, the Management Agreement allowed JKN to continue exercising

control that allowed it to extract revenues and other financial benefits to which it would not have been entitled and would have been prevented from usurping once it actually conveyed the license. A true and correct copy of the Management Agreement is attached here to as **Exhibit 1**.

5.    In fact, after JKN failed to abide by the contractual terms set forth in the Management Agreement, it reaffirmed its purported agreement to work in good faith to finalize and convey the MLA by a date certain, in order to induce VVV to (a) enter into a settlement agreement (the "*Settlement Agreement*"), purportedly absolving JKN of its prior breaches and (b) continue managing the Pageants without a license. A true and correct copy of the Settlement Agreement is attached here to as **Exhibit 2**.

6.    However, shortly before the date to finalize the agreement through which JKN was required to convey the license, JKN took one more shot at extracting further financial benefits from VVV to which it otherwise was not entitled.  When VVV refused, JKN purported to terminate the Management Agreement on entirely pretextual grounds in order to unilaterally (and unlawfully) relieve itself of its obligation to finalize and convey the long-term license for the Pageants to VVV.  Moreover, JKN failed to provide VVV with 30 days' written notice or an opportunity to cure any purported default, making the termination ineffective.

7.    JKN also breached provisions of the Management Agreement and the Settlement Agreement requiring payment, indemnification and defense, and non-disparagement.

8.    For its breaches, JKN is liable to VVV for compensatory damages, expectation damages, and attorney fees.

9.    JKN is also liable to VVV for reliance damages, compensatory damages in tort, and damages provided by statute, and JKN must disgorge to VVV the amounts by which it has been unjustly enriched.

## THE PARTIES

10.    Defendant and Counterclaimant, VVV Global Ent., LLC, is a Florida limited-liability company with its principal place of business in Florida. VVV's sole member is Laylah Loiczly, known professionally as Laylah Rose ("*Rose*"). Rose resides in Florida.

11.    Plaintiff and Counterclaim-Defendant, JKN Universe, LLC, is a Delaware limited-liability company with its principal place of business in New York.

## JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction over VVV's counterclaims under 28 U.S.C. § 1332.

13.    This Court has personal jurisdiction over JKN because JKN's principal place of business is in New York and because JKN consented to this Court's jurisdiction in an agreement with VVV.

14.    Venue is proper in this district under 28 U.S.C § 1391(b) because a substantial part of the events giving rise to the claims in this counterclaim occurred here, where JKN has offices.

## FACTS

**The Pageant System**

15.    JKN owns a proprietary system for conducting the Pageants and the Miss Universe Pageant, and it owns the rights to use trademarks associated with the Pageants, including Miss USA, Miss Teen USA, and Miss Universe.

16.    JKN operates under the d/b/a Miss Universe or the Miss Universe Organization (sometimes referred to as "MUO").

4

17.    The Pageants are part of the Miss Universe competition. The winner of the Miss USA Pageant goes on to compete against winners from other countries around the world for the title of Miss Universe.

18.    JKN licenses to third parties the right to operate national-level pageants like Miss USA.

19.    VVV was formed by Rose to become the long-term licensee of the Miss USA and Miss Teen USA Pageants. Rose has a lifetime of experience in the fashion, broadcasting, and pageant businesses.

20.    The Pageants are held annually in the late summer or fall. They must be completed in time for the winner of Miss USA to prepare for and travel to that year's Miss Universe competition.

21.    Similarly, before the national-level Pageants can be conducted, state-level pageants are held in each state and the District of Columbia.  JKN licenses the right to run state-level pageants to "*State Directors*" on an annual basis. The winners of the state-level pageants (both for Miss USA and Miss Teen USA) then go on to compete in their respective national-level Pageants.

22.    Before JKN can issue licenses to a State Director, it must comply with state and federal franchise law, which required JKN to prepare and issue Franchise Disclosure Documents "*FDDs*" to prospective state directors.

23.    Under federal regulations, a franchisor must provide an FDD to the franchisee before accepting a license fee or executing a license. This rule is designed to protect franchisors from predatory franchisees by providing them with relevant information about the franchise before they decide to invest. Federal FDD regulations require franchisors to disclose 23 categories of information.

24.　　Each state also has its own FDD requirements. Some states require FDDs to be filed with the state and approved by authorities before they are issued to franchisees.

25.　　State-pageant license fees are the primary source of funds used to finance the operation of the national Pageants. As a result, timely providing FDDs to prospective State Directors is critical to ensuring that the State Directors' license fees will be paid in a timely fashion, thereby ensuring sufficient funds to operate the national Pageants.

**JKN and VVV Enter into a Series of Contracts**

### 1. The MLA Term Sheet

26.　　On December 20, 2022, JKN and VVV entered into a contract requiring JKN to convey a twelve-year license with respect to the Miss USA and Miss Teen USA Pageants by April 1, 2023 (the "***Term Sheet***").

27.　　In particular, the license would grant VVV the right to conduct the Pageants and use and display certain "Proprietary Marks," thereby entitling VVV to (1) all license fees paid by State Directors to run state-level Pageants, (2) broadcasting fees, (3) sponsorship fees, (4) merchandising for the Proprietary Marks, and (5) talent management fees from titleholders of the Pageants.

28.　　The parties agreed that VVV would pay $6 million in total for the license, with a $1.5 million "***Deposit***" to be paid by December 23, 2022, and the remainder being paid in twelve annual installments of $375,000 each. VVV further agreed to post a $4.5 million irrevocable letter of credit to secure the annual payments, while the parties agreed that VVV's $1.5 million Deposit would be refundable if the parties did not enter into the MLA by April 1, 2023.

29.      Before VVV executed the Term Sheet and paid the $1.5 million Deposit, JKN represented to VVV that JKN maintained a bank account with $1.5 million in it that VVV would be able to use to pay Pageant expenses on a going-forward basis.

30.      VVV timely paid the $1.5 million Deposit to JKN and provided the $4.5 million irrevocable letter of credit. JKN did not provide VVV with an FDD before accepting the Deposit.

**2.  The Management Agreement**

31.      In fact, the parties did not enter into the MLA by April 1, 2023, because JKN had not completed the regulatory requirements necessary to transfer the license.

32.      By July 2023, JKN represented to VVV that it still had not able to satisfy the regulatory requirements needed to convey the MLA to VVV, but JKN communicated to VVV that it was working expeditiously to do so.

33.      In the meantime, to allow the parties to move forward with their plan to have VVV take primary operational control of the 2023 Pageants, JKN and VVV entered into a second agreement, the Management Agreement, on July 28, 2023.

34.      JKN assured VVV that the Management Agreement was solely an interim agreement to allow VVV to begin taking over the operation of the Pageants while JKN satisfied the legal requirements needed to convey the MLA.  Indeed, that representation was incorporated directly into the Management Agreement itself, which provided a term running from the Effective Date of July 28, 2023, through "the earlier of the day after the 2025 State-Level Pageants or all required regulatory approvals have been obtained (the 'Term'), at which time the parties ***shall*** execute a definitive License Agreement in the form attached hereto as Exhibit A, subject to customary terms and conditions that are mutually satisfactory to the parties." [*Id*. § 3.01.]

35. To fund the operation of the Pageants, the Management Agreement required JKN to collect all license fees from the State Directors and transfer them to VVV. [*Id.* § 2.01.]

36. The Management Agreement permitted JKN to deduct $255,137 from the State Directors license fees paid to VVV [*id.*], which represented VVV's $375,000 annual payment toward the $6 million MLA licensing fee, offset to account for holdover expenses. The State Director license fees were therefore intended to be the lifeblood that allowed VVV to operate the Pageants during the Term, and JKN understood and acknowledged this.

37. The Management Agreement nevertheless required VVV to absorb $516,000.00 of 2022 and 2023 operating costs that were deducted from the 2023 State Director license fees that JKN was required to pay to VVV. When discussing the consideration for VVV's absorption of these costs, JKN's attorney stated, referring to the MLA, that "[VVV] is receiving the longest license for the Miss USA/Miss Teen USA in the pageant's history."

38. The Management Agreement provided VVV with less control and restricted revenue, compared with the MLA. The MLA would have allowed VVV to take full control of the Pageants. Among other things, the MLA would have enabled VVV to (1) issue its own FDDs and directly sub-license to State Directors the right to conduct state-level pageants and to do so on VVV's own timeline, (2) directly set and collect license fees from State Directors and/or registration fees from contestants, (3) directly engage with and collect revenue from sponsors and partnerships, (4) sell merchandise and tickets and collect event revenues, and (5) control and collect fees from broadcasting and media rights.

39. In contrast, the Management Agreement allowed JKN to remain involved in the operation of the Pageants. Without the MLA, VVV could not prepare and issue FDDs, leaving the timing and collection of the revenues needed to properly fund and operate the Pageants entirely

under JKN's control. JKN also retained the practical ability to select the State Directors, with whom VVV was required to conduct business. The Management Agreement also included the additional requirement that VVV's owner and her husband provide personal guarantees of VVV's financial obligations to JKN, which was not contemplated in the MLA. And the Management Agreement provided only one source of revenue—the State Director fees—as opposed to the multiple sources, including licensing fees for branded products and services, that would have been available under the MLA.

40.     Before VVV signed the Management Agreement, VVV was told that under JKN's business plan, it could expect to receive 20% of the sponsorship fees to help produce the Pageants.

41.     In contrast, when JKN granted VVV the MLA, VVV would be entitled to significant revenue from license fees paid by the State Directors and/or from contestant registration fees, as well as all the revenue from sponsorship fees and from licensing Miss-USA- and Miss-Teen-USA-branded products and services. The twelve years of expected revenue would have enabled VVV to turn a profit on its initial investment.

42.     The Management Agreement further provided that if its term was extended beyond the 2023 state-level pageants, the same process outlined above would be followed, except the "annual fee" deducted from the State Director license fees paid by JKN to VVV would be $375,000, [*id*.], *i.e.*, the amount of one annual installment of the license fee for the MLA under the Term Sheet.

43.     The Management Agreement expressly provided that it could be unilaterally terminated by JKN only upon 30 days' written notice based upon the following specifically enumerated circumstances:

      a.  If VVV was "in default of any of the covenants or obligations" in the Management Agreement or "in violation of any applicable law," and failed to take action to cure

any such default or violation within 30 days after having received written notice of such default or violation from JKN. [*Id*. § 3.02(a).]

b. If JKN terminated the State Directors' licenses or decided to stop holding the Pageants. [*Id*. § 3.02(b).]

c. If VVV failed to maintain insurance required by the Management Agreement; or

d. If VVV engaged in "improper action(s) or inaction(s)" that subjected VVV to "public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency in [JKN's] reasonable and good faith opinion." [*Id*.]

44.    Pursuant to the Management Agreement, VVV organized and executed the 2023 Pageants. It did so in only two months. The 2023 Pageants were highly successful thanks to VVV's management. The Pageants were broadcast nationwide on the CW television network, thanks to an exclusive broadcast-partnership agreement that VVV reached with the CW network, based on VVV's connections in the industry.

45.    VVV was required to use its own funds to finance the operation of the 2023 Pageants because JKN breached its obligation to timely issue FDDs and collect and transfer to VVV state licensing fees.

46.    JKN collected the State Director license fees in approximately September 2023—roughly contemporaneously with VVV's hosting the 2023 Pageants.

47.    Yet, JKN did not pay the 2023 State Director licensee fees to VVV, nor deposit any sponsor or ticket revenue in a designated account as it had represented it would.

**3. The Settlement Agreement**

48.    By March 1, 2024, JKN had still failed to transfer the 2023 State Director license fees and sponsor fees it owed to VVV, and the parties still had not entered into the MLA.

49.     In addition, a dispute had arisen concerning JKN's interference with VVV's management of the Pageants, including by engaging directly with State Directors about matters VVV possessed the sole right to communicate them about.

50.     After a series of discussions related to JKN's breaches of the Management Agreement, JKN and VVV entered into the Settlement Agreement, with a March 1, 2024 effective date, to resolve their rights, roles, and responsibilities with respect to finalizing the MLA and performing under the Management Agreement in the interim. [Ex. 2 Recital I.]

51.     The Settlement Agreement incorporated, by way of Section 1, certain recitals as part of the parties' agreement detailing the parties' history and providing relevant context regarding the rest of the agreement, including:

a.  "The Parties entered into a Letter of Intent ('LOI' [the Term Sheet]) on December 20, 2022 pursuant to which VVV paid $1,500,000 and agreed to pay additional 12 payments of $375,000 to JKN for the right to enter into a 12 year master license agreement . . . for the operation of the Miss USA and Miss Teen USA pageants";

b.  The parties did not sign the License Agreement by April 1, 2023 as they had agreed;

c.  VVV put on the 2023 Pageants under the Management Agreement;

d.  As of the date of the Settlement Agreement, JKN had not "paid to VVV the State Director License Fees and sponsor fees due and owing for the 2023 pageants";

e.  As of the date of the Settlement Agreement, the parties had not signed the License Agreement.

52.     This, in Section 3(a), JKN agreed to "work cooperatively and expeditiously to finalize and sign a twelve-year master license agreement . . . with VVV, with [a retroactive] effective date of April 30, 2023." [*Id.* § 3(a).]

53.     In Section 4(a), the parties agreed that VVV would continue to manage the 2024 Pageants under the Management Agreement during "the Interim Period," *i.e.*, while the Parties negotiate[d] the Master License Agreement." [*Id.* § 4(a).]

11

54. Although JKN was still legally required to issue FDDs and execute the State Director licensing agreements, JKN agreed that the fees due under those agreements could be paid directly to VVV so as to reduce any delay associated with VVV obtaining the revenues to which it was entitled and which it needed to operate the 2024 Pageants resulting from JKN acting as a middleman. [*Id*. § 5(b).]

55. JKN also agreed to pay to VVV "pay to VVV as required under the Management Agreement all amounts owed for the 2023 pageants," and to pay over all sponsorship and other revenues to VVV. [*Id*. § 5(a).]

56. The Settlement Agreement further required JKN to give VVV credit in the amount of $140,876, applied toward the second of the 12 annual $375,000 payments that VVV was required to make to JKN under the Term Sheet. [*Id*. § 5(a).]

57. The parties also agreed to certain communication standards, called "Rules of Engagement," set forth in Exhibit B to the Settlement Agreement. [*Id*. § 4(b).]

58. The Rules of Engagement reaffirmed that JKN could not engage directly with State Directors but would instead direct any inquiries to VVV.

59. The Settlement Agreement contained mutual releases, by both JKN and VVV, of claims against the other arising prior to the effective date of the Settlement Agreement, March 1, 2024. [*Id*. § 7.]

60. The mutual releases expressly excluded claims arising from a breach of the Settlement Agreement and claims arising from a breach of the Management Agreement accruing after the effective date of the Settlement Agreement. [*Id*.]

61. After entering into the Settlement Agreement, VVV went to work on putting on the 2024 Pageants. In April 2024, VVV extended its broadcast partnership with the CW network into

a multi-year deal to broadcast the Pageants in English nationwide.  An April 25, 2024 CW press release noted that VVV's 2023 Pageants had been "the network's #1 new special of the year and delivered the pageant's strongest performance of the last three years on television," with a peak viewership of over 1.1 million total viewers.

62.    JKN delayed completing its contractual duty to prepare the FDDs and complete the additional state-specific franchise requirements that were necessary prerequisites to securing the State Director license agreements, which were in turn prerequisites to ensuring that VVV received the State Director license fees, which were supposed to fund the Pageants.

63.    Once again, under VVV's direction and control, the 2024 Pageants were a rousing success, despite the fact that VVV again had to largely self-finance their operation because JKN had once again failed to timely prepare the FDDs needed to enter into state licensing agreements and collect state licensing fees.

64.    VVV's expenses for the 2024 Pageants included the cost of hiring a production company. Production company costs totaled $2,053,574.84, of which $1,828,637.09 was for the 2024 Pageants.

65.    VVV also incurred $28,745.00 for crisis public relations.

66.    VVV incurred Pageant-related costs from the Hotel Biltmore for $14,358.79.

67.    Due to JKN's failure to properly fund the Pageants in both 2023 and 2024, VVV was forced to take on debt to cover these and other costs. VVV's total debt, which is attributable to operational costs for the Pageants, exceeds $4,160,000.00.

68.    Subsequently, VVV continued to seek to finalize the MLA in good faith.

69.    In November 2024, the parties discussed a joint venture instead of an MLA. However, in January 2025, VVV rejected the joint venture.

13

70.     In March 2025, the parties resumed discussing a license.

71.     On May 21, 2025, JKN's then-CEO, Jakkaphong "Anne" Jakrajutatip, texted Rose on behalf of JKN stating the following, promising a twelve-year MLA, to which Rose responded, "Hi, yes, confirmed!"



72.     On May 29, 2025, VVV's counsel emailed to JKN's then-Vice President of International Relations, Mario Búcaro, a draft MLA reflecting the agreement discussed by Rose and Jakrajutatip.

73.     On June 2, Búcaro responded via email. Búcaro thanked VVV's counsel and stated that JKN would review the draft and get back to VVV.

14

74.    On June 20, VVV's counsel followed up with Búcaro about the status of the draft MLA.

75.    Búcaro did not respond to VVV's counsel's inquiry.

76.    On July 15, 2025, Rose participated in a telephone call with Búcaro and Jakrajutatip.

77.    On the July 15 call, Búcaro stated that Miss Universe was losing money. He cited two lawsuits for which it wanted VVV to indemnify it, and he cited the $2 million it would take to put on the fast-approaching 2025 Pageants.

78.    Rose responded that in order to put on the Pageants, VVV needed the money from the State Director license fees, which it could not receive until JKN issued FDDs to the State Directors.

79.    Despite Jakrajutatip's recent confirmation that JKN was ready to finally convey the long-negotiated 12-year license on financial terms to which both sides agreed, Búcaro stated that JKN would not sign the MLA without a commitment from VVV regarding indemnification and pre-funding the 2025 Pageants.

80.    Those requirements were not a condition precedent to JKN's obligation to negotiate in good faith and then enter into the MLA. They also were inconsistent with the Management Agreement and the Settlement Agreement, which provided that State-Director license fees would fund the Pageants and that JKN would indemnify VVV for claims alleging franchise violations.

81.    On July 17, 2025, two days after Rose refused Búcaro's extortionate demand, José Castillo, Vice President of Operations for Miss Universe, sent a letter to Rose purporting to terminate the Management Agreement (the "***Termination Letter***"). A true and accurate copy of the Termination Letter is attached as **Exhibit 3**.

82.     In the Termination Letter, Castillo cited eight reasons supporting the decision to terminate the Management Agreement. The cited reasons were: (1) Term Sheet Revisions, (2) Master License Agreement, (3) Communication Failures, (4) Titleholder Resignations & Brand Damage, (5) Employee Instability, (6) Alma Cooper (Miss Universe USA 2024), (7) State Director Vacancies & Management Gaps, and (8) Washington State Litigation.

83.     Each of the eight reasons cited in the Termination Letter was based in falsehood, was merely a pretext for terminating VVV's involvement in the Pageants, or both.

84.     The first reason, "Term Sheet Revisions," referred not to the Term Sheet for the MLA but to a term sheet for the short-lived joint-venture proposal that VVV entertained, without waiver of JKN's obligation to negotiate and enter into the MLA. This "term sheet" had nothing to do with the Management Agreement, did not constitute a default of any provision of the Management Agreement, and predated JKN's stated willingness, on both May 21 and July 15, 2025, to continue with VVV as manager and licensee.

85.     The second reason, "delays" and "substandard terms" in negotiations related to the MLA, is belied by (a) JKN's delay in responding to VVV's counsel's emails after Rose and Jakrajutatip reached their May 21 agreement, (b) JKN's failure to identify any specific terms it found to be "substandard," (c) JKN's failure to make a counter-proposal, and (d) JKN's subsequent agreement to an MLA with BDE with materially the same terms except for duration and price. The only reason JKN had to "move on without" the MLA was its desire to sell the license to another party for a higher price.

86.     The third, fifth, and seventh reasons, "communication failures," "employee instability," and "state director vacancies & management gaps," are factually unsupported. Further, they do not constitute defaults of any provision of the Management Agreement. And any events on

which these allegations could be based would have occurred, if at all, prior to JKN's stated willingness, on both May 21 and July 15, 2025, to continue with VVV as manager and licensee.

87.    The fourth reason, "titleholder resignations and brand damage," stems from the resignation of the 2023 Miss USA titleholder due to self-described "mental health issues" after the titleholder failed to fulfill her contractual obligations and VVV attempted to seek her compliance in communications that JKN agreed with and approved. Further, the events surrounding the resignations all preceded, by a year or more, JKN's stated willingness, on both May 21 and July 15, 2025, to continue with VVV as manager and licensee. In addition, JKN's subsequent sale of the license fully negate its claim of brand damage.

88.    The sixth reason, threatened litigation by the 2024 Miss USA titleholder, does not represent a failure of Management by VVV. The titleholder sought her salary and other benefits, but was an active-duty servicemember and was prohibited by the U.S. Army from receiving those benefits. VVV had a memorandum of understanding with the U.S. Army to that effect and could not have paid the benefits without violating its agreement with the Army. Further, the events regarding this titleholder predated JKN's stated willingness, on both May 21 and July 15, 2025, to continue with VVV as manager and licensee.

89.    The eighth reason, litigation filed against JKN and VVV in Washington state by a former State Director alleging violations of franchise law and related causes of action, is contrary to the indemnification provisions in the Management Agreement and Settlement Agreement. Those agreements put JKN squarely in charge of franchise-law compliance and State Director license agreements and require JKN to indemnify VVV in any action arising from franchise obligations. VVV had no obligation to indemnify or defend JKN in the Washington-state litigation. The

17

initiation of that litigation also predated JKN's stated willingness, on both May 21 and July 15, 2025, to continue with VVV as manager and licensee.

90.     Further, JKN did not give VVV prior written notice and 30 days to cure any of the cited "reasons" for terminating the Management Agreement.

91.     The Termination Letter did not mention or purport to terminate the Settlement Agreement.

92.     In September 2025, JKN announced that it was granting a ten-year MLA to operate the Pageants to a third party.

93.     The MLA that JKN entered into with the third party was not identical to the MLA that VVV's counsel sent to JKN reflecting the terms agreed to by Jakrajutatip on May 21, but the only material differences were the price and duration.

## COUNT I
**Breach of Contract – Management Agreement**

94.     VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

95.     The Management Agreement is a valid, binding, and enforceable contract between VVV and JKN.

96.     VVV performed its obligations under the Management Agreement.

97.     JKN breached its obligations under the Management Agreement.

98.     JKN has breached the Management Agreement by, among other things, the following acts and omissions:

    a.   failing to complete its regulatory approvals required for it to execute the promised MLA, in violation of Section 3.01;

    b.   failing to execute the MLA, in violation of Section 3.01;

18

c.  interfering with VVV's operation, direction, management, and supervision of the Business, in violation of Sections 1.01, 1.02, 1.04, and 4.01;

d.  failing to pay to VVV all profits from the operation of the Business, in violation of Section 1.02 and Section 2;

e.  failing to timely collect, or allow VVV to collect, all license fees owed by the Licensees (as defined in the Management Agreement) under the License Agreement (as defined in the Management Agreement), in violation of Sections 1.02 and 2.01;

f.  failing to indemnify and defend VVV against a lawsuit filed against VVV and JKN in Washington state by a State Director called NW Productions, in violation of Section 4.02;

g.  failing to indemnify, defend, and hold harmless VVV against and in respect of any and all claims, demands, losses, costs, obligations, liabilities, damages, recoveries and deficiencies, included interest, penalties and reasonably attorneys' fees that VVV has incurred that arise out of, result from, or relate to JKN's breach and failure to perform in accordance with the Management Agreement's terms, in violation of Section 4.02;

h.  "terminating" the Management Agreement without justification, in violation of Section 3.02;

i.  "terminating" the Management Agreement for pretextual and false reasons, in violation of Section 3.02; and

j.  "terminating" the Management Agreement without providing prior written notice and a 30-day opportunity to cure the alleged defaults, in violation of Section 3.02.

99.    VVV calculates its expectation damages/lost profits to be not less than $116,357,876.00.

100.    VVV has also incurred crisis public-relations costs as a result of JKN's breaches, in the amount of $28,745.00, and additional public relations costs in an amount to be proven at trial.

101.    The Management Agreement provides for attorney fees to a party who successfully asserts its rights under that agreement.

102.    VVV is entitled to its attorney fees under that provision.  [Ex. 1 § 4.07.]

19

103.    VVV has incurred attorneys' fees from the Law Offices of Eric C. Fleming in the amount of $107,806.64.

104.    VVV has incurred attorney fees from Polsinelli in an amount in excess of $172,242.05.

105.    VVV has incurred and will continue to incur attorney fees from Barnes & Thornburg in connection with this litigation.

106.    VVV is entitled to a permanent injunction barring any transfer to any third party (or renewal with any third party) of the license to operate the Pageants pending regulatory approval and/or the compliance with regulatory requirements for the transfer to VVV of the license described in the Term Sheet and Settlement Agreement as part of the MLA.

107.    VVV is entitled to an order of specific performance compelling JKN to comply with its contractual duty to expeditiously negotiate with VVV in good faith regarding the final terms of the MLA.

108.    VVV is entitled to an order of specific performance compelling JKN to comply with its contractual duty to enter into the MLA with VVV.

## COUNT II
### Breach of Contract – Settlement Agreement

109.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

110.    The Settlement Agreement is a valid, binding, and enforceable contract between VVV and JKN.

111.    VVV performed its obligations under the Settlement Agreement.

112.    JKN breached its obligations under the Settlement Agreement.

113.    JKN has breached the Settlement Agreement by, among other things, the following acts and omissions:

a.    failing to work cooperatively and expeditiously with VVV to finalize and sign the MLA, in violation of Section 3(a);

b.    communicating to VVV that it was abandoning the concept of granting it the MLA, in violation of Recital A and Sections 1 and 3(a);

c.    failing to execute the MLA in violation of Recital A, Section 1, and Section 3(a);

d.    failing to return the $1.5 million Deposit that VVV paid to JKN for the MLA, in violation of Recital A and Sections 1 and 3(a);

e.    failing to return the $375,000 installment VVV paid JKN toward the license fee for the MLA, in violation of Recital A and Sections 1 and 3(a);

f.    failing to timely respond to VVV regarding the Parties' obligation to agree on who will be the 2024 State Directors for each state, in violation of Section 4(b) (as well as Section 3 of the Amendment to the Management Agreement), Section 4(c), and the Rules of Engagement;

g.    communicating with potential 2024 State Directors without VVV's knowledge or approval, in violation of Sections 4(b), 4(c), and the Rules of Engagement;

h.    representing to potential 2024 State Directors that they would be granted a 2024 State License Agreement without VVV's knowledge or approval, in violation of Sections 4(b), 4(c), and the Rules of Engagement;

i.    failing to timely enter into State Director license agreements, in violation of Section 4(d);

j.    failing to comply with federal and all applicable state franchise and business opportunity laws, in violation of Section 4(d);

k.    misrepresenting the sponsorship allocations and amounts and any other revenue received by JKN for Miss USA and Miss Teen USA in 2023, in violation of Section 5(a);

l.    breaching its warranty that "there was no other sponsorship revenue received by JKN for the 2023 Miss USA and Miss Teen USA pageants" than what JKN represented in the Settlement Agreement, in violation of Section 5(a);

m.    failing to timely cause the State Directors to pay the state license fees for the 2024 Miss USA and Miss Teen USA pageants directly to VVV and impeding their ability to do so by delaying the FDDs and State Director license agreements, in violation of Section 5(b);

21

n.  failing to forward to VVV all sponsorship and other revenues within five days of receipt, in violation of Section 5(b);

o.  failing to pay VVV all funds it is owed under the Management Agreement and Settlement Agreement, in violation of Section 5;

p.  failing to indemnify and defend VVV against a lawsuit filed against VVV and JKN in Washington state by a State Director called NW Productions, in violation of Section 6(a);

q.  failing to defend, indemnify, and hold harmless VVV and its owners for any claims, actions, or inquiries brought or initiated by any State Director arising out of any action or inaction by JKN between August 1, 2023 and the date the relevant State Director signs the new State License Agreement for the 2024 pageants related to or arising out the lack of compliance with applicable law or regulations, in violation of Section 6(a);

r.  disparaging, impugning, or otherwise speaking or writing negatively about VVV, in violation of Section 8;

s.  taking action that would subject VVV to ridicule, scandal, reproach, scorn, or indignity, or which negatively impacted the goodwill of VVV, in violation of Section 8;

t.  communicating with titleholders and their parents without VVV's knowledge, in violation of Section 4(b) (as well as Section 3 of the Amendment to the Management Agreement) and the Rules of Engagement; and

u.  in addition, as required by Section 4(b), Section 3 of the Amendment to the Management Agreement, and the Rules of Engagement, JKN failed to:

    i.   work collaboratively with VVV;

    ii.  attend and be prepared for meetings;

    iii. be 100% transparent, clear, and honest;

    iv.  directing all State Director communications to VVV;

    v.   respond substantively to each request from VVV within 48 hours of receipt of an email or other written request for information or within 48 hours of receipt of the request;

    vi.  engaging with State Directors without alerting VVV first; and

    vii. handle State Director issues directly with VVV.

22

114. More specifically, VVV calculates its expectation damages/lost profits to be not less than $116,357,876.00.

115. VVV has also incurred crisis public-relations costs as a result of JKN's breaches, in the amount of $28,745.00, and additional public relations costs in an amount to be proven at trial.

116. The Settlement Agreement provides for attorney fees to a party who successfully asserts its rights under that agreement.

117. VVV is entitled to its attorney fees under that provision. [Ex. 2 § 12.]

118. VVV has incurred attorneys' fees from the Law Offices of Eric C. Fleming in the amount of $107,806.64.

119. VVV has incurred attorney fees from Polsinelli in an amount in excess of $172,242.05.

120. VVV has incurred attorney fees from Barnes & Thornburg in an amount that increases as this dispute progresses.

121. VVV is entitled to a permanent injunction barring any transfer to any third party (or renewal with any third party) of the license to operate the Pageants pending regulatory approval and/or the compliance with regulatory requirements for the transfer to VVV of the license described in the Term Sheet and Settlement Agreement as part of the MLA.

122. VVV is entitled to an order of specific performance compelling JKN to comply with its contractual duty to expeditiously negotiate with VVV in good faith regarding the final terms of the MLA.

123. VVV is entitled to an order of specific performance compelling JKN to comply with its contractual duty to enter into the MLA with VVV.

## COUNT III
### Breach of the Implied Duty of Good Faith and Fair Dealing

124.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

125.    Every contract contains an implied duty of good faith and fair dealing.

126.    Under Delaware Law, a party violates the duty of good faith and fair dealing when it has "1) acted with bad motives or intentions or engaged in deception or evasion in the performance of contract; and 2) by such conduct, denied the party of the bargain initially intended by the parties." MRPC Christiana LLC v. Crown Bank, 2017 WL 6606587, *4 (Del. Super. Ct. Dec. 26, 2017).

127.    Under New York law, "[The covenant of good faith and fair dealing] is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Refreshment Mgmt. Servs., Corp. v. Complete Office Supply Warehouse Corp.*, 89 A.D.3d 913, 915 (2d Dept. 2011) (citing *Aventine Inv. Mgmt. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514 (2d Dept. 1999).

128.    The Management Agreement, which states it is governed by Delaware law, and the Settlement Agreement, which states it is governed by New York law, are valid and binding contracts between JKN and VVV.

129.    JKN has acted with bad motives or intentions in its conduct under the Management Agreement.

130.    JKN has engaged in deception and evasion in its performance of the Management Agreement.

24

131.    JKN has acted in a manner that has deprived VVV of the right to receive the benefits it bargained for under both the Management Agreement and Settlement Agreement.

132.    JKN's actions set forth in Counts I and II above are hereby incorporated herein by reference.

133.    JKN has violated the implied duty of good faith and fair dealing.

134.    JKN's violation of the implied duty of fair dealing has caused damages to VVV, in the amounts set forth above.

### COUNT IV
### Promissory Estoppel

135.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

136.    JKN made clear and unambiguous promises to VVV, including a promise to grant VVV a twelve-year License Agreement to operate the Pageants.

137.    These promises caused reasonable and foreseeable detrimental reliance on the part of VVV. That reliance specifically included (but is not limited to):

   a.    VVV's payment to JKN of a $1.5 million deposit toward the $6 million purchase price for the twelve-year License Agreement;

   b.    VVV's agreement to the Management Agreement and Settlement Agreement and the release of claims therein;

   c.    VVV's payment of additional annual $375,000 installments (as adjusted and set off in the Management and Settlement Agreements) toward the $6 million purchase price for the twelve-year License Agreement;

   d.    VVV's undertaking of additional debt to keep the Business running;

   e.    VVV's payment of costs and expenses of the business;

25

f.   VVV's owner's and her spouse's agreement to the personal guaranty.

138.   VVV's detrimental reliance on JKN's promises has resulted in injury and damages to VVV, in an amount to be determined at trial but in excess of $75,000.

## COUNT V
### Unjust Enrichment

139.   VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

140.   As the owner of Miss Universe, JKN has been unjustly enriched at VVV's expense.

141.   This unjust enrichment includes VVV's $1.5 million Deposit toward the twelve-year License Agreement, VVV's payment of two $375,000 installment payments (as adjusted and set off in the Management and Settlement Agreements) toward the $6 million cost of the twelve-year License Agreement. JKN has retained those payments yet refused to grant VVV the MLA.

142.   JKN's unjust enrichment at VVV's expense also includes additional funds VVV injected into the Pageants and the Miss USA organization in the amount of at least $4.16 million, plus debts or expenses of the Pageants that VVV has covered in an amount to be proven at trial, and the increased brand value Miss Universe has enjoyed thanks to VVV's efforts, in an amount to be quantified.

143.   It would be against equity and good conscience for JKN to retain these amounts, which VVV seeks to recover.

144.   VVV is therefore entitled to damages for JKN and Legacy's unjust enrichment, in an amount to be determined at trial but in excess of $75,000.

## COUNT VIII
### Violation of the Florida Deceptive and Unfair Trade Practices Act

145.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

146.    VVV is a Florida citizen and resident and has been injured in Florida by JKN violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

147.    Section 501.204(1) of FDUTPA bars unfair methods of competition, unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce.

148.    Under Fla. Stat. 501.203, the definition of consumer includes a business, partnership, or corporation.

149.    The FDUTPA prohibits deceptive and unfair acts in "trade or commerce." Trade or commerce includes "soliciting, providing, offering . . . any good or service or thing of value."

150.    For purposes of the FDUTPA, a thing of value includes licenses, franchises, and interests.

151.    JKN engaged in deceptive and unfair practices in inducing VVV to enter into the Management Agreement and Settlement Agreement.

152.    VVV would not have entered into the Management and Settlement Agreements without JKN's continued false and hollow promises that it would execute a twelve-year MLA with VVV once regulatory approvals were secured.

153.    After promising VVV a twelve-year MLA and inducing it to invest millions of dollars into the Miss USA organization, which VVV would not have done without the promise that it was purchasing a twelve-year license, JKN participated in a campaign to jaundice contestants,

State Directors, and the public against VVV, creating a false narrative of a toxic environment and poor management.

154. These actions had the purpose and effect of depriving VVV of money, effort, and goodwill using the false pretense of a twelve-year MLA.

155. JKN engaged in deceptive and unfair practices in accepting and retaining from VVV, among other things, a $1.5 million deposit and a $375,000.00 annual license fee, despite never executing a final license agreement, in violation of Florida's Franchise Misrepresentation Act, Fla. Stat. § 817.416(2).

156. JKN engaged in deceptive and unfair practices in misrepresenting to VVV the known required total investment for the subject franchise, in violation of Florida's Franchise Misrepresentation Act, Fla. Stat. § 817.416(2).

157. VVV is aggrieved by each of the above-described deceptive or unfair trade practices.

158. VVV suffered injury caused by JKN's deceptive or unfair trade practices, including the expenditure of time, energy, funds, and goodwill, and the release of claims.

159. VVV is therefore entitled to actual damages for JKN's violation of the FDUTPA in an amount to be determined at trial but in excess of $75,000.

160. VVV is entitled to a declaratory judgment that JKN engaged in a deceptive or unfair trade practice.

161. VVV is entitled to injunctive relief to remedy JKN's unfair or deceptive trade practices.

162. VVV is entitled to its reasonable attorney fees and costs.

**COUNT IX**
**Fraudulent Inducement**

163.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

164.    JKN made material misrepresentations or omission of fact to induce VVV to enter into the Settlement Agreement.

165.    JKN represented that it intended to grant VVV a twelve-year MLA to operate the Pageants.

166.    JKN represented that it intended to abide by the Rules of Engagement that were in an exhibit to the Settlement Agreement.

167.    The representations described in the preceding three paragraphs were false.

168.    JKN knew its representations were false when it made them.

169.    While promising VVV a twelve-year MLA, JKN was engaged in contemporaneous discussions about future licensing and brand-building opportunities with a third party.

170.    Additionally, shortly after one Miss Universe executive texted VVV to confirm it was going to be receiving the long-discussed MLA, another executive made an unreasonable, bad faith, and extra-contractual demand to VVV for additional funds, threatening that JKN would not sign the MLA.

171.    JKN pretextually terminated the Management Agreement and announced a long-term licensing agreement with a third party almost immediately thereafter.

172.    The above facts all serve to evidence JKN's long-term plan of fraudulent inducement with respect to VVV. Under that plan JKN intended to extract as much labor and as many funds as it could from VVV using the lure of a twelve-year MLA, only to terminate those

discussions when VVV no longer proved "useful" because VVV refused to spend more of its own money putting on the Pageants without an actual MLA in place.

173.    The totality of the circumstances and facts set forth in this Counterclaim demonstrate JKN's fraudulent inducement of VVV.

174.    JKN had knowledge of the falsity of its misrepresentations.

175.    JKN made its misrepresentation with the intent to defraud VVV.

176.    VVV reasonably relied on JKN's misrepresentation, to VVV's detriment.

177.    By agreeing to the Settlement Agreement, VVV agreed to cover Pageant expenses in an amount enumerated therein; to potentially costly indemnification obligations as described therein (and which JKN has attempted to enforce with respect to litigation pending in Washington State); and to release valuable legal claims that had accrued against JKN.

178.    JKN fraudulently induced VVV to enter into the Settlement Agreement.

179.    JKN's fraudulent inducement has resulted in damages to VVV.

180.    VVV is therefore entitled to damages for JKN's fraudulent inducement in an amount to be determined at trial but in excess of $75,000.

**COUNT X**
**Indemnification and Defense**

181.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

182.    An action has been brought against JKN and VVV in the Superior Court of Pierce County, Washington, by a former State Director, NW Productions, LLC, Case No. 25-2-08202-0, filed on April 30, 2025. A copy of the Complaint in the action is attached as **Exhibit 4**.

183.    The action alleges violations of Washington franchise law and other related claims, all arising from the process of licensing NW Productions as a State Director.

184.    JKN had a contractual duty under Section 4.02 of the Management Agreement and Section 6 of the Settlement Agreement to indemnify and defend VVV against NW Productions' action.

185.    Section 4.02 of the Management Agreement requires JKN to

indemnify, defend and hold harmless [VVV] against and in respect of any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies, included interest, penalties and reasonably attorneys' fees that [VVV] shall incur or suffer, which arise out of, result from, or relate to (i) any breach of, or failure by [JKN] to perform in accordance with the terms hereof, including any breach of the representations, warranties, covenants or agreements of [JKN] set forth in this Agreement, and (ii) the operation of the Business (or the failure to operate the Business) prior to the Effective Date by [JKN] or [JKN]'s prior Licensee(s).

186.    Section 6 of the Settlement Agreement provides,

JKN will defend, indemnify, and hold harmless VVV and its owners, employees, representatives and agents for any claims, actions or inquiries brought or initiated by any State Director or any regulatory body (including but not limited to the Federal Trade Commission and any state agency regulating the offer and sale of franchises or business opportunities) arising out of any action or inaction by JKN between August 1, 2023 and the date the relevant State Director signs the new State Director License Agreement for the 2024 pageants relating to or arising out (a) the Master License Agreement, (b) Management Agreement, (c) any State Director License Agreement, (d) any related franchise disclosure documents and state registrations, and/or ( e) the lack of compliance with applicable law or regulations; provided that the foregoing indemnity will not apply to any third party claims relating to agreements that VVV sent in 2023 to any candidate for a state directorship in 2024 who was not a State Director in 2023.

187.    NW Productions was a State Director in 2023, so the last clause does not apply.

188.    The claims in NW Productions' action all relate to obligations of the franchisor, which was at all times JKN. (As the Settlement Agreement provides, "During the Interim Period, JKN will, at its cost enter into (or, as applicable, amend, extend or renew) state director license agreements ("State Director License Agreements") directly with the state directors ("State

31

Directors") and comply with federal and all applicable state franchise and business opportunity laws including resolution of any pending state registrations.")

189.    JKN was aware of its contractual duty to indemnify and defend VVV against NW Productions' action.

190.    JKN failed to defend VVV against the action, leading to the entry of default against VVV.

191.    VVV has had to expend attorney fees to seek relief from the entry of default, and will be required to expend additional attorney fees in defense of the action.

192.    VVV has demanded that JKN defend it against NW Productions' action and indemnify VVV for its costs of defense and any losses or damages VVV incurs in the action.

193.    JKN has not undertaken VVV's defense nor confirmed that it will indemnify VVV.

194.    JKN has breached its contractual duty to indemnify and defend VVV.

**COUNT XI**
**Violation of Fla. Stat. § 817.416 – Florida Franchise Misrepresentation Act**

195.    VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

196.    At all relevant times, JKN was engaged in the offer of franchises, as defined by Fla. Stat. § 817.416(1)(b), to persons in the State of Florida.

197.    VVV is a Florida resident and was solicited by JKN to enter into a franchise relationship for the operation of VVV's business in Florida.

198.    JKN represented to VVV that, upon payment of a $1,500,000 deposit, and payments of $375,000.00 annual license fees, VVV would receive the exclusive right to enter into a final franchise or license agreement with JKN.

199.    VVV invested additional funds into the operation of JKN's franchise.

32

200.     JKN represented to VVV that the $1,500,000 deposit would be refundable if JKN and VVV did not enter into a final franchise or license agreement.

201.     In connection with the offer of this franchise, JKN intentionally misrepresented, by failure to disclose or otherwise, the known required total investment for the franchise.

202.     VVV invested funds into the operation of JKN's franchise in the amount of not less than $4,160,000

203.     Specifically, JKN intentionally failed to provide VVV with full and accurate information as required by Fla. Stat. § 817.416(2), including, but not limited to, omitting information about the total investment VVV would be required to make for JKN to execute the final franchise agreement, and by misrepresenting that JKN would return VVV's license fee payments if the final franchise agreement were not executed.

204.     As a direct and proximate result of JKN's violations of the Florida Franchise Misrepresentation Act, VVV has suffered actual damages, including but not limited to the loss of the $1,500,000 deposit, the $375,000 annual license fee payment, and other amounts that VVV invested in JKN's franchise.

205.     Pursuant to Fla. Stat. § 817.416(3), VVV is entitled to recover damages for all moneys invested in JKN's franchise, costs, and reasonable attorneys' fees.

## COUNT XII
## Violation of N.Y. Gen. Bus. Law § 680 et seq. – New York Franchise Sales Act

206.     VVV incorporates by reference the allegations in all preceding paragraphs of this Counterclaim as if fully set forth herein.

207.     At all relevant times, JKN was engaged in the business of offering and selling franchises, as defined by N.Y. Gen. Bus. Law § 681(3), to prospective franchisees for business operations both within and outside the State of New York.

33

208.   VVV is a person to whom a franchise license was offered and who remitted consideration, including a $1,500,000 deposit and a $375,000 annual license fee payment, to JKN in connection with the proposed sale of a franchise.

209.   JKN's principal place of business is in the State of New York.

210.   JKN consented to New York law in an agreement with VVV.

211.   The acts, transactions, and practices described herein occurred in and involved the State of New York, bringing this franchise claim within the scope of the New York Franchise Sales Act.

212.   JKN offered a franchise to VVV and solicited, accepted, and retained, among other things, a $1,500,000 deposit and a $375,000 annual license fee payment, without registering the offering with the New York Attorney General and/or without providing VVV with a franchise disclosure prospectus, as required by N.Y. Gen. Bus. Law § 683.

213.   JKN's failure to register the offering to VVV with the New York Attorney General before collecting payments from VVV constitutes violations of the New York Franchise Sales Act.

214.   JKN's failure to provide VVV with a franchise disclosure prospectus before collecting payments from VVV constitutes violations of the New York Franchise Sales Act.

215.   As a direct and proximate result of JKN's violations, VVV has suffered actual damages in the amount of not less than $1,875,000.

216.   VVV is therefore entitled to actual damages for JKN's violation of the New York Franchise Sales Act in an amount to be determined at trial but in excess of $75,000.

217.   VVV is entitled to rescission.

218.   VVV is entitled to its reasonable attorney fees and costs.

34

## PRAYER FOR RELIEF

**WHEREFORE,** VVV prays for the following relief:

a.  Compensatory and expectation damages for breach of contract, in an amount to be proven at trial;

b.  Compensatory and expectation damages for breach of JKN's duty of good faith and fair dealing, in an amount to be proven at trial

c.  Damages resulting from VVV's detrimental reliance on JKN's promises, in an amount to be proven at trial;

d.  Restitution and disgorgement of funds by which JKN has been unjustly enriched, in an amount to be proven at trial;

e.  Compensatory damages for the torts pleaded herein, in an amount to be proven at trial;

f.  All damages owed under the statutory claims pleaded herein, in an amount to be proven at trial;

g.  VVV's costs to defend against NW Productions's action in Washington state, including attorney fees, along with any liability VVV incurs in that action;

h.  A permanent injunction barring any transfer to any third party (or renewal with any third party) of the license to operate the Pageants pending regulatory approval and/or the compliance with regulatory requirements for the transfer to VVV of the license described in the Term Sheet and Settlement Agreement as part of the MLA;

i.  An order of specific performance compelling JKN to comply with its contractual duty to expeditiously negotiate with VVV in good faith regarding the final terms of the MLA;

j.   An order of specific performance compelling JKN to comply with its contractual duty to enter into the MLA with VVV;

k.   Alternatively, an order of rescission;

l.   A declaratory judgment that JKN engaged in a deceptive or unfair trade practice;

m.   An award of VVV's reasonable attorney fees and costs;

n.   An award of pre-and post-judgment interest;

o.   All other remedies, legal and equitable, as the Court determines are just.


**JURY-TRIAL DEMAND**

VVV requests a jury trial on all claims so triable.

Dated: January 16, 2026                    Respectfully submitted,


                                           **BARNES & THORNBURG LLP**

                                           */s/ Robert C. Folland*


                                           Robert C. Folland
                                           Florida Bar No. 1007951 (*Pro hac vice*)
                                           BARNES & THORNBURG, LLP
                                           3300 PGA Blvd., Suite 510
                                           Palm Beach Gardens, FL 33410
                                           Tel: (561) 473-7565
                                           Email: Rob.Folland@btlaw.com

                                           Molly N. Sigler
                                           Tenn. Bar No. BPR# 040151
                                           (*Pro hac vice motion forthcoming*)
                                           BARNES & THORNBURG, LLP
                                           1600 West End Ave.
                                           Nashville, TN 37023
                                           Tel: (612) 367-8728
                                           Email: Molly.Sigler@btlaw.com

                                           Kristopher J. Armstrong
                                           Ohio Bar No. 0077799 (*Pro hac vice*)
                                           BARNES & THORNBURG, LLP
                                           41 S. High St., Suite 3300
                                           Columbus, OH 43215
                                           Tel: (614) 628-1475
                                           Email: Kristopher.Armstrong@btlaw.com

                                           Russell T. Gorkin
                                           BARNES & THORNBURG, LLP
                                           390 Madison Ave., 12th Floor
                                           New York, NY 10017
                                           Tel: (646) 746-2400
                                           Email: RGorkin@btlaw.com

                                           *Attorneys for Defendant/*
                                           *Counterclaimant VVV Global Ent., LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing document was filed via the Court's ECF system and will be served by that system on counsel for all parties, this 16th day of January, 2026.

/s/ Robert C. Folland
Counsel for Defendant and
Counterclaimant VVV Global Ent.,
LLC