USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:________________
DATE FILED: 07/20/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JKN UNIVERSE, LLC,

Plaintiff,

-v-

VVV GLOBAL ENT. LLC,

Defendant.

VVV GLOBAL ENT. LLC,

Counterclaim Plaintiff,

-v-

JKN UNIVERSE, LLC,

Counterclaim Defendant.

25-cv-8234 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Counterclaim-Defendant JKN Universe, LLC ("JKN") moves, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), to dismiss the First Amended Counterclaim of Defendant Counterclaim-Plaintiff VVV Global Ent. LLC ("VVV"). Dkt. No. 156. For the reasons that follow, that motion is granted in part and denied in part.

**BACKGROUND**

This case involves control over the Miss USA and Miss Teen USA Pageants (the "Pageants").

## I. The Relevant Parties

JKN is a Delaware limited liability company with its principal place of business in New York. Dkt. No. 153 ("First Amended Counterclaim" or "FAC") ¶ 11. It owns a proprietary system for conducting the Pageants and the Miss Universe Pageant and the rights to use trademarks associated with the Pageants, including Miss USA, Miss Teen USA, and Miss Universe. *Id.* ¶¶ 1, 15.

VVV is a Florida limited liability company with its principal place of business in Florida. *Id.* ¶ 10. Its sole member is Laylah Loiczly, known professionally as Laylah Rose ("Rose"), who resides in Florida. *Id.* Rose has a lifetime of experience in the fashion, broadcasting, and pageant businesses. *Id.* ¶ 19. VVV was formed by Rose to become the long-term licensee of the Miss USA and Miss Teen USA Pageants. *Id.*

The Pageants are part of the Miss Universe competition. *Id.* ¶ 17. Before the national-level Pageants can be conducted, state-level pageants are held in each state and in the District of Columbia. *Id.* ¶ 21. The winners of the state-level pageants (both for Miss USA and Miss Teen USA) then compete in their respective national-level Pageants which are held annually in the late summer or fall. *Id.* ¶¶ 20–21. The winners of the Pageants then compete against winners from other countries around the world for the title of Miss Universe. *Id.* ¶¶ 17, 20.

JKN licenses the right to operate the national-level Pageants such as Miss USA to third parties and licenses the right to run state-level pageants to "State Directors" on an annual basis. *Id.* ¶¶ 18, 21. Before JKN can issue licenses to a State Director, it must comply with state and federal franchise law, which require JKN to prepare and issue Franchise Disclosure Documents or "FDDs" to prospective State Directors. *Id.* ¶ 22. The funds to finance the operation of the national Pageants are generated from the state-pageant license fees. *Id.* ¶ 25. Accordingly, FDDs must be provided on a timely basis to prospective State Directors to ensure that the State

Directors will pay the license fees that are necessary to the successful operation of the national Pageants. *Id.* ¶ 25.

## II. The Term Sheet

JKN and VVV are parties to a series of contracts relating to the operation of the Pageants that are at the heart of this case. In particular, on December 20, 2022, JKN and VVV agreed to a Term Sheet relating to the operation of the Pageants (the "Term Sheet"). *Id.* ¶ 26. The Term Sheet reflects the desire on the part of JKN to grant a license to VVV to conduct the Pageants for a period of 12 years commencing April 1, 2023 pursuant to terms and conditions set forth in the Term Sheet. Dkt. No. 59-5.[1] Those terms and conditions include that VVV would pay JKN a $1.5 million deposit by December 23, 2022, and an additional $375,000 a year for a period of 12 years (for a total of $4.5 million) in exchange for a license to conduct the Pageants and to use and display certain "Proprietary Marks". FAC ¶¶ 27–28. (The Term Sheet contemplates that VVV would conduct the Pageants. Dkt. No. 59-5 at 2.) In turn, VVV would be entitled to (1) all license fees paid by State Directors to run state-level Pageants, (2) broadcasting fees, (3) sponsorship fees, (4) merchandising for the Proprietary Marks, and (5) talent management fees from titleholders of the Pageants. FAC ¶¶ 27–28; Dkt. No. 59-5. VVV further agreed to post a $4.5 million irrevocable letter of credit to secure the annual payments. Dkt. No. 59-5 at 2. The parties further agreed that VVV's $1.5 million deposit would be refundable if the parties did not enter into a master license agreement (the "MLA") by April 1, 2023, defined as the Contract Date. FAC ¶ 28; Dkt. No. 59-5.

---

[1] Because the page numbers in the original erroneously repeat themselves, citations to this docket entry use ECF pagination.

The Term Sheet contemplated that the parties would memorialize the "full terms and conditions" of their agreement in a license agreement. It stated:[2]

> Closing: The full terms and conditions of this Transaction shall be memorialized in a License Agreement and other applicable ancillary agreements (the "Agreements") drawn by the Licensor's attorney and approved by the Licensee and Licensee's attorney. Said Agreement to be fully executed by the Licensor and the Licensee on or before April 1, 2023 ("Contract Date"). Closing of this Transaction will occur simultaneously with the Contract Date.

Dkt. No. 59-5 at 2.

VVV paid the $1.5 million deposit to JKN as required by December 23, 2022, and provided JKN with the $4.5 million irrevocable letter of credit, FAC ¶ 30, but the parties did not enter into a MLA by April 1, 2023, because JKN had not completed the regulatory requirements necessary to transfer the license to the Pageants, *id.* ¶ 31.

## III. The Management Agreement

To allow the parties to move forward with their plan to have VVV take primary operational control of the 2023 Pageants, JKN and VVV entered into a second agreement, the Management Agreement (the "Management Agreement"), on July 28, 2023, which displaced the Term Sheet. *Id.* ¶ 33; Dkt. No. 153-1.

The Management Agreement recites that JKN (defined as the Licensor) had entered into letters of intent or license agreements with licensees from each state and the District of Columbia pursuant to which the licensees would conduct Miss USA or Miss Teen USA state pageants managed by JKN, and that JKN desired to contract with VVV "for the management and operation" of the business conducted pursuant to such licenses and to conduct the 2023 Miss USA and Miss Teen USA Pageants. Dkt. No. 153-1 at 2. VVV agreed to operate, direct, manage, and supervise the 2023 Pageants. *Id.* § 1.01. In exchange, JKN agreed that VVV would

[2] The Term Sheet is incorporated by reference.

have the right to all the profits from the Pageants but also would bear and pay all the expenses of the Pageants. *Id.* § 1.02. VVV was to operate the Pageants "in accordance with the operating standards developed" by JKN. *Id.* § 1.02(a). To help VVV pay for the operation of the Pageants, JKN was to collect all license fees owed by licensees of the Pageants and to remit those fees to VVV less an initial fee of $255,137 for the Pageants, which was considered compensation for VVV's obtaining the right to manage the Pageants. *Id.* § 2.01; FAC ¶¶ 35–36. Consistent with the original terms of the Term Sheet, the $255,137 fee represented VVV's $375,000 annual payment toward the $6 million MLA licensing fee, offset to account for holdover expenses. FAC ¶ 36.

The Management Agreement contemplated that the relationship between the parties might extend beyond the 2023 Pageants. Its term was stated to begin on July 28, 2023 but to continue "until the earlier of the day after the 2025 State Pageants or all required regulatory approvals have been obtained" for the execution of a definitive license agreement. Dkt. No. 153-1 § 3.01. In full, Section 3.01 provided:

> Term. The term of this Agreement shall commence upon the Effective Date, subject to the termination provisions hereinafter provided, and shall continue until the earlier of the day after the 2025 State Pageants or all required regulatory approvals have been obtained (the "**Term**"), at which time the parties shall execute a definitive License Agreement in the form attached hereto as Exhibit A, subject to customary terms and conditions that are mutually satisfactory to the parties.

*Id.* § 3.01. It did not attach an Exhibit A. The parties agreed that if the Management Agreement extended beyond the 2023 State Pageants, JKN was to remit the license fees less an annual fee of $375,000, matching the annual fee under the Term Sheet for the license agreement. FAC ¶ 42; Dkt. No. 153-1 § 2.01.

The Management Agreement imposes reciprocal obligations to indemnify and defend on each of VVV and JKN. The Management Agreement requires VVV to "indemnify, defend, and

hold harmless" JKN against and in respect of "any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies . . . which arise out of, result form, or relate to (i) any breach of, or failure by [VVV] to perform in accordance with the terms [of the Management Agreement] [or] any of the Services . . . and (ii) the operation of the Business." Dkt. No. 153-1 § 4.02. It imposes the identical obligation on JKN to indemnify, defend, and hold harmless VVV against and in respect of "any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies . . . which arise out of, result from, or relate to (i) any breach of, or failure by [JKN] to perform in accordance with the terms [of the Management Agreement] … and (ii) the operation of the Business." *Id.*

Each party has the right to terminate the Management Agreement if the other is in default of its covenants and obligations under the agreement subject to a 30-day notice-and-cure period. FAC ¶ 43; Dkt. No. 153-1 § 3.02. In addition, JKN has the right to terminate the agreement upon thirty days' written notice in the event that "[VVV]'s improper action(s) or inaction(s), as the case may be, results in any situation or occurrence which subjects [VVV] to public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency in [JKN's] reasonable and good faith opinion." Dkt. No. 153-1 § 3.02(b).

The Management Agreement also contains an integration clause. It provides:

> <u>Entire Agreement</u>. This Agreement sets forth the entire understanding between the parties concerning the subject matter of this Agreement and incorporates all prior negotiations and understandings. There are no covenants, promises, agreements, conditions, or understandings, either oral or written, between the parties relating to the subject matter of this Agreement other than those set forth herein. No representation or warranty has been made by or on behalf of any party to this Agreement (or any officer, director, employee, or agent thereof) to induce the other party to enter into this Agreement or to abide by or consummate any transactions

> contemplated by any terms of this Agreement, except representations and warranties, if any, expressly set forth herein. No alteration, amendment, change, or addition to this Agreement shall be binding upon either party unless in writing and signed by the party to be charged. The submission of an unexecuted copy of this Agreement shall not constitute an offer to be legally bound by any provision of the document submitted, either currently or in the future; and no party shall be bound by this Agreement until it is fully executed and delivered by all parties.

*Id.* § 4.08.

The interpretation of the Management Agreement is governed by Delaware law. *Id.* § 4.06.

## IV. The Settlement Agreement

VVV organized and executed the 2023 Pageants. FAC ¶ 44. It used its own funds to finance the operation of the 2023 Pageants because JKN did not timely issue FDDs and collect and transfer to VVV state licensing fees. *Id.* ¶¶ 45–47. By March 1, 2024, JKN had still failed to transfer the 2023 State Director license fees and sponsor fees it owed to VVV, and the parties still had not entered into the MLA. *Id.* ¶ 48. In addition, VVV claims that JKN interfered with VVV's management of the Pageants, including by engaging directly with State Directors. *Id.* ¶ 49.

To resolve the disputes regarding JKN's alleged breaches of the Management Agreement, JKN and VVV entered into the Settlement and Release Agreement (the "Settlement Agreement"), with a March 1, 2024 effective date. *Id.* ¶ 50. The Settlement Agreement recites that the parties had entered into the Term Sheet for the right of VVV to enter into a 12-year master license agreement for the operation of the Pageants under certain terms and conditions, defined as the Master License Agreement, but that the Master License Agreement had not been signed because it was not finalized and "certain regulatory approvals had not been obtained," and that VVV had operated the 2023 Pageants pursuant to the Management Agreement "consistent with the economics and rights to be granted to VVV under the yet-to-be-signed Master License

Agreement". Dkt. No. 153-2 at 2. It further reflected that disputes and disagreements had developed between the parties on "how best to complete the Master License Agreement and perform under the Management Agreement in the interim." *Id.*, Recital I.

The Management Agreement contemplated that the parties might end their relationship without agreeing on a MLA. However, under the Settlement Agreement, the parties agreed to "work cooperatively and expeditiously to finalize and sign a twelve-year master license agreement ('Master License Agreement') with an effective date of April 30, 2023." FAC ¶ 52; Dkt. No. 153-2 § 3(a).

The parties agreed that VVV would continue to manage the 2024 Pageants under the Management Agreement during "the Interim Period," i.e., "while the Parties negotiate[d] the Master License Agreement." FAC ¶ 53. Although JKN was still legally required to issue FDDs and execute the State Director licensing agreements, JKN agreed that the fees due under those agreements could be paid directly to VVV so as to reduce any delay associated with VVV obtaining the revenues to which it was entitled and which it needed to operate the 2024 Pageants. *Id.* ¶ 54. JKN also agreed to "pay to VVV as required under the Management Agreement all amounts owed for the 2023 pageants," and to pay over all sponsorship and other revenues to VVV. *Id.* ¶ 55. The Settlement Agreement further required JKN to give VVV credit in the amount of $140,876, applied toward the second of the twelve annual $375,000 payments that VVV was required to make to JKN under the Term Sheet. *Id.* ¶ 56. The parties also agreed to certain communication standards, called "Rules of Engagement," set forth in Exhibit B to the Settlement Agreement. *Id.* ¶ 57. The Rules of Engagement provided that JKN could not engage directly with State Directors but would instead direct any inquiries to VVV. *Id.* ¶ 58.

The Settlement Agreement contained mutual releases, by both JKN and VVV, of claims against the other arising prior to the effective date of the Settlement Agreement, March 1, 2024. *Id.* ¶ 59. VVV agreed to release JKN from all claims "in connection with, as a result of, or in any way arising from, any relationship or transaction with JKN or the JKN Parties . . . from the beginning of time until the Effective Date of this Settlement Agreement." Dkt. No. 153-2 § 7(a). The release did not extend to breaches of the Settlement Agreement or breaches of the Management Agreement accruing after the effective date of the Settlement Agreement. *Id.*; FAC ¶ 60.

The Settlement Agreement also contained an integration clause. It provides:

> **Entirety**. This Settlement Agreement and attachments embodies the entire agreement and understanding between the Parties and supersedes all prior agreements and understandings related to the subject matter hereof. For avoidance of doubt, as set forth above, the Management Agreement as amended remains in full force and effect.

Dkt. No. 153-2 § 13.

The interpretation of the Settlement Agreement is governed by New York law. *Id.* § 10.

## V. The Negotiation of a Master License Agreement

VVV alleges that subsequent to the 2023 and 2024 Pageants, it continued to seek to finalize the MLA in good faith. FAC ¶ 68. In November 2024, the parties discussed a joint venture instead of a MLA but in January 2025, VVV rejected the joint venture. *Id.* ¶ 69. In March 2025, the parties resumed discussing a license. *Id.* ¶ 70. On May 21, 2025, JKN's then Chief Executive Officer texted Rose on behalf of JKN asking to wrap up negotiations on a 12-year MLA starting from 2023 with $375,000 allocated every June 1 from 2025 onward. *Id.* ¶ 71. Rose responded: "Hi, yes, confirmed!". *Id.* On May 29, 2025, VVV's counsel emailed JKN's then Vice President of International Relations, Mario Búcaro, a draft MLA reflecting the agreement discussed by Rose and JKN. *Id.* ¶ 72. On June 2, 2025, Búcaro responded by email,

thanking VVV's counsel and agreeing to review the draft and get back to VVV. *Id.* ¶ 73. VVV's counsel followed up with Búcaro on June 20, 2025, but Búcaro did not respond to the inquiry. *Id.* ¶¶ 74–75.

The parties held a telephone call on July 15, 2025. *Id.* ¶ 76. Búcaro stated that Miss Universe was losing money and asked that VVV indemnify it for the costs of two lawsuits to which it was subject. *Id.* ¶ 77. Rose responded that in order to put on the Pageants, VVV needed the money from the State Director license fees, which it could not receive until JKN issued FDDs to the State Directors. *Id.* ¶ 78. Búcaro stated that JKN would not sign the MLA without a commitment from VVV regarding indemnification and pre-funding the 2025 Pageants in the amount of $2 million. *Id.* ¶ 79.

## VI. The Termination Letter

On July 17, 2025, two days after the July 15 call, JKN sent a letter to VVV purporting to terminate the Management Agreement (the "Termination Letter"). *Id.* ¶ 81. In the Termination Letter, JKN cited eight reasons supporting the decision to terminate the Management Agreement, including (1) Term Sheet Revisions, (2) Master License Agreement, (3) Communication Failures, (4) Titleholder Resignations & Brand Damage, (5) Employee Instability, (6) Alma Cooper (Miss Universe USA 2024), (7) State Director Vacancies & Management Gaps, and (8) Washington State Litigation. *Id.* ¶ 82. VVV alleges that the reasons were pretextual. *Id.* ¶ 83. It also alleges that JKN did not give VVV prior written notice and 30 days to cure any of the cited "reasons" for terminating the Management Agreement. *Id.* ¶ 90.

In September 2025, JKN announced that it was granting a ten-year MLA to operate the Pageants to a third party. *Id.* ¶ 92.

## PROCEDURAL HISTORY

JKN initiated this action by complaint filed against VVV on October 3, 2025. Dkt. No. 1. VVV answered the complaint on October 22, 2025, and filed a third-party complaint against third-party Defendants BDE Miss USA, LLC ("BDE"), Raúl Rocha Cantú, Thom Brodeur, and Legacy Holding Group USA, Inc. ("Legacy"). Dkt. No. 21.[3]

On January 16, 2026, VVV filed its First Amended Counterclaim. Dkt. No. 153. That same day, it served notice of its voluntary dismissal of its claims against BDE, Brodeur, Cantú, and Legacy. Dkt. No. 154. The Court so ordered that dismissal on January 21, 2026. Dkt. No. 155.[4]

VVV asserts ten claims for relief. FAC ¶¶ 94–218.[5] VVV's first claim for relief alleges breach of the Management Agreement. *Id.* ¶¶ 94–108. Its second claim for relief alleges breach of the Settlement Agreement. *Id.* ¶¶ 109–23. Its third claim for relief alleges breach of the implied duty of good faith and fair dealing implied in the Management Agreement and the Settlement Agreement. *Id.* ¶¶ 124–34. VVV's fourth claim for relief alleges a claim for promissory estoppel. *Id.* ¶¶ 135–38. Its fifth claim alleges unjust enrichment. *Id.* ¶¶ 139–44. Its eighth claim alleges violation of the Florida Deceptive and Unfair Trade Practices Act. *Id.* ¶¶ 145–62. Its ninth claim for relief alleges a claim for fraudulent inducement. *Id.* ¶¶ 163–80.

---

[3] VVV attempted to file its answer and third-party complaint on October 20 and October 21, 2025, but its submissions were rejected by the Clerk of Court for a filing error. Dkt. Nos. 14, 20.
[4] On December 12, 2025, Legacy and Cantú moved to dismiss the Counterclaim against them for lack of personal jurisdiction and failure to state a claim for relief. BDE and Thom Brodeur moved to dismiss the counterclaim for lack of personal jurisdiction and failure to state a claim for relief, and JKN moved to dismiss for failure to state a claim for relief and failure to plead fraud with particularity. Dkt. Nos. 136, 138, 140. Those motions were all rendered moot by the filing of the Amended Counterclaim and therefore are denied as moot.
[5] VVV's claims for relief are numbered one through five and then eight through twelve. It does not allege a sixth or seventh claim for relief. The Court numbers the claims as they are numbered in the First Amended Counterclaim.

Its tenth claim for relief alleges "indemnification and defense." *Id.* ¶¶ 181–94. Its eleventh claim for relief alleges that JKN violated the Florida Franchise Misrepresentation Act, Fla. Stat. § 817.416. *Id.* ¶¶ 195–205. Its twelfth claim for relief alleges that JKN violated the New York Franchise Sales Act, N.Y. Gen. Bus. Law § 680 *et seq.* *Id.* ¶¶ 206–18.

JKN filed its motion to dismiss the First Amended Counterclaim on February 13, 2026. Dkt. No. 156. It supported that motion with a memorandum of law. Dkt. No. 157. On March 6, 2026, VVV filed a memorandum of law in opposition to the motion to dismiss. Dkt. No. 158. On March 20, 2026, JKN filed a reply memorandum of law in further support of the motion to dismiss. Dkt. No. 159.[6]

**LEGAL STANDARD**

"'A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint.'" *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 440 (S.D.N.Y. 2021) (quoting *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020)); *see also Oneida Indian Nation v. Phillips*, 981 F.3d 157, 165 (2d Cir. 2020). The counterclaim must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

[6] VVV moved for a preliminary injunction. Dkt. Nos. 58–60. The Court denied the motion for a preliminary injunction by a ruling from the bench on December 17, 2025. Dkt. No. 148.

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

To satisfy Rule 9(b)'s heightened pleading standard, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Allegations of fraud must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402–03 (2d Cir. 2015) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)). Although "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally," Fed R. Civ. P. 9(b), "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting Acito v. IMCERA Gr*p*., Inc., 47 F.3d 47, 52 (2d Cir. 1995)). Plaintiffs may raise this inference "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 290–91 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)). Allegations that are "conclusory and unsupported by assertions of facts" are not sufficient to meet the Rule 9(b) standard. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

## DISCUSSION

JKN first argues that the release in the Settlement Agreement bars the remainder of VVV's claims and that because VVV has not stated a claim for breach of the Settlement

Agreement, it cannot assert any of its other claims. The Court turns to that argument first. After rejecting it, the Court addresses JKN's remaining arguments that the Counterclaims fail to state a claim for relief.

**I. Breach of the Settlement Agreement**

Count II alleges that JKN breached the Settlement Agreement by failing to work cooperatively and expeditiously to finalize and sign the MLA and failing to execute the MLA and by communicating to VVV that it was abandoning the concept of granting it the MLA. FAC ¶ 113(a)–(c). VVV also alleges a number of other ways in which JKN allegedly violated the Settlement Agreement. *Id.* ¶ 113(d)–(u).

JKN argues that the count fails to state a claim for relief because (1) JKN had no enforceable obligation to enter into a MLA—there was only an unenforceable agreement to agree, and (2) any obligations it had expired by its own terms in the fall of 2025. Dkt. No. 157 at 8–11. It further argues that because it did not breach the Settlement Agreement, the release contained in that agreement remains enforceable and operative and that it precludes the remainder of VVV's claims.

Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011)); *see Genao v. Ruiz*, 2025 WL 219160, at *4 (S.D.N.Y. Jan. 16, 2025), *appeal dismissed sub nom. Genao v. City of New York*, 2025 WL 4483442 (2d Cir. Sept. 4, 2025). When a release is clear and unambiguous, "effect must be given to the intent of the parties as indicated by the language employed." *Tromp v. City of New York*, 465 F. App'x 50, 52 (2d Cir. 2012) (summary order) (citations omitted); *see Pampillonia v. RJR Nabisco, Inc.*,

138 F.3d 459, 463 (2d Cir. 1998) ("[A] release that is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced.").

However, "a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). This principle applies with full force to settlement agreements and their release provisions. A party who materially breaches a settlement agreement cannot avail itself of the releases made as part of that agreement. *See Simmons v. Mount Vernon City Sch. Dist.*, 2026 WL 412120, at *10 (S.D.N.Y. Feb. 13, 2026).

"'Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.'" *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA.*, 698 F. Supp. 3d 663, 673 (S.D.N.Y. 2023) (quoting *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021)). The FAC alleges each of those elements here. VVV alleges that the Settlement Agreement is a valid, binding, and enforceable contract between VVV and JKN, that VVV performed its obligations under the agreement, and that JKN breached its obligations under the Settlement Agreement, causing VVV damages. FAC ¶¶ 110–23. In particular, VVV argues that JKN breached its obligations in 21 different ways, including by failing to work cooperatively and expeditiously with VVV to finalize and sign the MLA. *Id.* ¶ 113(a).

JKN argues that VVV has not stated a claim for breach of the Settlement Agreement because neither that agreement nor the Management Agreement, which the Settlement Agreement amended and of which it is a part, *see AT&T Enters., LLC v. Atos IT Sols. & Servs., Inc.*, 2026 WL 1090227, at *20 (S.D.N.Y. Apr. 22, 2026), required JKN to execute a MLA. Dkt.

No. 157 at 7–10. It also argues that the FAC does not allege a breach of the Settlement Agreement because: "(a) the Counterclaim pleads facts that actually demonstrate JKN made efforts consistent with this goal toward finalizing a licensing agreement; and (b) the Settlement Agreement effectively amended the preexisting Management Agreement, and thus expired by its own terms in the fall of 2025." *Id.* at 10. Neither argument is availing.

Under New York law, parties to an agreement need not agree to their "ultimate contractual objective" to form a binding agreement to negotiate in good faith. *See Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998) (quoting *Tchrs. Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)); *see also IDT Corp. v. Tyco Grp.*, 918 N.E.2d 913, 916–17 (N.Y. 2009) (holding that under a settlement agreement that contemplated the negotiation of additional agreements, the parties were required to negotiate in good faith); 28 N.Y. Prac., Contract Law § 3:37. Two parties who have not agreed on all of the material terms of a contract can by the language of their agreement and their performance under it commit each other "'to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework.'" *Adjustrite*, 145 F.3d at 548 (quoting *Tribune*, 670 F. Supp. at 498). Federal courts applying New York law typically use the language of Type I and Type II agreements. "Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities." *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996). "A binding preliminary agreement binds both sides to their ultimate contractual objective in recognition that, 'despite the anticipation of further formalities,' a contract has been reached." *Adjustrite*, 145 F.3d at 548 (quoting *Tribune*, 670 F. Supp. at 498). "Type II is where the parties recognize the existence of open terms, even major ones, but, having agreed on certain important

terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open. In Type II agreements, the parties do not bind themselves to conclude the deal but only to negotiate in good faith toward conclusion within the agreed framework." *Shann*, 84 F.3d at 77.[7]

While not disagreeing with the "federal line of cases," the New York Court of Appeals has stated that it has not found "the rigid classification into 'Types' useful" in every case. *IDT Corp.*, 918 N.E.2d at 915 n.2. The Second Circuit has continued to distinguish between Type I and Type II agreements, *see, e.g.*, *SSP Capital Partners, LLP v. Mandala, LLC*, 402 F. App'x 572, 573 (2d Cir. 2010); *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 150–51 (2d Cir. 2022); *Javelin Glob. Commodities (UK) Ltd. v. Lexington Coal Co., LLC*, 2026 WL 1210102, at *2 (2d Cir. May 1, 2026) (summary order), or what it sometimes calls a "fully binding preliminary agreement" which is "preliminary only in form" and "binds both sides to their ultimate contractual objective" and a "binding preliminary commitment" which imposes an obligation "only to make a good faith effort to negotiate and agree upon the open terms and a final agreement," *Rubinstein v. Clark & Green, Inc.*, 395 F. App'x 786, 789 (2d Cir. 2010) (internal citations omitted). The specific terminology is not critical on this motion to dismiss. The courts are consistent on the ultimate proposition that two parties can form an agreement to negotiate in good faith. *See Tribune*, 670 F. Supp. at 498.

"The considerations relevant to whether a preliminary agreement is a binding Type II agreement [or what might be called a "binding preliminary agreement"] are: (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the

---

[7] Except perhaps with respect to damages, Delaware law is to the same effect. *See Cambridge Cap. LLC*, 565 F. Supp. 3d at 441 (S.D.N.Y. 2021) ("Delaware law follows New York law in recognizing that parties can create between themselves an obligation to negotiate in good faith.").

negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Brown v. Cara*, 420 F.3d 148, 157 (2d Cir. 2005).

VVV has adequately pleaded the existence, at a minimum, of an agreement to negotiate in good faith. The language of the Settlement Agreement reflects an intent on the part of VVV and JKN to be bound. Under it, "the Parties [agree to] work cooperatively and expeditiously to finalize and sign a 12-year master license agreement ('Master License Agreement') with an effective date of April 30, 2023." Dkt. No. 153-2 § 3(a). There is nothing precatory about the language. The word "agree" bespeaks a commitment. *See Tribune*, 670 F. Supp. at 499–500 (finding that the "terminology of binding contract," such as the words "Accepted and agreed to," evidences an intent to be bound). The reference to "finaliz[ing]" and "sign[ing]" indicates a definitive object of the agreement—something that was far along and capable of being finalized and signed, *i.e.* the 12-year MLA. Other provisions are consistent with that understanding. The Master License Agreement is a defined term under the Settlement Agreement referring to (and thereby incorporating by reference) the Master License Agreement as defined under the Term Sheet. The economics and assignments of responsibilities of the Settlement Agreement are consistent with those under the Term Sheet; VVV is to run the Pageants and to enjoy the revenues generated by it in exchange for a $375,000 fee. The MLA to be finalized appears to be the agreement under which the parties were effectively operating.

The context of the negotiations further supports the claim that the parties had at least a binding agreement to negotiate in good faith. Under the Settlement Agreement, VVV gave up something of value. It compromised its claims based on JKN's violations of the Management Agreement. Dkt. No. 153-2 § 7(a). According to VVV, those claims included claims for the

State Director license fees that JKN was required to collect and remit to VVV as well as to sponsor and ticket revenue. FAC ¶ 47; Dkt. No. 153-2, Recital E. As a result, VVV was required to use its own funds to finance the operation of the 2023 Pageants. FAC ¶ 45. It is plausible that it did not just give up those claims for nothing. In exchange, it obtained the right for the MLA as described in the Term Sheet to be signed by April 1, 2023. In effect, in exchange for taking on the obligation to operate and invest in the Pageants, VVV obtained a right to the returns from that investment through a 12-year MLA.

The existence of open terms further supports the plausibility of VVV's pleading that there existed an enforceable agreement to negotiate in good faith. JKN tries to make much of the fact that the Management Agreement does not attach a form of the proposed MLA. Dkt. No. 157 at 3. But the Settlement Agreement defines the MLA by reference to the December 20, 2022 Term Sheet. Dkt. No. 153-2, Recital A. And the Term Sheet sets forth at length the terms for the MLA. Those terms include the commencement and end date for the MLA (and its term), the license fees and payment terms, VVV's rights under the MLA, and provisions with respect to confidentiality. *See Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002) (under New York law, "[p]arties to a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements" (quoting *Ronan Assocs. v. Local 94–94A–94B, Int'l Union of Operating Eng'rs*, 24 F.3d 447, 449 (2d Cir. 1994))); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (document will be incorporated by reference where it can be "identified beyond all reasonable doubt" and it is clear that the parties to the agreement "had knowledge of and assented to the incorporated terms") (internal citations omitted).

VVV has pleaded partial performance. It managed the Pageants for 2023 and 2024, spending funds out of its own pocket. FAC ¶¶ 44–47, 61–67. It also negotiated the terms of a 12-year MLA, sending a draft of the MLA to JKN. *Id.* ¶ 72. It is reasonable to presume that VVV would not have made that investment had it not been assured that it would be rewarded through an agreement that gave it the right to continue to manage the Pageants for the remaining ten years. Moreover, VVV essentially performed the MLA as reflected in the Term Sheet. It "timely paid the $1.5 million Deposit to JKN and provided the $4.5 million irrevocable letter of credit" set forth in the Term Sheet and recited in the Settlement Agreement, *id.* ¶¶ 29, 51, and in turn conducted the 2023 and 2024 Pageants using the Miss USA and Miss Teen USA Proprietary Marks. This is the kind of "extensive and valuable performance within the framework described by" the Term Sheet that entitles VVV "to demand [JKN's] good faith in negotiating remaining open terms." *Brown*, 420 F. 3d at 158.

Finally, with respect to the fifth prong, the parties do not dispute that the actual transfer of the license to VVV required a more formal contract, and the Settlement Agreement expressly contemplated its future execution in the form of a MLA. FAC ¶ 52. In addition, the "customary form" of the transaction required that JKN obtain certain regulatory approvals in order to convey the promised MLA in its "final form". *Id.* ¶ 34.

Once it is understood that the FAC sufficiently alleges an agreement to negotiate in good faith, it is readily apparent that VVV also alleges a breach of the Settlement Agreement. The Court need not and does not address each of VVV's claims of breach of the Settlement Agreement. *See Talkdesk, Inc. v. Unique Travel Corp.*, 2024 WL 4904684, at *3 n.5 (S.D.N.Y. Nov. 27, 2024) ("Although the Complaint pleads multiple breach of contract theories, [plaintiff] need only plausibly plead one theory for the claim to survive dismissal.") (citing *Martin v.*

*Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 283 n.6 (S.D.N.Y. 2024) ("A cause of action that is based on one set of facts but that contains multiple, alternative legal theories supporting relief is still just one 'claim.'" (internal quotation marks omitted))). VVV alleges that JKN breached its obligations to "cooperatively" and "expeditiously" finalize and sign the MLA. FAC ¶ 113(a). VVV has alleged a breach of that covenant. JKN had an obligation not to renounce the deal, abandon negotiations, or insist on conditions that did not conform to the preliminary agreement. *Tribune*, 670 F. Supp. at 498. According to VVV, however, while it continued to seek to finalize the MLA in good faith, JKN delayed responding to VVV's inquiries and drafts of the MLA, and then demanded on conditions that were not set forth in the Term Sheet. FAC ¶¶ 68, 72–80.[8] VVV has therefore adequately stated a claim for breach of the Settlement Agreement.[9]

---

[8] However, the obligation to negotiate in good faith "can come to an end without a breach by either party," as "[t]here is such a thing as a good faith impasse." *IDT Corp. v. Tyco Group, S.A.R.L.*, 15 N.E.3d 329, 332 (N.Y. 2014); *see McGowan v. Clarion Partners, LLC*, 132 N.Y.S.3d 281, 282 (1st Dep't 2020), *lv denied*, 37 N.Y.3d 903 (N.Y. 2021). Whether a party has negotiated in good faith "necessitates examination of a state of mind [and] is [generally] not an issue which is readily determinable on a motion for summary judgment." *Places in Saratoga, LLC v. Izzo*, 253 N.Y.S.3d 363, 370 (3d Dep't 2026) (quoting *Credit Suisse First Boston v. Utrecht-America Fin. Co.*, 915 N.Y.S.2d 531, 533 (1st Dep't 2011) (internal quotation marks and citation omitted)).

[9] JKN also argues that VVV's claim for breach of the Management Agreement must fail because "the Settlement Agreement effectively amended the preexisting Management Agreement, and thus expired by its own terms in the fall of 2025." Dkt. No. 157 at 10. Specifically, the Management Agreement states that its term would continue "until the earlier of the day after the 2025 State Pageants or all required regulatory approvals have been obtained," at which point the parties would execute a definitive License Agreement. Dkt. No. 153-1 § 3.02. Because the required regulatory approvals were never obtained, JKN seems to argue, the agreement must have expired following the 2025 State Pageants. The Settlement Agreement may have "supplanted the affected provisions of the underlying" Management Agreement "while leaving the balance of its provisions unchanged," including its term. *Atos*, 2026 WL 1090227, at *20. But this argument does not get JKN very far, as VVV has plausibly alleged a breach prior to the end of the Management Agreement's term.

JKN's motion to dismiss VVV's second count is denied. And, because VVV has stated a claim for breach of the Settlement Agreement, JKN's arguments predicated on the enforceability of the release contained in the Settlement Agreement necessarily fail at the pleading stage.

**II. Breach of the Management Agreement**

In its first count, VVV alleges that JKN breached the Management Agreement by: (a) failing to complete the regulatory approvals required for it to execute the MLA; (b) failing to execute the MLA; (c) interfering with VVV's operation, direction, management, and supervision of the Business; (d) failing to pay to VVV all profits from the operation of the Business; (e) failing to timely collect, or allow VVV to collect, all license fees owed by the Licensees (as defined in the Management Agreement) under the License Agreement (as defined in the Management Agreement); (f) failing to indemnify and defend VVV against a lawsuit filed against VVV and JKN in Washington state by a State Director called NW Productions; (g) failing to indemnify, defend, and hold harmless VVV; (h) "terminating" the Management Agreement without justification; (i) "terminating" the Management Agreement for pretextual and false reasons; and (j) "terminating" the Management Agreement without providing prior written notice and a 30-day opportunity to cure the alleged defaults. FAC ¶ 98. At the pleading stage, VVV need not establish that each of its theories of breach states a claim for relief; it is sufficient that reading the Counterclaims as a whole, VVV has stated a claim for breach of the Management Agreement.

VVV alleges that an action was filed against both JKN and VVV on April 30, 2025 in Washington state court by a former State Director, NW Productions, and that the action alleges violations of Washington franchise law and other related claims which triggered JKN's contractual duty under Section 4.02 of the Management Agreement to indemnify and defend VVV. *Id.* ¶¶ 98(f), 182–94. JKN argues that VVV's allegations of failure to indemnify and

defend are defective because VVV does not allege that it has paid any sum to a third party that would fall within the indemnification provision, and because the Management Agreement—which is governed by Delaware law—requires VVV to indemnify JKN, not the other way around. Dkt. No. 157 at 14–15.

Under Delaware law, "[w]here the claim is one for indemnification or contribution for damages paid to a third party, a cause of action accrues only after the party seeking indemnification has made payment to the third party." *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *7 (Del. Ch. Jan. 24, 2005) (citations omitted). JKN points out that it appears the Washington litigation is ongoing, and that VVV does not allege that it has been found liable yet. Dkt. No. 157 at 24. However, the FAC states that "VVV has had to expend attorney fees to seek relief from the entry of default, and will be required to expend additional attorney fees in defense of the action." FAC ¶ 191. In short, VVV alleges that it has in fact made payments to legal counsel in connection with the lawsuit. Moreover, Section 4.02 specifically includes "reasonably [sic] attorneys' fees" within the scope of expenses for which JKN will indemnify VVV. Dkt. No. 153-1 § 4.02. VVV has therefore adequately pled a claim for breach of JKN's duty to indemnify under the Management Agreement.

VVV also pleads breach of JKN's duty to defend VVV in connection with the Washington action. "[U]nder Delaware law the duty to defend is separate and distinct from the duty to indemnify." *Evanston Ins. Co. v. Layne Thomas Builders, Inc.*, 635 F. Supp. 2d 348, 352 (D. Del. 2009) (citing *Charles E. Brohawn & Bros., Inc. v. Employers Commercial Union Ins. Co.*, 409 A.2d 1055, 1058 (Del. 1979)); *see also Bastion Rest. Grp. LLC v. Gaudelet*, 2024 WL 5135977, at *5 (Del. Super. Ct. Dec. 17, 2024) (applying distinction between duty to indemnify and duty to defend from insurance context to claims for contractual indemnification); *Marydale*

*Pres. Assocs., LLC v. Leon N. Weiner & Assocs., Inc.*, 2022 WL 4446275, at *18–19 (Del. Super. Ct. Sept. 23, 2022) (same); *Convergent Wealth Advisors LLC v. Lydian Holding Co.*, 2012 WL 2148221, at *5 (S.D.N.Y. June 13, 2012) (applying Delaware law). "The duty to defend . . . arises when an allegation in the underlying complaint shows a potential for liability." *Bastion*, 2024 WL 5135977, at *5.

Section 4.02 of the Management Agreement imposes a duty upon JKN as the "Licensor" to indemnify and defend VVV against claims arising out JKN's failure to perform under the Management Agreement. Dkt. No. 153-1 § 4.02. The Washington state complaint alleges claims arising out of JKN's inactions with respect to providing FDDs and executing a State Director License Agreement. For example, NW Productions' first and second claims for relief relate to certain alleged unfair and deceptive acts and practices committed by the *franchisor* (here, JKN) under Washington's Franchisor Investment Protection Act, such as refusing to provide NW Productions with a contract and failing to provide franchise disclosure documents. Dkt. No. 153-4 ¶¶ 73–92. Under the Management Agreement, however, VVV was explicitly prohibited, absent agreement from JKN, from entering into any license on behalf of JKN. Dkt. No. 153-1 § 1.03. VVV plausibly alleges that it is being sued on claims arising out of JKN's operation of the Business, and JKN does not appear to contest that any such claim for breach of the duty to defend is ripe.

JKN instead argues that *VVV* owes it a duty to indemnify and defend and that it does not owe VVV such a duty.[10] The Washington action can be read to allege claims against JKN

[10] In support of this argument, JKN also asserts that VVV carries the obligation to indemnify and defend JKN against the Washington complaint because the conduct alleged therein "occurred after the Effective Date of the Management Agreement." Dkt. No. 157 at 15. However, NW Productions' complaint makes at least some factual allegations dating prior to the Management Agreement's Effective Date of July 28, 2023 which would support VVV's claim for breach by

arising out of VVV's breach of its obligations under the Management Agreement. *See, e.g.*, Dkt. No. 153-4 ¶¶ 34, 40–43 (alleging that Rose, on behalf of VVV, "made the belated decision to call" the plaintiff and cancel three state pageants and subsequently issued cease and desist letters in August 2023); *id.* ¶¶ 36, 47 (alleging that VVV's decision to cancel certain pageants was the result of a "discriminatory motive by Laylah Rose and [VVV]" and constitutes a violation of Washington's consumer protection statute). But the obligation to indemnify and defend is not an "either-or" proposition. *See Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 147 (S.D.N.Y. 2004) (under New York law, even if seller had wrongfully declined to defend buyer for all pre-closing third-party claims, "such a breach would not excuse [buyer]'s failure to perform its indemnification obligation" to seller for defense of post-closing third-party claims). There may be claims as to which VVV owes JKN a duty to defend while there also are claims that trigger JKN's obligation to defend VVV. Thus, the fact that VVV may owe JKN a duty to defend does not automatically relieve JKN of its corresponding duty to defend VVV. *Id*.

JKN next argues that it cannot be liable for terminating the Management Agreement without justification and without prior written notice because the Management Agreement does not require an opportunity to cure. But that argument is predicated on the notion that the Management Agreement was properly terminated for casting VVV into disrepute. The Management Agreement generally requires notice and an opportunity to cure before it can be terminated. Section 3.02 of the agreement provides, in relevant part, that "[t]he non-defaulting party may terminate . . . in the event that a party hereto shall be in default of any of the

---

JKN. For example, NW Productions alleges that JKN sent a series of Letters of Intent regarding the 2023 state pageants on November 1, 2022, Dkt. No. 153-4 ¶ 20, which in turn forms part of NW Productions' claim for promissory estoppel on the grounds that NW Productions reasonably relied on the franchisor's repeated promises, assurances, and representations that it would provide it with a franchisee license. *Id.* ¶ 94.

covenants or obligations hereunder or is in violation of any applicable law, which default/violation is not cured within thirty (30) days following the giving of written notice by the non-defaulting party to the defaulting party." Dkt. No. 153-1 § 3.02(a). Section 3.02(b) contains an exception to the requirement of cure. It allows for termination upon thirty (30) days' prior written notice but without opportunity to cure only in certain enumerated circumstances. One of those circumstances is if VVV's improper actions or inactions subject VVV to "public scandal, disrepute, widespread contempt, public ridicule," or similar embarrassments. Dkt. No. 1 ¶ 48(d).

JKN argues that it need not have provided notice because VVV's improper actions subjected VVV to public scandal and disrepute. Dkt. No. 157 at 16. But that is hotly disputed. VVV alleges it did not engage in improper actions and that, as a result, the notice-and-cure period was required—and not given here. FAC ¶¶ 43(a), 90. That dispute cannot be resolved on the pleadings.

If JKN can prove that VVV in fact subjected itself to public scandal, disrepute, and the like, then JKN is likely correct that its termination was not defective for failure to provide notice and opportunity to cure. But that question will have to await discovery; it is a factual issue that is "improper for resolution at the motion to dismiss stage." *Rogers v. Blacksmith Brands, Inc.*, 2011 WL 6293764, at *7 (S.D.N.Y. Dec. 13, 2011); *see also Aperture Net LLC v. Cambium Networks, Inc.,* 2022 WL 605740, at *3 (D. Del. Feb. 1, 2022) (same); *Coach IP Holdings, LLC v. ACS Grp. Acquisition LLC*, 2024 WL 4553923, at *5 (S.D.N.Y. Oct. 22, 2024) ("[F]actual disputes do not render a breach-of-contract claim futile."); *Campbell v. Mark Hotel Sponsor, LLC*, 2010 WL 3466020, at *4 (S.D.N.Y. Sept. 3, 2010) ("[W]here questions exist as to whether a party has performed or breached the agreement . . . dismissal prior to fact discovery is inappropriate.").

When considering a motion to dismiss, "the court is to accept as true all facts alleged [in the counterclaim]." *Cartier Int'l AG v. Motion in Time, Inc.*, 2013 WL 1386975, at *1 (S.D.N.Y. Apr. 5, 2013) (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)); *see also Patel v. Dhaduk*, 839 F. App'x 715, 720 n.6 (3d Cir. 2020) ("In analyzing a 12(b)(6) motion to dismiss, we accept as true the well-pleaded facts of the counterclaim and disregard legal conclusions."). Assuming that termination under Section 3.02(b) was unjustified, as VVV alleges, then JKN would have been obligated to provide notice and an opportunity to cure the alleged defaults. JKN does not contest that it did not do so here. Dkt. No. 157 at 16. VVV's allegations of breach of Section 3.02(a) are thus sufficient to survive Rule 12(b)(6) dismissal.

JKN's remaining arguments are without merit. It briefly notes that "VVV does not allege any adverse action was taken by JKN against VVV within 30 days of the date of" the Termination Letter. Dkt. No. 157 at 16. But this fact alone does not establish that JKN complied with Section 3.02(a)'s notice-and-cure requirement. To the contrary, the Termination Letter describes the Miss Universe Organization's decision to terminate as "final," effectively foreclosing any opportunity for VVV to cure. Dkt. No. 153-3 at 4.

JKN also argues that it should be excused from strict compliance with the notice-and-cure provision of Section 3.02(a) because any attempt by VVV to cure would have been futile. Dkt. No. 157 at 16 & n.4 (citing *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209 (2d Cir. 2014)). But as this Court has stated, "[T]he [futility] exception to the general rule favoring enforcement of notice and cure provisions is a narrow one," and is found "'only in limited circumstances,' which include 'where the non-performing party (1) expressly repudiated the parties' contract or (2) abandons performance thereunder.'" *Spencer-Smith v. Ehrlich*, 2026 WL 305215, at *12 (S.D.N.Y. Feb. 5, 2026) (internal citations omitted); *see also Optical Air*

*Data Sys., LLC v. L-3 Commc'ns Corp.*, 2019 WL 328429, at *4 (Del. Super. Ct. Jan. 23, 2019) (explaining that Delaware courts have established a similar two-part test). VVV plausibly alleges that it neither repudiated nor abandoned the Management Agreement. According to the FAC, it was JKN who prevented VVV from performing after the Termination Letter by granting a ten-year MLA to operate the Pageants to a different entity. FAC ¶ 92. Moreover, as noted above, the Termination Letter seems to leave no room for cure. Dkt. No. 153-3 at 4. If JKN repudiated the Management Agreement, such repudiation would "remove[] any obligation for [VVV] to perform under the agreement, including any obligation to attempt to cure the breach." *Spencer-Smith*, 2026 WL 305215, at *11.

Finally, JKN asserts that VVV has "pleaded itself out of a claim" based on JKN's termination of the Management Agreement by attaching to the FAC the Washington complaint, which references news articles regarding accusations against VVV's CEO—thereby conceding that VVV had, through its own improper actions or inactions, subjected itself to public scandal and ridicule. Dkt. No. 157 at 16. While it is true that courts "need not accept allegations in a complaint that are refuted by documents that are attached to it," *Bailey v. New York L. Sch.*, 2021 WL 5500078, at *5 (2d Cir. Nov. 24, 2021) (summary order), the Washington complaint is not incorporated by reference for the truth of its allegations but for the fact of the claims made therein. *See Lonstein L. Off., P.C. v. Evanston Ins. Co.*, 2022 WL 311391, at *2 n.1 (S.D.N.Y. Feb. 2, 2022) (finding that contents of complaints were "properly before the Court for what they allege but not for their truth" where they were incorporated by reference into the complaint). The Washington complaint accuses VVV of conduct that may cast it into disrepute. But the Management Agreement requires that VVV have engaged in such conduct and not merely that it have been accused of it. *See* Dkt. No. 153-1 § 3.02(b).

Accordingly, accepting the FAC's allegations as true, VVV states a plausible claim for breach of the Management Agreement.

**III. Breach of the Implied Duty of Good Faith and Fair Dealing**

VVV's third count alleges that JKN breached the duty of good faith and fair dealing implied in the Management Agreement and Settlement Agreement by acting with bad motives or intentions in its conduct under the Management Agreement and with deception and evasion. FAC ¶¶ 125–30. VVV alleges that JKN has deprived VVV of the right to receive benefits it bargained for under both the Management Agreement and Settlement Agreement. *Id.* ¶ 131.

JKN argues that the count should be dismissed because it is premised on the same conduct that gives rise to VVV's claims for breach of the Settlement Agreement and the Management Agreement. Dkt. No. 157 at 17.

The Court applies New York law with respect to the claim for breach of the covenant of good faith and fair dealing implied in the Settlement Agreement, and Delaware law with respect to the claim for breach of the covenant of good faith and fair dealing implied in the Management Agreement. *See ARS Kabirwala, LP v. El Paso Kabirwala Cayman Co.*, 2017 WL 3396422, at *3 (S.D.N.Y. Aug. 8, 2017) ("Choice-of-law provisions that govern a contract also govern related claims for breach of the implied covenant of good faith and fair dealing."); *Parisi v. Wipro Ltd.*, 2016 WL 6905987, at *8 (S.D.N.Y. Nov. 23, 2016) (applying Delaware choice-of-law provision in contract to claim for breach of the contract's implied covenant of good faith and fair dealing).

Every contract in New York contains "an implied covenant of good faith and fair dealing." *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, 2026 WL 1502410, at *3 (N.Y. May 28, 2026). The implied covenant carries with it "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the

fruits of the contract." *Id.* (citing *Singh v. City of New York*, 217 N.E.3d 1, 5 (N.Y. 2023)). It "'requires the parties to perform under the contract in a reasonable way.'" *Id.* (quoting *Cordero v. Transamerica Annuity Serv. Co.*, 211 N.E.3d 663, 670 (N.Y. 2023)). When parties "enter into a binding contract under which the[ir] obligations . . . are conditioned on the negotiation of future agreements," the covenant of good faith and fair dealing requires such parties "to negotiate in good faith." *IDT Corp.*, 15 N.E.3d at 331–32.

"Under Delaware law, '[t]he implied covenant [of good faith and fair dealing] is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 123–24 (2d Cir. 2022) (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017)). "The implied covenant 'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.'" *Id.* at 124 (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)). "To sufficiently plead breach of the implied covenant of good faith and fair dealing under Delaware law, a complaint must allege (1) a specific implied contractual obligation, (2) a breach of that obligation by the defendant, and (3) resulting damage to the plaintiff." *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 561 (S.D.N.Y. 2024) (citing *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020)).

The law of both states recognizes that a claim for promissory estoppel may be dismissed where it concerns the same facts or conduct underlying the breach of conduct claim. *See Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair

dealing when a breach of contract claim, based upon the same facts, is also pled."); *Sports Med. Rsch. & Testing Lab'y v. Labware, Inc.*, 2025 WL 315352, at *2 (D. Del. Jan. 28, 2025) ("[A] plaintiff cannot assert an implied covenant claim that parrots the language of the breach claim or is based on 'exactly the same acts' or 'same conduct.'"). However, "a plaintiff can plead a claim for breach of the covenant of good faith and fair dealing where there is a dispute over the existence, scope, or enforceability of the putative contract." *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 627 (S.D.N.Y. 2024) (internal citation omitted); *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) (generally speaking, "a party may plead 'in the alternative' claims seeking recovery under theories of contract or quasi-contract . . . only when there is doubt surrounding the enforceability or the existence of the contract") (internal citation omitted).

VVV argues in the first instance that the implied covenant carried with it an obligation on the part of JKN to refund the advance $1.5 million payment VVV made pursuant to the Term Sheet and that it is disputed whether the Settlement Agreement explicitly contained that obligation. Dkt. No. 158 at 12. That argument is without merit. The Management Agreement and the Settlement Agreement both displaced the Term Sheet. Each of them had integration clauses. Dkt. No. 153-1 § 4.08, Dkt. No. 153-2 § 13. *See Vogt v. DG Fastchannel, Inc.*, 2010 WL 11571117, at *3 (S.D.N.Y. Nov. 9, 2010) ("'New York law gives full effect to . . . integration clauses' providing that a contract 'supersedes all prior agreements.'") (internal citation omitted); *Park7 Student Hous., LLC v. PR III/Park7 SH Holdings, LLC*, 340 A.3d 614, 618–19 (Del. Ch. 2025) ("A contract with an integration clause supersedes the terms of any prior agreement covering the same subject matter."). Thus, whatever obligations JKN owed VVV under the Term Sheet did not survive the execution of the Management Agreement and the

Settlement Agreement. *See A & E Television Networks, LLC v. Pivot Point Ent., LLC*, 2013 WL 1245453, at *10 (S.D.N.Y. Mar. 27, 2013) (New York law); *CreditSights, Inc. v. Ciasullo*, 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29, 2007) (New York law); *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *4 (Del. Ch. 2018) (Delaware law); *see also AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 708 F. Supp. 3d 385, 402 (S.D.N.Y. 2023) (discussing legal principles).

The limited, but important, function of the covenant of good faith and fair dealing is to ensure that a party to an agreement does not take action that would make one of its obligations under that agreement illusory. *See S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021) (courts will apply covenant where it is "necessary to preserve the fruits of the contract and prevent it from being illusory"); *Chamison v. HealthTrust--Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000) (implied covenant is "designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain"). It is a gap-filler intended to make a contract effective. But VVV has not alleged facts that would support that JKN had an obligation to refund the $1.5 million VVV previously paid it to make either the Management Agreement or the Settlement Agreement effective. The Management Agreement appears to be complete in and of itself. JKN is obligated to collect and remit license fees to VVV, VVV is required to manage the Pageants, VVV has to pay a licensing fee and enjoys the profits from the Pageant, and the term of the Agreement ends either after the 2025 Stage Pageants or after the parties have executed a MLA. VVV has not alleged how failure to refund the $1.5 million deposit fee would be necessary to avoid making any of JKN's obligations illusory. And while the Settlement Agreement refers to the deposit, it does so only in the recitals as a way of identifying the MLA that the parties were required to

cooperate to finalize. If JKN failed to comply with that obligation, VVV may be entitled to relief in the form of damages. But the Counterclaim does not explain why, assuming JKN has discharged its duty to cooperate and finalize the MLA but the MLA for some reason is not finalized, JKN would nonetheless be obligated to refund the $1.5 million.

At the same time, however, other allegations in VVV's Counterclaim could support a finding of a breach of the implied covenant. VVV alleges that JKN breached its obligation to negotiate in good faith towards the execution of a MLA. JKN, however, disputes that such an obligation can be found in either the Management Agreement or the Settlement Agreement. Dkt. No. 157 at 8–10. However, it is at least plausible that if an agreement to negotiate in good faith was not express in the Management Agreement, it was implicit in the notion that the term of the agreement would be based on whether the parties reached an MLA. *See IDT Corp.*, 918 N.E.2d at 916–17. And, at this stage, JKN cannot be heard both to argue that the Settlement Agreement did not obligate it to negotiate a MLA in good faith and that such an obligation cannot be implied in the Settlement Agreement because it was covered by such agreement.

Accordingly, recognizing that VVV will not be allowed double recovery on both a breach of contract theory and a covenant of good faith and fair dealing theory, VVV's claim for breach of the covenant of good faith and fair dealing survives JKN's motion to dismiss.

## IV. Promissory Estoppel

VVV's fourth count alleges a claim for promissory estoppel. VVV alleges that JKN made clear and unambiguous promises to VVV, including a promise to grant VVV a twelve-year license agreement, that VVV relied on those promises by, in part, agreeing to the $1.5 million deposit, the payment of the additional annual $375,000 installments, the payment of costs and

expenses of the business, and the release of claims against JKN, and that VVV suffered injury and damages as a result of that reliance. FAC ¶¶ 135–38.[11]

To state a claim for promissory estoppel under New York law,[12] the plaintiff must allege "'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'" *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78 (2d Cir. 1984) (quoting *Ripple's of Clearview, Inc. v. Le Havre Associates*, 452 N.Y.S.2d 447, 449 (2d Dep't 1982) (citation omitted)).

JKN argues that VVV cannot assert a claim for promissory estoppel because that claim is based on the same allegations that support VVV's claim for breach of contract. "Promissory estoppel . . . is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason." *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 342–43 (S.D.N.Y. 2023) (quoting *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 361 (S.D.N.Y. 2017)). It offers a remedy where a clear and unambiguous promise has been made and the recipient of the promise has changed its position in reliance thereon, but no consideration has been exchanged. *Frio Energy Partners, LLC*, 680 F. Supp. 3d at 342. "The existence of a valid and enforceable written contract governing a particular subject matter thus ordinarily precludes

---

[11] VVV also alleges that it undertook additional debt to keep the business running and that its owner and her spouse agreed to a personal guaranty. *Id.* ¶ 137(d), (f).

[12] "Under New York law, where '[t]he parties' briefs assume' that a certain body of law controls, 'such implied consent is sufficient to establish choice of law.'" *Smart Recovery Techs. LLC v. Supplies Plus MI LLC*, 2026 WL 787788, at *14 (S.D.N.Y. Mar. 20, 2026) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). Here, both parties brief the question of promissory estoppel and unjust enrichment under New York law, *see* Dkt. No. 157 at 17–20, Dkt. No. 158 at 15–17, so the Court will apply New York law in deciding JKN's motion to dismiss both of these quasi-contract claims.

recovery in quasi contract for events arising out of the same subject matter." *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 214 (S.D.N.Y. 2021) (quoting *Dart Brokerage Corp. v. Am. Com. Ins. Co.*, 2013 WL 5966901, at *2 (S.D.N.Y. Nov. 7, 2013)). Where the promise is embodied in a contract, the injured party is entitled to the remedies provided by the law of contract (and the covenant of good faith and fair dealing contained therein) and cannot resort to promissory estoppel to supplement or complement that relief.

VVV argues that it has properly pleaded breach of contract and promissory estoppel in the alternative[13] because of JKN's argument that the agreements with respect to the MLA are not enforceable. Dkt. No. 158 at 16; *see Mancuso v. L'Oreal USA, Inc.*, 2021 WL 1240328, at *4 (S.D.N.Y. Apr. 2, 2021) ("An exception" to the general rule that a contract governing the same subject matter precludes a cause of action in promissory estoppel "exists where 'a bona fide dispute exists as to the existence of the contract,' in which case 'a plaintiff may proceed on both breach of contract and quasi-contract theories' in the alternative.") (quoting *Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*, 2020 WL 5820599, at *35 (E.D.N.Y. Sept. 30, 2020)).

VVV does not plead, however, that JKN made any clear or unambiguous statements upon which it relied other than the promises it made in the Term Sheet, the Management Agreement, and the Settlement Agreement to grant VVV a twelve-year license agreement to operate the Pageants.[14] *See, e.g.*, Dkt. No. 153-2 § 3.01 (providing that the Management Agreement's term

[13] Though the Counterclaim does not expressly plead promissory estoppel or unjust enrichment in the alternative, "Federal Rule of Civil Procedure 8(d) 'offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as [courts] must do in' in a motion to dismiss posture." *Birner v. Kensington Vanguard Holdings, LLC*, 2025 WL 963311, at *4 (S.D.N.Y. Mar. 31, 2025) (internal citation omitted).

[14] Though not explicitly plead within Count IV, VVV's claim for promissory estoppel could be read to also include representations from JVN officials, such as then-CEO Jakkaphong "Anne" Jakrajutatip's text to Rose indicating that a 12-year MLA may be coming shortly after further

shall continue until "the earlier of the day after the 2025 State-Level Pageants or all required regulatory approvals have been obtained . . . at which time the parties ***shall*** execute a definitive License Agreement . . .") (emphasis added). The Term Sheet, however, was replaced by the Management Agreement and the Settlement Agreement and there is no dispute that such agreements are enforceable. It follows that VVV's claim that JKN failed to fulfill its purported promise to grant VVV a license agreement must be measured by the standards set forth in the latter two agreements (including the incorporation by reference into the Settlement Agreement of the term in the Term Sheet) and that VVV's relief for any failure to live up to its promise lies in contract and not in promissory estoppel.

Because VVV's claim for promissory estoppel as plead "is based on promises that are consistent with the undertakings contained in the contract," *Four Finger Art Factory, Inc. v. Dinicola*, 2000 WL 145466, at *8 (S.D.N.Y. Feb. 9, 2000), it must be dismissed.

**V. Unjust Enrichment**

VVV's fifth count asserts a claim for unjust enrichment. FAC ¶¶ 139–44. VVV alleges that JKN has been unjustly enriched at VVV's expense by VVV's payment of the $1.5 million deposit and its payment of two $375,000 installment payments and by VVV's injection of $4.16 million of additional funds into the Pageants and Miss USA organization (plus debts and expenses of the Pageants), and that it would be against equity and good conscience for JKN to retain those amounts. *Id.*

To prevail on a claim for unjust enrichment in New York, a plaintiff must establish: "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant[ ] to make restitution." *Intell. Cap.*

"internal talk". FAC ¶ 71. But, even assuming that could be construed as a clear promise, VVV does not plead that it took any action in reliance thereon. *See id.* ¶ 137 (alleging acts of reliance).

*Partner v. Institutional Credit Partners LLC*, 2009 WL 1974392, at *8 (S.D.N.Y. July 8, 2009). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (quoting *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004)).

As with claims for promissory estoppel, "it is black letter law that '[w]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.'" *Frio Energy Partners, LLC*, 680 F. Supp. 3d at 337–38 (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009)); *see also Corsello*, 967 N.E.2d at 1185 ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."); Restatement (Third) of Restitution and Unjust Enrichment § 2(2) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."). However, "[a] plaintiff may plead an unjust enrichment claim in the alternative 'where there is a dispute over the existence, scope, or enforceability of the putative contract.'" *Yodice v. Touro Coll. & Univ. Sys.*, 2024 WL 3466546, at *3 (2d Cir. July 19, 2024) (summary order) (quoting *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999)).

Though VVV alleges that the Term Sheet did originally give VVV the right for the deposit to be refunded, FAC ¶ 28, the parties' subsequent contracting history defeats VVV's claim that JKN was unjustly enriched. The Settlement Agreement can be reasonably construed to carry forward the terms of the MLA as set forth in the Term Sheet, including the fact of VVV's $1.5 million deposit and installments. *See* Dkt. No. 153-2, Recital A. But any deposit

refund right in the Term Sheet was extinguished once the parties signed the Management and Settlement Agreements.[15] In exchange for being relieved of its obligation to refund the $1.5 million deposit, JKN assumed the obligations in the Management and Settlement Agreements, including the obligations to collect and remit the license fees and, as alleged by VVV, the duty to negotiate in good faith towards the execution of the final MLA. Dkt. No. 153-2 §§ 3, 5. The Court cannot second-guess the value of that consideration. "Where a party did receive the 'benefit of [the] bargain,' they cannot have a viable unjust enrichment claim." *Basso v. New York Univ.*, 2017 WL 1019505, at *6 (S.D.N.Y. Feb. 24, 2017) (citing *One Step Up, Ltd. v. Webster Bus. Credit Corp.*, 925 N.Y.S. 2d 61, 70 (1st Dep't 2011)).

As for VVV's additional claims regarding its injection of $4.16 million in additional funds into the Pageants, VVV does not dispute that a valid contract exists between itself and JKN regarding such payments and the settlement of additional debts and expenses it incurred while operating the 2023 and 2024 Pageants. The Management Agreement, for example, stated that VVV as Manager "shall bear and pay when due all expenses of the Business," Dkt. No. 153-1 § 1.02, and that JKN as Licensor "shall collect all license fees owed by the Licensees under the License Agreements" which were then "intended to cover . . . all expenses of operating the Business," *id.* §§ 2.01, 2.02. When JKN allegedly failed to fulfill that obligation, the parties resolved their disputes over payments, among other issues, by executing the Settlement Agreement. For example, the parties agreed that JKN would pay all amounts owed to VVV for the 2023 Pageants and that JKN would "cause the State Directors to pay the license fees for the 2024 Miss USA and Miss Teen USA pageants directly to VVV." Dkt. No. 153-2 § 5(a), (b). It

[15] As discussed *supra*, the integration clauses in both the Management and Settlement Agreements further undercut VVV's quasi-contract claims.

may be that the investment by VVV in the Pageants further supports its claim that, as part of the Settlement Agreement, VVV obtained an enforceable right against JKN to finalize and execute the MLA. But if so, then VVV's avenue for relief lies, as discussed with respect to Count II, in a claim for breach of the Settlement Agreement. It also may be that as VVV alleges, JKN still did not uphold its end of the bargain, forcing VVV to "largely self-finance" the 2024 Pageants. FAC ¶ 63. But again, any claim that VVV has to recover would be based on the Settlement Agreement, then, which expressly covers the dispute and thus in the law of contract—and not by implying an obligation under the law of quasi-contract that would displace the parties' private ordering.

Because VVV's unjust enrichment claim is duplicative of its breach of contract claims, it is dismissed.

## VI. Florida Deceptive and Unfair Trade Practices Act

In Count VIII,[16] VVV alleges that JKN engaged in deceptive and unfair practices in inducing VVV to enter into the Management Agreement and Settlement Agreement, in particular by making "false and hollow promises that it would execute a twelve-year MLA with VVV once regulatory approvals were secured," by accepting and retaining the $1.5 million deposit and $375,000 annual license fee despite never executing a final license agreement, and in misrepresenting to VVV the known required total investment for the subject franchise." FAC ¶¶ 145–62. JKN argues that VVV's claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") fails because VVV neglects to allege that any purportedly deceptive conduct occurred in Florida. Dkt. No. 157 at 20.

[16] The parties' briefs do not raise the choice-of-law provisions in the Management and Settlement Agreements and assume that Florida law controls, so the Court will apply Florida law in deciding JKN's motion to dismiss the FDUTPA claim. *Smart Recovery Techs.*, 2026 WL 787788, at *14.

"The case law regarding FDUTPA's geographical reach is somewhat unclear and mostly focuses on whether out-of-state consumers can pursue a FDUTPA claim." *Buckley v. Moore*, 2021 WL 3173185, at *8–9 (S.D. Fla. July 26, 2021) (citing *Bank of Am., N.A. v. Zaskey*, 2016 WL 2897410, at *9 (S.D. Fla. May 18, 2016)). Courts agree, however, that the FDUTPA "does not limit its protection to acts occurring exclusively in Florida." *Eli Lilly & Co. v. Tyco Integrated Sec., LLC.*, 2015 WL 11251732, at *4 (S.D. Fla. Feb. 10, 2015). Florida-based consumers can successfully assert FDUTPA claims against out-of-state defendants where they plausibly allege conduct occurring outside of Florida that is directed at, and impacts, Florida consumers. *See, e.g.*, *Buckley*, 2021 WL 3173185, at *9 (allegations that out-of-state conduct, including a demand for payment, was directed to plaintiff in Florida and that Florida consumers were misled considered "sufficient to establish a relationship to Florida for purposes of asserting a FDUTPA claim"); *Zarfati v. Artsana USA, Inc.*, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025) (denying motion to dismiss where "the allegedly deceptive acts and unfair practices" of a baby stroller company, though not a Florida corporation, "were at a minimum aimed at consumers in Florida"); *Wyndham Vacation Ownership, Inc. v. Sussman*, 2021 WL 4949162, at *6 (M.D. Fla. Sept. 27, 2021) (denying summary judgment on FDUTPA claim for lawyer defendant on issue of whether conduct occurred outside of Florida where co-defendants "solicited clients from around the country, including several relevant owners in Florida" and lawyer defendant sent demand letters to plaintiff in Florida).

FDUTPA claims will typically fail where consumers do not make such allegations. *See, e.g.*, *Hakim-Daccach v. Knauf Int'l GmbH*, 2017 WL 5634629, at *7 (S.D. Fla. Nov. 22, 2017) (dismissing FDUTPA claim where plaintiff alleged improper acts that were only "indirectly associated with bank accounts in Miami"); *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d

570, 606 (S.D.N.Y. 2022) (dismissing FDUTPA claim where "SAC allege[d] that all relevant conduct occurred either at Mediant's headquarters in New York or at Donnelley's headquarters in Illinois" and rejecting plaintiff's argument that "it is enough that the conduct generated a sufficient relationship with Florida by injuring Florida investors" like himself).

Here, VVV plausibly alleges that "JKN engaged in deceptive conduct *in Florida* because it directed deceptive communications to VVV in Florida." Dkt. No. 158 at 21. Those communications could conceivably include, for example, JKN's alleged misrepresentations to VVV regarding "the known required total investment for the subject franchise." FAC ¶ 156. Moreover, JKN does not contest that VVV, as a Florida resident, alleges that it has been injured in Florida as a result of JKN's unfair and deceptive trade practices.

Accordingly, JKN's arguments are not sufficient to defeat VVV's FDUTPA claim at this stage.

**VII. Fraudulent Inducement**

VVV's ninth count purports to state a claim for fraudulent inducement. FAC ¶¶ 163–80. VVV alleges that JKN represented that it intended to grant VVV a twelve-year MLA to operate the Pageants and agreed to abide by the Rules of Engagement that were an exhibit to the Settlement Agreement, and that VVV relied on those representations in agreeing to enter into the Settlement Agreement. *Id.*

JKN primarily argues that VVV's fraudulent inducement claim fails to satisfy Rule 9(b) because "VVV does not allege *who* at JKN made any statements to VVV, *what* specifically was said, *how* the statements were made, *how* the statements were false, *when* or *where* the alleged misrepresentations were made, or *to whom*." Dkt. No. 157 at 22.

To state a claim for fraudulent inducement, the party must allege: "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable

reliance on the misrepresentation by appellants; and (iv) resulting damages." *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011)); *see also Xeriant, Inc. v. XTI Aircraft Co.*, 762 F. Supp. 3d 345, 353 (S.D.N.Y. 2025). As discussed *supra*, a claim for fraud is also subject to the particularity requirements of Federal Rule of Civil Procedure 9(b). *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

"[A]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006); *see also N.Y.U. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 769 (N.Y. 1995) ("General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the claim."). Courts will dismiss claims for fraudulent inducement where parties simply "repurpose[ ] the allegations underlying their breach of contract claim to allege a fraudulent inducement claim." *Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Ins. Co.*, 2025 WL 1797219, at *7 (S.D.N.Y. June 26, 2025); *see also AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 330–31 (S.D.N.Y. 2024) ("At bottom, Atos's fraudulent inducement claim amounts to no more than a claim that AT&T never intended to perform the contract according to its terms and therefore does not establish claims for fraudulent inducement or concealment.").

Here, VVV attempts to recast a breach of contract claim as one for fraud. VVV contends that JKN "represented that it intended to grant VVV a twelve-year MLA to operate the Pageants" and that it "intended to abide by the Rules of Engagement" to be exhibited to the Settlement Agreement, FAC ¶¶ 165–66, but these purportedly false promises are no different from VVV's breach of fraud claims. *See, e.g.*, FAC ¶¶ 98(b), 113(c), (f)–(h). Nor can such allegations satisfy the heightened pleading standard of Rule 9(b) without a more detailed showing as to the content

of the alleged misrepresentation, the identity of its speaker, when it was made and to whom, and the like.

Moreover, the parties explicitly agreed that "in entering into this Settlement Agreement, they are relying upon their own judgment, belief, and knowledge as to all phases of any claims and further acknowledge that no promise, inducement or agreement or any representations and warranties not expressed herein have been made to procure their agreement hereto." Dkt. No. 153-2 § 15. The existence of such a merger clause is not necessarily dispositive of VVV's fraudulent inducement claim. *See, e.g.*, *Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *6 (S.D.N.Y. Apr. 21, 2004) ("Under New York law, a general merger clause precludes neither an action for fraud in the inducement nor parol evidence concerning fraudulent representations."); *DiFillippo v. Hidden Ponds Assocs.*, 537 N.Y.S.2d 222, 223 (2d Dep't 1989) ("It is well settled that a general merger clause is ineffective to exclude parol evidence of fraud in the inducement."). However, VVV does not plead any facts predating the execution of the Settlement Agreement which suggest that JKN made any representations to it besides what is contained in the Settlement Agreement. *See Great Am. Ins. Co. v. Gemstone Prop. Mgmt. LLC*, 2025 WL 2196886, at *14 (S.D.N.Y. Aug. 1, 2025). Nor has it alleged facts to support that at the time of contract execution, JKN did not intend to honor the agreement it reached. *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016) ("[A] contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution.").

VVV's fraudulent inducement claim must therefore be dismissed.

**VIII. Indemnification and Defense**

VVV's tenth claim alleges that JKN has breached its contractual duty to indemnify and defend VVV against NW Productions' Washington state action under Section 4.02 of the

Management Agreement and Section 6 of the Settlement Agreement. FAC ¶¶ 184, 194. JKN mounts the same ripeness arguments in support of dismissal that the Court has already addressed with respect to VVV's breach of contract claims, asserting that VVV fails to state a claim because "VVV does not allege that the Washington litigation concluded, that VVV has been found liable, or that VVV has paid any fixed sum as a result." Dkt. No. 157 at 24.

For the reasons stated *supra*, VVV's claim for breach of the Management Agreement's indemnification and defense provisions survives dismissal. For similar reasons, VVV's indemnification and defense claim based on Section 6 of the Settlement Agreement also survives the motion to dismiss.

Section 6(a) of the Settlement Agreement, which is governed by New York law, provides that "JKN will defend, indemnify, and hold harmless VVV . . . for any claims, actions or inquiries brought or initiated by any State Director . . . arising out of any action or inaction by JKN between August 1, 2023 and the date the relevant State Director signs the new State Director License Agreement for the 2024 pageants relating to or arising out (a) the Master License Agreement, (b) Management Agreement, (c) any State Director License Agreement, (d) any related franchise disclosure documents and state registrations, and/or (e) the lack of compliance with applicable law or regulations." Dkt. No. 153-2 § 6. Certain allegations in NW Productions' Washington complaint fall squarely within Section 6's terms. NW Productions, as a former State Director, alleges violations of Washington franchise law and other claims arising from the franchisee licensing process in 2023 and 2024. *See generally* Dkt. No. 153-4.

Under New York law as under Delaware law, "a cause of action for contractual indemnification 'does not arise until liability is incurred by way of actual payment' to a third party." *Lehman XS Trust, Series 2006-GP2 v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116,

126 (2d Cir. 2019) (quoting *Varo, Inc. v. Alvis PLC*, 691 N.Y.S.2d 51, 55 (1st Dep't 1999)). "New York law distinguishes between the duty to indemnify and the duty to defend." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 76–77 (2d Cir. 2013). In the insurance context, where regulation limits the freedom of contract, "the duty to defend is exceedingly broad," as a matter of law, and "an insurer will be called upon to provide a defense whenever the allegations of the complaint suggest . . . a reasonable possibility of coverage." *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006) (internal citations and quotations omitted). However, the "'breadth of a non-insurer's contractual defense obligations is defined solely by the terms of the contract, strictly construed.'" *Catlin Ins. Co. v. Champ Constr. Co.*, 2025 WL 2494291, at *7 (S.D.N.Y. Aug. 29, 2025) (quoting *Dresser-Rand Co. v. Ingersoll Rand Co.*, 2015 WL 4254033, at *7 (S.D.N.Y. July 14, 2015)).

Here, VVV plausibly alleges that it has expended attorneys' fees in connection with the Washington action. FAC ¶ 191. Moreover, JKN agreed in the Settlement Agreement to defend VVV against any claims brought by State Directors arising out of JKN's actions or inactions relating to the franchise disclosure documents, triggering its duty to defend once the Washington action was brought. *See McCleary v. City of Glens Falls*, 819 N.Y.S.2d 607, 612 (3d Dep't 2006) ("[T]he fact that the County was not held liable did not vitiate the Club's duty to defend the County in connection with the third-party action . . . Inasmuch as the Club agreed to defend the County against any claims arising from the Club's 'activities, conduct, omissions, non[ ]feasance or misfeasance' in developing and maintaining the trails under license from the City, the third-party complaint alleging that the County failed to properly monitor the trail system triggered the Club's duty to defend.").[17]

[17] In *Dresser-Rand*, 2015 WL 4254033, at *8, where the parties had reciprocal indemnification

VVV's allegations are therefore sufficient to state a claim for indemnification and defense arising from the Settlement Agreement.

## IX. Florida Franchise Misrepresentation Act

VVV's eleventh count alleges that JKN failed to provide VVV with full and accurate information in violation of the Florida Franchise Misrepresentation Act, Fla. Stat. § 817.416, including by "omitting information about the total investment VVV would be required to make for JKN to execute the final franchise agreement, and by misrepresenting that JKN would return VVV's license fee payments if the final franchise agreement were not executed." FAC ¶ 203. JKN's motion to dismiss focuses only on the Management Agreement's choice-of-law provision. It counters that VVV's claim must be dismissed because the Management Agreement is governed by Delaware law, and this choice-of-law provision renders Florida franchise law inapplicable. Dkt. No. 157 at 24–25.

The Florida Franchise Misrepresentation Act applies to misrepresentations made "when selling or establishing a franchise or distributorship." Fla. Stat. § 817.416(2)(a); *see also* FAC

---

duties that "flow both ways . . . depending on the circumstances and the claims at issue," the court held that a declaratory judgment action was not ripe for adjudication because "determination of the scope of both obligations [wa]s contingent upon the determination of whether Dresser–Rand's post-Closing acts or omissions are responsible for Yara Belle's losses." But the Court's jurisdiction under the Declaratory Judgment Act is discretionary. *See Harco Nat'l Ins. Co. v. Wayfarer Studios LLC*, 2026 WL 2032053, at *4 (S.D.N.Y. July 14, 2026). "[T]he fact that the court may have to address a merits question [to determine contractual indemnification] does not make the lawsuit unripe. It may just mean that, as a matter of prudence, decision is best deferred until the underlying case is also decided." *Catlin Ins. Co.*, 2025 WL 2494291, at *7 (internal citations omitted). *Dresser-Rand* thus is best understood in that context and not to state a more general proposition as to when a claim arises. VVV's claim here accrued when it expended sums on the Washington lawsuit. That its entitlement to indemnification might turn on facts developed in that lawsuit might suggest delay or coordination. But it would not delay accrual (or the corresponding running of the statute of limitations).

¶ 196 (alleging that "[a]t all relevant times, JKN was engaged in the offer of franchises . . . to persons in the State of Florida").

The choice-of-law provision in the Management Agreement provides that the Agreement "shall be construed in accordance with the laws of the State of Delaware, without regarding to its conflict of laws principles," and that "[a]ny legal action (including judicial and administrative proceedings) with respect to any matter arising under or growing out of this Agreement, shall be brought in a court of competent jurisdiction in the City and County of New York, New York." Dkt. No. 153-1 § 4.06. By its plain terms, then, the Agreement provides only that the Management Agreement's terms are to be construed in accordance with Delaware law; it does not provide that all disputes arising out of the relation between the parties are to be decided in accordance with Delaware law. *See Lively v. Wayfarer Studios LLC*, 2025 WL 2884407, at *6 (S.D.N.Y. Oct. 9, 2025) ("'New York courts typically apply the law selected in contractual choice-of-law clauses only to causes of action sounding in contract unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties.'") (quoting *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 1997207, at *16 (S.D.N.Y. June 6, 2022)).

VVV's claim under the Florida Franchise Misrepresentation Act does not assert a breach of contract and does not relate to the construction of the Management Agreement, but relates instead to alleged misrepresentations made "[i]n connection with the offer of this franchise" which may constitute statutory violations under Florida law. FAC ¶ 201; *see also Maltz v. Union Carbide Chemicals & Plastics Co.*, 992 F. Supp. 286, 315 n.34 (S.D.N.Y. 1998) ("[T]he Second Circuit has explicitly rejected the argument . . . that a choice of law provision in a franchise agreement precludes statutory claims arising under the laws of states other than the state chosen

by the parties to govern their contract disputes.") (citing *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 612 (2d Cir. 1996)). The choice-of-law provision in the Management Agreement thus does not defeat VVV's claim for violation of the Florida Franchise Misrepresentation Act.

Accordingly, VVV plausibly alleges a violation of the Florida Franchise Misrepresentation Act by JKN.

**X. New York Franchise Sales Act**

VVV's twelfth and final claim alleges that "JKN offered a franchise to VVV and solicited, accepted, and retained . . . a $1,500,000 deposit and a $375,000 annual license fee payment, without registering the offering with the New York Attorney General and/or without providing VVV with a franchise disclosure prospectus" in violation of the New York Franchise Sales Act, N.Y. Gen. Bus. Law § 681(3). FAC ¶ 212.

JKN argues that VVV's Counterclaim does not allege any facts to suggest that the offer or acceptance of the Management Agreement, or any other contract between the parties, occurred in New York. Dkt. No. 157 at 25.

"By its terms, the NYFSA applies only when a person offers to sell or sells a franchise in the State of New York." *JM Vidal, Inc. v. Texdis USA, Inc.*, 764 F. Supp. 2d 599, 616 (S.D.N.Y. 2011) (citing N.Y. Gen. Bus. Law § 683(1)). The NYFSA is therefore "applicable only to specific transactions solicited or accepted in New York, or affecting New York." *Id.* (citing *Century Pac.*, 2004 WL 868211, at *5). It is not enough that the franchisor be located in New York. *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 847 (9th Cir. 1992) (fact that offeror was a New York corporation was "irrelevant" and only finding that the NYFSA applied because franchise agreement contained a choice-of-law provision providing that franchise was "deemed" to have been made in New York). "The New York statute cannot have any effect whatsoever on the

nationwide marketing of franchises if the franchisor elects to conduct his activities outside of this State and with non-residents." *Mon-Shore Mgmt., Inc. v. Family Media, Inc.*, 584 F. Supp. 186, 191 (S.D.N.Y. 1984).

VVV points to the fact that "JKN's headquarters and principal place of business is in New York" and argues that the cases cited by JKN are inapposite because "neither the franchisors nor the franchisee . . . had places of business in New York." Dkt. No. 158 at 25. But it is not enough that JKN have a place of business in New York. A franchisor doing business in all 50 states might choose to locate its headquarters in New York but to conduct all of its franchising business and make all of its franchising offers from a division located elsewhere. The statute requires that the offer to sell or the sale of the franchise occur in New York, including if the offer originated from New York or was directed to New York and "received at the place to which it is directed," or where the "acceptance is communicated to the offeror" in New York. NYFSA § 681(12); *see also A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 2011 WL 4102084, at *6 (D. Md. Sept. 13, 2011) (finding that, for purposes of NYFSA claim, defendant's offer to sell franchise originated from New York where defendant's offering circular and final agreement was mailed from defendant's office in New York to plaintiff in Maryland).

VVV has not alleged as much. Its Counterclaim only contains bare-bones allegations that "[t]he acts, transactions, and practices described herein occurred in and involved the State of New York," FAC ¶ 211, and that "JKN's repeated offers of the Miss USA franchise to VVV originated" from New York, Dkt. No. 158 at 25. It does not allege the state in which JKN's franchising business was located, the place from which any franchising offers were extended, the location to which payments were to be made or communications were to be sent, or any other facts that would establish that an offer or sale was made in New York. Indeed, the agreements

which are alleged to constitute the offer do not even contain a notice address for JKN. Without any supporting facts whatsoever, VVV has not stated a claim for relief under the NYFSA. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Seabrook v. City of New York*, 509 F. Supp. 2d 393, 406 (S.D.N.Y. 2007) ("conclusory allegations, merely tracking statutory language, are insufficient to survive a motion to dismiss").

**CONCLUSION**

JKN's motion to dismiss is GRANTED IN PART and DENIED IN PART. VVV's claims for promissory estoppel, unjust enrichment, fraudulent inducement, and violation of the New York Franchise Sales Act are dismissed without prejudice to VVV filing a second Amended Counterclaim within 21 days consistent with this opinion.

The motions of Legacy, Cantú, BDE, Thom Brodeur, and JKN at Dkt. Nos. 136, 138, and 140 are DENIED as moot.

The Clerk of Court is respectfully directed to close Dkt. Nos. 136, 138, 140, and 156.

SO ORDERED.

Dated: July 20, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge